1   COOLEY LLP
    MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
2   JEFFREY M. GUTKIN (216083) (jgutkin@cooley.com)
    KYLE C. WONG (224021) (kwong@cooley.com)
3   101 California Street, 5th Floor
    San Francisco, CA 94111-5800
4   Telephone:    (415) 693-2000
    Facsimile:    (415) 693-2222
5
    Attorneys for Defendant
6   GOOGLE INC.

7

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12

13   FREE RANGE CONTENT, INC.                    Case No.  5:14-cv-02329-BLF

14              Plaintiff,                        **DEFENDANT GOOGLE INC.'S MOTION TO
                                                  DISMISS CLASS ACTION COMPLAINT**
15         v.
                                                  **F.R.C.P. 12(b)(6)**
16   GOOGLE INC.,
                                                  Date:         December 11, 2014
17              Defendant.                        Time:         9:00 a.m.
                                                  Courtroom:    3
18                                                Judge:        Hon. Beth Labson Freeman
                                                  Trial Date:   Not Yet Set
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS .................................................................. 1

STATEMENT OF RELIEF SOUGHT ..................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 2

I.      INTRODUCTION ................................................................................................ 2

II.     STATEMENT OF FACTS ...................................................................................... 3

    A.      Google's AdSense service provides website publishers with a free way to make money from advertisements placed on their sites.......................................... 3

    B.      Publisher's compliance with the AdSense terms of service is critical to protect the integrity of the AdSense ecosystem ....................................................... 4

    C.      Plaintiff ran a business that showed AdSense ads on third-party websites............ 6

    D.      The AdSense Terms govern the rights and obligations of Google and Plaintiff................................................................................................................ 7

        1.      Terms Regarding Invalid Clicks ..................................................... 7

        2.      Terms Regarding Policy Violations (Content and Format Restrictions) ................................................................................. 8

        3.      Terms Regarding Termination For Click Fraud and Policy Violations. .................................................................................... 9

    E.      In early 2014, Free Range's AdSense ads were deluged by invalid activity, triggering its termination as an AdSense publisher................................................. 9

    F.      Free Range sued Google. ................................................................................. 10

III.    APPLICABLE STANDARDS ............................................................................... 11

IV.     ARGUMENT .................................................................................................... 11

    A.      Plaintiff fails to state a claim for breach of contract (Count I). ........................... 11

        1.      Plaintiff's own allegations show its breach of the AdSense Terms. ......... 11

        2.      Terms that Plaintiff does not mention, much less challenge, preclude a finding that Google breached or that Plaintiff has damages. .................................................................................. 12

        3.      The TOS terms that Plaintiff does challenge are neither unconscionable nor an impermissible liquidated damages provision ....... 14

            a.      The AdSense Terms are not unconscionable as a matter of law ......................................................................................... 14

                (1)      Plaintiff cannot establish procedural unconscionability. ................................................ 14

                (2)      Substantive unconscionability is also absent here. ........... 17

            b.      Prohibitions against liquidated damages do not apply here.......... 19

                (1)      There is no liquidated damages provision in the Terms ........................................................................ 19

**TABLE OF CONTENTS**
**(continued)**

                                                                                        **Page**

        (2)    Even if the challenged provision were a liquidated damages provision, it would be enforceable. ................... 20

B.    The AdSense Terms preclude Plaintiff's claim for breach of the Implied Covenant of Good Faith and Fair Dealing (Count II). ......................................... 21

C.    Plaintiff fails to state a claim for unjust enrichment (Count III) .......................... 22

D.    Plaintiff fails to state a claim under the UCL (Count IV) ................................... 23

    1.    The UCL does not apply to business-to-business contracts ..................... 23

    2.    The facts alleged state no claim under the UCL's unlawful prong ........... 24

    3.    Plaintiff alleges no facts stating a claim under the UCL's unfair prong ................................................................................................... 24

E.    Plaintiff fails to state a claim for declaratory relief (Counts V and VI) ............... 25

V.    CONCLUSION ................................................................................................................. 25

Cooley LLP
Attorneys At Law
San Francisco

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ABI, Inc. v. City of L.A.*,
  153 Cal. App. 3d 669 (1984)................................................................................20

*Am. Software, Inc. v. Ali*,
  46 Cal. App. 4th 1386 (1996) .........................................................................15, 18

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
  24 Cal. 4th 83 (2000) ........................................................................................14

*Avila v. Countrywide Home Loans*,
  No. 10-cv-5485, 2010 WL 5071714 (N.D. Cal. Dec. 7, 2010)........................21, 24

*Bardin v. DaimlerChrysler Corp.*,
  136 Cal. App. 4th 1255 (2006) .............................................................................25

*Beasley v. Wells Fargo Bank*,
  235 Cal. App. 3d 1383 (1991)...............................................................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................11

*Belton v. Comcast Cable Holdings, LLC*,
  151 Cal. App. 4th 1224 (2007) ...............................................................14, 17, 25

*Berenblat v. Apple, Inc.*,
  No. 08-cv-4969, 2010 WL 1460297 (N.D. Cal. Apr. 9, 2010)..............................17

*Bionghi v. Metro. Water Dist. of S. Cal.*,
  70 Cal. App. 4th 1358 (1999) ..............................................................................22

*Brown v. Dillard's, Inc.*,
  430 F.3d 1004 (9th Cir. 2005)...............................................................................12

*Burcham v. Expedia, Inc.*,
  No. 07-cv-1963, 2009 WL 586513 (E.D. Mo. Mar. 6, 2009) ...............................16

*Captain Bounce, Inc. v. Bus. Fin. Servs., Inc.*,
  No. 11-cv-0858, 2012 WL 928412 (S.D. Cal. Mar. 19, 2012) ...................15, 16, 17

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
  222 Cal. App. 3d 1371 (1990)..........................................................................12, 22

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
  2 Cal. 4th 342 (1992) ...........................................................................................22

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii.

**DEF. GOOGLE INC.'S MOTION TO DISMISS**
**CASE NO. 5:14-CV-02329-BLF**

**TABLE OF AUTHORITIES**
(continued)

Page

*Cornejo v. Spenger's Fresh Fish Grotto*,
   No. 09-cv-5564, 2010 WL 1980236 (N.D. Cal. May 17, 2010)................................16

*Craigslist, Inc. v. Naturemarket, Inc.*,
   694 F. Supp. 2d 1039 (N.D. Cal. 2010) ................................................16

*Daugherty v. Am. Honda Motor Co., Inc.*,
   144 Cal. App. 4th 824 (2006) ................................................25

*Dillon v. NBCUniversal Media, LLC*,
   No. 12-cv-9728, 2013 WL 3581938 (C.D. Cal. June 18, 2013) ................................24

*Dollar Tree Stores Inc. v. Toyama Partners LLC*,
   875 F. Supp. 2d 1058 (N.D. Cal. 2012) ................................................23

*Drum v. San Fernando Valley Bar Ass'n*,
   182 Cal. App. 4th 247 (2010) ................................................24, 25

*El Centro Mall, LLC v. Payless ShoeSource, Inc.*,
   174 Cal. App. 4th 58 (2009) ................................................21

*Epis, Inc. v. Fid. & Guar. Life Ins. Co.*,
   156 F. Supp. 2d 1116 (N.D. Cal. 2001) ................................................22

*Feldman v. Google Inc.*,
   513 F. Supp. 2d 229 (E.D. Pa. 2007) ................................................16

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ................................................23

*Gerlinger v. Amazon.Com, Inc.*,
   311 F. Supp. 2d 838 (N.D. Cal. 2004) ................................................23

*Ingels v. Westwood One Broad. Servs., Inc.*,
   129 Cal. App. 4th 1050 (2005) ................................................24

*Klein v. Chevron U.S.A., Inc.*,
   202 Cal. App. 4th 1342 (2012) ................................................23

*Levine v. Blue Shield of Cal.*,
   189 Cal. App. 4th 1117 (2010) ................................................22, 23

*Linear Tech. Corp. v. Applied Materials, Inc.*,
   152 Cal. App. 4th 115 (2007) ................................................23

Cooley LLP
Attorneys At Law
San Francisco

iv.

Def. Google Inc.'s Motion to Dismiss
Case No. 5:14-cv-02329-BLF

**TABLE OF AUTHORITIES**
(continued)

Page

*Lucas v. Hertz Corp.*,
   875 F. Supp. 2d 991 (N.D. Cal. 2012) ....................................................................15

*Morris v. Redwood Empire Bancorp*,
   128 Cal. App. 4th 1305 (2005) .........................................................14, 16, 17, 18

*Nagrampa v. MailCoups, Inc.*,
   469 F.3d 1257 (9th Cir. 2006)....................................................................18

*Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*,
   319 F. Supp. 2d 1059 (C.D. Cal. 2003) ........................................................24

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001).......................................................................11

*Newton v. Am. Debt Servs., Inc.*,
   854 F. Supp. 2d 712 (N.D. Cal. 2012) .........................................................18

*Outdoor Recreation Grp. v. Crymson Co., Ltd.*,
   No. 99-cv-55690, 2000 WL 1685032 (9th Cir. Nov. 9, 2000) ....................20

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996)........................................................................23

*Petroleum Sales, Inc. v. Valero Ref. Co.*,
   No. 05-cv-3526, 2006 WL 3708062 (N.D. Cal. Dec. 14, 2006)...................18

*Pry Corp. of Am. v. Leach*,
   177 Cal. App. 2d 632 (1960)........................................................................12

*Puentes v. Wells Fargo Home Mortgage, Inc.*,
   160 Cal. App. 4th 638 (2008) ......................................................................24

*Ridgley v. Topa Thrift & Loan Ass'n*,
   17 Cal. 4th 970 (1998) ...........................................................................20, 21

*Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*,
   965 F. Supp. 2d 1141 (E.D. Cal. 2013).......................................................24

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011)........................................................11

*Stirlen v. Supercuts, Inc.*,
   51 Cal. App. 4th 1519 (1997) ......................................................................15

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Tietsworth v. Sears, Roebuck & Co.,*
   No. 09-cv-0288, 2009 WL 3320486 (N.D. Cal. Oct. 13, 2009) .........................................15, 17

*Tietsworth v. Sears, Roebuck and Co.,*
   No. 09-cv-0288, 2013 WL 1303100 (N.D. Cal., Mar. 28, 2013)..............................................13

*Ulbrich v. Overstock.Com, Inc.,*
   887 F. Supp. 2d 924 (N.D. Cal. 2012) ...................................................................................14

*United States v. Drew,*
   259 F.R.D. 449 (C.D. Cal. 2009) ...........................................................................................16

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S.Ct. 2541 (2011) ............................................................................................................13

*Wall St. Network, Ltd. v. N.Y. Times Co.,*
   164 Cal. App. 4th 1171 (2008) ..............................................................................................11

*Walnut Producers of Cal. v. Diamond Foods, Inc.,*
   187 Cal. App. 4th 634 (2010) ................................................................................................18

*Weber, Lipshie & Co. v. Christian,*
   52 Cal. App. 4th 645 (1997) ..................................................................................................21

*West v. Henderson,*
   227 Cal. App. 3d 1578 (1991)....................................................................................15, 16, 17

*Williamson v. Reinalt-Thomas Corp.,*
   No. 11-cv-3548, 2012 WL 1438812 (N.D. Cal. Apr. 25, 2012).............................................25

*Wornum v. Aurora Loans Servs.,*
   No. 11-cv-2189, 2011 WL 3516055 (N.D. Cal. Aug. 11, 2011) ............................................25

**Statutes**

CAL. BUS. & PROF. CODE
   § 17200........................................................................................................................ *passim*

CAL. CIV. CODE
   § 1670......................................................................................................................................21
   § 1671.................................................................................................................................20, 21

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .................................................................................1, 11

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi.

DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 11, 2014, at 9:00 a.m., or as soon thereafter as this motion may be heard in the above-entitled Court, located at 280 South First Street, San Jose, California 95113, in Courtroom 3 (5th Floor), defendant Google Inc. ("Google") will move to dismiss the Class Action Complaint (the "Complaint") filed by Plaintiff Free Range Content, Inc. ("Plaintiff" or "Free Range"). Google's Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Jim Gray and Kyle C. Wong, and concurrently filed Request for Judicial Notice (the "RJN"), and all pleadings and papers on file in this matter, and upon such other matters as may be presented to the Court.

**STATEMENT OF RELIEF SOUGHT**

Google seeks an order dismissing each of the Complaint's six causes of action with prejudice for failure to state a claim upon which relief can be granted.

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether Plaintiff fails to state a claim for breach of contract where it does not challenge contractual terms that expressly permit Google's alleged conduct, and where the contractual terms Plaintiff does challenge are legally appropriate and enforceable.

2.     Whether Plaintiff fails to state a claim for the implied breach of good faith and fair dealing where the claim is duplicative of a breach of contract claim.

3.     Whether Plaintiff fails to state a claim for unjust enrichment where California courts have expressly held that no such cause of action exists under state law and the challenged conduct is authorized by contract.

4.     Whether Plaintiff fails to state a claim under the California Unfair Competition Law ("UCL") because: (i) the UCL does not apply to contracts involving sophisticated corporations; (ii) Plaintiff does not allege any violation of a state or federal law under the "unlawful" prong of the UCL; and (iii) Plaintiff does not allege any facts to show that: a) Google's alleged conduct violates a legislatively declared policy tethered to specific constitutional or statutory provisions or b) is immoral and unethical.

5.     Whether Plaintiff fails to state a claim for declaratory relief under California or federal law where its contention that contractual provisions are unenforceable has no merit.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In its Complaint, Plaintiff Free Range attempts to turn contract law on its head.  Plaintiff entered into a short, plainly-worded, and mutually-beneficial commercial contract with Google to earn money through Google's free online advertising network, "AdSense."  After enjoying the benefits of participating in the AdSense program for a-year-and-a-half, Plaintiff, by its own admission, breached several explicit terms of that contract.  Google then did *exactly* what it said it would do in the contract—it: (i) closed Plaintiff's AdSense account, (ii) did not make a payment to Plaintiff that, pursuant to numerous contract provisions, Plaintiff had no right to receive, and (iii) refunded the withheld payment (along with Google's revenue share) to advertisers.  Plaintiff then brought suit, on behalf of a putative class, asking the Court to void those provisions of the contract that it (apparently) no longer likes, and to rule that Google's pre-authorized actions constitute a breach of the newly-minted contract Plaintiff claims should now take effect.  This attempt at legal jujitsu, in which a breaching party brings a suit for breach against the party that followed their agreement to the letter, must fail as a matter of law.

First, black letter law holds that a plaintiff who has himself breached a contract cannot bring a breach of contract claim. Here, Plaintiff admits that it breached its contract with Google. In particular, as Plaintiff alleges, it agreed to the AdSense terms of service (which are attached to the Complaint) and admits that at least 75% of "clicks" on its AdSense ads were invalid and that its entire business model was premised on placing ads on third-party websites that Plaintiff does not control—both of which are clear breaches of the AdSense terms of service.

Second, provisions in the terms of service that Plaintiff does not challenge (or even mention in the Complaint) clearly authorized the actions that Google took in response to Plaintiff's breach, and also made clear that Plaintiff is owed no money at all.  Consequently, even if Plaintiff's infirm legal arguments that challenge *other provisions* in the underlying contract were accepted, Plaintiff's breach of contract claim is a non-starter.

Third, Plaintiff's challenges to other provisions of the AdSense terms of service are baseless.  Plaintiff claims that the AdSense terms of service are unconscionable, yet its allegations

1  establish neither procedural nor substantive unconscionability. Plaintiff also claims that the

2  provisions it challenges impose impermissible liquidated damages, but these provisions do not fit

3  within the narrow definition of "liquidated damages" recognized under California law, nor does

4  Plaintiff allege any facts establishing that the provisions were not a reasonable forecast of the

5  damages Google could have expected to incur from Plaintiff's breach at the time of contracting.

6      Fourth, while Plaintiff vaguely contends that Google's conduct breached the implied

7  covenant of good faith and fair dealing, its claim is premised on the very same conduct that

8  purportedly supports its breach of contract claim and, worse yet, is premised on conduct that the

9  contract expressly allows.  Settled law establishes that the implied covenant cannot be used to

10  override a directly applicable *actual covenant* in a party's agreement.

11      Fifth, Plaintiff brings a claim for unjust enrichment, which not only has no factual basis,

12  since Google was not enriched, as stated above, but also has no legal basis.  As numerous courts

13  in this district have made clear, unjust enrichment is not a recognized cause of action.

14      Finally, Plaintiff's claims under California's consumer protection law are inapt for a host

15  of reasons, including that Plaintiff is not a consumer, that nothing Google did plausibly qualifies

16  as "unlawful," and that Plaintiff has no claim of "unfairness" under any of the recognized tests.

17      For these reasons, and others discussed below, Plaintiff's attempts to retroactively rewrite

18  its contract with Google are legally and factually meritless.  Google respectfully submits that this

19  Court should dismiss Plaintiff's Complaint with prejudice.

20  **II.    STATEMENT OF FACTS**

21      **A.    Google's AdSense service provides website publishers with a free way to make money from advertisements placed on their sites.**

22      AdSense is an online advertising service offered by Google that allows website

23  publishers [1] of all sizes to earn money by displaying Google-supplied ads on their sites. [2]

24

---

25  [1] Though they are not publishers in the traditional sense of printers of books and magazines, website owners who create content for the public are generally referred to as "publishers."

26  [2] Compl. ¶¶ 12-13; *see also* Declaration of Jim Gray ("Gray Decl.") Ex. 3 (cited in Compl. ¶ 12) ("What's AdSense?"); Declaration of Kyle C. Wong ("Wong Decl.") Ex. 6 (cited in Compl. ¶ 17)

27  ("Advertising helps fund great web services and enables companies of all sizes to grow.").  *See Generally* RJN (showing that the Gray and Wong exhibits are properly before the Court).

28

Publishers using the service place a snippet of code on their website pages to display ads from advertisers who also contract with Google.[3]  When a user visits such a page, Google selects the relevant ads to display through an automated auction.  When an user clicks on an ad, Google charges the advertiser and pays the majority of that revenue to the publisher.[4]  Publishers pay nothing to Google or any advertiser to participate in the service.[5]

AdSense, and other advertising networks and exchanges like it, give web publishers a simple and highly efficient way to earn money from their sites and fund the content they create.[6]  The service affords all types of publishers (including small businesses, individual bloggers, and other content producers that lack dedicated advertising sales teams) access to a large pool of advertisers, saving them the expense of identifying and contracting with advertisers individually.[7]  AdSense also helps advertisers, by providing them an efficient way to buy online ad inventory.[8]

In this way, AdSense is a "win-win," in which advertisers get access to quality inventory, and website publishers can monetize their content without upfront expense.

> **B.    Publisher's compliance with the AdSense terms of service is critical to protect the integrity of the AdSense ecosystem.**

For the network to function properly, and benefit both advertisers and publishers, the advertisers must have confidence that clicks for which they are charged are real and reflect a genuine interest in their products or services.[9]  The reason is simple:  advertisers are charged for each click on their ads posted on AdSense publishers' websites.  On the other hand, because publishers are *paid* for each click, some may feel that they have a short-term incentive to break the rules and artificially inflate the number of clicks on the ads on their sites (or to fail to prevent this from happening).  These artificial clicks are called "invalid clicks" or "click fraud."[10]

---

[3] *See, e.g.*, Gray Decl. Ex. 3 ("How AdSense Works").
[4] Compl. ¶¶ 1, 13 n.2; Gray Decl. Ex. 3 ("How AdSense Works").
[5] Compl. ¶ 13; Gray Decl. Ex. 3 ("What's AdSense?").
[6] Compl. ¶ 13; Gray Decl. Ex. 3 ("How AdSense Works").
[7] Gray Decl. Ex. 3 ("Access advertisers").
[8] Note that advertisers do not contract with Google via the AdSense service, but through a separate service called AdWords.  *See, e.g.*, http://www.google.com/adwords/.
[9] *See, e.g.*, Wong Decl. Ex. 6 (cited at Compl. ¶ 17).
[10] *See* Gray Decl. Ex. 1 (AdSense Program Policies) at "Invalid clicks and impressions" ("Clicks on Google ads must result from genuine user interest.  Any method that artificially generates clicks or impressions on your Google ads is strictly prohibited.")  Publisher's incentive to cheat

Cooley LLP
Attorneys At Law
San Francisco

1  Publishers can commit click fraud through unsophisticated means, such as clicking on the ads on

2  their site themselves or paying others to do so, or by more subtle means like formatting their site

3  so that visitors are tricked into clicking on ads.[11]  If publishers were allowed to game the system

4  like this, advertisers would be charged for artificial clicks for which they receive no value at all.[12]

5      To ensure the integrity of the program for advertisers, publishers, and users, Google

6  requires that all publishers agree to a set of rules in order to participate in AdSense (for free).

7  Those rules are laid out in the AdSense Online Terms of Service ("TOS"), which is a concise,

8  plainly worded statement of the contractual rights and obligations to which all AdSense

9  publishers (including Plaintiff) agree.[13]  At four pages long, the TOS is far shorter than many

10 commercial contracts.  Publishers also must agree abide by the AdSense Program Policies,

11 which are incorporated by reference in the TOS (collectively with the TOS, the "AdSense Terms"

12 or "Terms").  These agreements strictly forbid all forms of invalid clicks, and explain the types of

13 clicks that are invalid and for which publishers will not be paid.[14]

14     In addition to prohibiting click fraud, the AdSense Terms also help ensure that AdSense

15 ads appear on quality websites.  For example, they prohibit:  (i) the display of ads on web pages

16 featuring violent or adult content, (ii) ad formatting that may confuse consumers, (iii) ad

17 placement that encourages accidental clicks, and (iv) the display of ads on third-party sites not in

18 the publisher's control.[15]  As these rules arise from the Program Policies expressly incorporated

19 into the TOS, violations of these rules are generally referred to as "policy violations."

20 the system is short term, because Google terminates publishers fraudulently generating their own
   clicks.  *See also* Wong Decl. Ex. 10 (cited at Compl. ¶ 27).
21 [11] *Id.*; Compl. ¶ 3 (referring to "click fraud" and "bought traffic").
22 [12] Wong Decl. Ex. 10 ("fake" site traffic "will have no interest in the particular subject, but does
   results [sic] in clicks that cost the advertiser money.  This type of traffic is harmful to
23 advertisers…they're paying for traffic that will, ultimately, not convert for them.").
24 [13] *See* Compl. Exs. A-C.  Unless otherwise noted, all references and citations to the TOS are to
   the operative version in place when Plaintiff was terminated, attached as Exhibit C to the
   Complaint.  Note, however, that Exhibit A is substantively identical for purposes of this motion.
25 [14] Compl. ¶ 14; TOS ¶¶ 1 (requiring compliance with Program Policies), 5 (payments withheld
26 for invalid activity); Gray Decl. Ex. 1 (Program Policies) ("[P]rohibited methods [for generating
   clicks] include, but are not limited to, repeated manual clicks or impressions, automated click and
27 impression generating tools and the use of robots or deceptive software.  Please note that clicking
   your own ads for any reason is prohibited").
28 [15] Gray Decl. Ex. 1 (Program Policies) at "Content Guidelines."

Google bears the responsibility to both advertisers and publishers to monitor publishers' sites and click activity to ensure compliance with the Terms, and to enforce them when necessary. In some cases, enforcement can result in the termination of a publisher's account, in which event revenue generated by the publisher is refunded back to the advertisers, including Google's own share.[16]   Significantly, Google does not disclose specific information about its systems for detecting invalid clicks and policy violations, nor does it explain the details of its decision to terminate publishers for good reason—the disclosure of such information would allow bad actors to evade detection of their click fraud and policy violations, and thereby, defraud advertisers.[17]

Because Google actively enforces the rules regarding click fraud and policy violations, AdSense is able to deliver clicks that reflect real value, allowing advertisers to get a return on their ad dollars.  This, in turn, redounds to the benefit of publishers, many of whom could not offer their content to the public, without the advertising that funds their work.

### C.     Plaintiff ran a business that showed AdSense ads on third-party websites.

Free Range is a sophisticated, commercial entity that owns the "Repost content syndication service" and operates the website "Repost.us."[18]  As described on the Repost website referenced in the Complaint, Repost "has partnered with thousands of publishers and bloggers to make a wide range of news, features, videos, and more available" to its users.[19]  Repost gathered content from users who wanted to spread their content around the web and made it available to other users who were looking for content to republish on their own websites.

Like AdSense, the Repost service was free to publishers.  To make money, Repost would append an ad (including ads supplied by AdSense) to the content that it collected from one set of users and reposted to other users' websites.[20]  Google paid Repost for any valid activity associated with AdSense advertisements.  Given the nature of Repost's business, AdSense ads

---

[16] *See* TOS ¶ 5, Wong Decl. Exs. 8, 9 (discussing Google's advertiser refund practice).

[17] *See* Compl. ¶ 23 (quoting Google's termination letter); *see also* Gray Decl. Ex. 4 (full letter).

[18] Compl. ¶ 19.  Since the complaint was first filed, Repost has shut down its site.  *See* Wong Decl. Ex. 11 (current Repost homepage).

[19] *See* Wong Decl. Ex. 12 (Repost FAQ).

[20] *Id.*

appeared on third-party websites that were not owned or controlled by Repost.[21]

Also like AdSense, Repost required its users to agree to "terms of service" that governed the user relationship with Free Range. These terms include a termination provision that states:

> Notwithstanding any of these Terms of Use, F[ree Range] reserves the right, *without notice and in its sole discretion*, to terminate your account and/or block your use of the Sites.[22]

**D.** **The AdSense Terms govern the rights and obligations of Google and Plaintiff.**

Free Range signed up for the AdSense service in July 2012, which required it to agree to the Adsense Terms, including (as noted above) the TOS and all documents it incorporates.[23] Plaintiff attached three versions of the TOS to the Complaint, including the version that was current (and therefore operative) when it was terminated (Compl. Ex. C). Particular portions of the AdSense Terms are germane to (and dispositive of) the claims here, including the following.

**1.** **Terms Regarding Invalid Clicks**

The TOS specifies the types of clicks and impressions[24] for which a publisher will and will not be paid. Specifically, the TOS states that "[s]ubject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google."[25] The same paragraph of the TOS specifies that "[p]ayments to [publishers] may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole discretion."[26] "Invalid activity" is defined as including (without limitation):

---

[21] Compl. ¶¶ 19 ("plaintiff became an AdSense publisher for pages served on various websites under its Repost.us brand") and 26 (AdSense ads shown on "Repost.com-branded webpages").
[22] Wong Decl. Ex. 13 (Repost Terms of Use)(emphasis added).
[23] Compl. ¶¶ 13-14; *see also* Compl. Ex. B (attaching the TOS operative in July 2012).
[24] In general, a "click" occurs when a user clicks on an ad and an "impression" occurs whenever an ad is displayed. What constitutes a "valid" click is discussed in detail further below.
[25] *See*, *e.g.*, Compl. Ex. C ¶ 5.
[26] *Id.* If this matter proceeds beyond the pleading stage, which it should not, the evidence will show that all the money withheld from Plaintiff here was refunded to advertisers, including Google's "revenue share" connected with those ads (i.e., the money Google would have earned if it had treated those ads as genuine). Despite Plaintiff's baseless allegations to the contrary,

(i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above.[27]

Publishers, like Plaintiff, also grant Google the right to monitor their websites for compliance.[28]

The Complaint does not challenge the validity and enforceability of any of these provisions.[29]

### 2.    Terms Regarding Policy Violations (Content and Format Restrictions)

Google's content policies, largely found in the AdSense Program Policies portion of the AdSense Terms, place additional restrictions on how and where AdSense ads can be displayed. As noted above, this includes, for example, forbidding the display of AdSense ads on pages containing "[p]ornography, adult or mature content," "[i]llicit drugs and drug paraphernalia content," and "[a]ny other content that is illegal, promotes illegal activity or infringes on the legal rights of others."[30] The AdSense Program Policies, in its section on "ad placement policies," also forbids the display of AdSense ads on third-party pages that the publisher does not control.[31]

---

Google kept nothing for itself from the revenue associated with the payments withheld from Plaintiff – a fact supported by numerous comments in one of the documents on which the Complaint relies.  (See, e.g., Wong Decl. Ex. 9 (cited at Compl. ¶¶ 3 n.1 & 27) ("I work in an agency with several fortune 500 clients. Yes, I've seen ad spending refunds on several occurrences because of alleged fraud.")

[27] TOS; Compl. Exs. A & C ¶ 5; Ex. B ¶ 11.

[28] Id. ("you grant Google the right to access, index and cache [your website], or any portion thereof, including by automated means").

[29] Paragraph 16 of the Complaint references TOS ¶ 5, but only challenges non-payment when accounts are terminated.  Elsewhere, Plaintiff admits that Google need not pay publishers for invalid clicks.  See, e.g., Compl. ¶ 22 (conceding that Plaintiff is only owed $8,000 - $11,000).

[30] See Gray Decl. Ex. 1; see also Wong Decl. Ex. 9  (cited in Compl. ¶¶ 3 n.1 & 27) ("I got banned because someone posted some insults/porn words in a title. There was no pictures/videos... it was just words"); id. ("The problem is that advertisers don't want their brands associated with that kind of content.  In order to keep advertisers happy, Google needs to police for content w[ith] r[espect] t[o] ads.").

[31] Gray Decl. Ex. 2 ("When a website displays someone else's website within a frame or window on their own site, this is considered framing content.  Placing Google ads on such pages is strictly prohibited.").  The AdSense Help Center, likewise, states that: "To use AdSense… you must have access to edit the HTML source code of the web pages where you'd like the ads to be displayed. If you submit a site that you don't own (for example, www.google.com), you won't be able to

The Complaint challenges <u>none</u> of the Adsense Program Policies.  To the contrary, the Complaint quotes a source stating that Google devotes "substantial technical, financial, and human resources" to the removal of "bad ads and bad ad-funded content" and that "[h]undreds of [Google] engineers, policy experts and others have dedicated their careers to this work."[32]

### 3.    Terms Regarding Termination For Click Fraud and Policy Violations

The TOS expressly permits either party to terminate the relationship at any time.[33]  This provision explicitly authorizes Google to terminate the publisher relationship, withhold final payments to publishers, and refund money back to advertisers if Google detects invalid activity or a policy violation (and alerts publishers of Google's right to take such action):

> Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason.  If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account.[34]

Other public sources (including sources cited in the Complaint) also confirm Google's approach to dealing with violations of the AdSense Terms:

> [Google's] teams and automated systems work around the clock to stop bad actors and protect our publishers, advertisers and users.  All publishers that sign up for AdSense agree to the Terms and Conditions of the service and a set of policies designed to ensure the quality of the network for users, advertisers and other publishers. When we discover violations of these policies, we take quick action, which in some cases includes disabling the publisher's account and refunding affected advertisers.[35]

### E.    In early 2014, Free Range's AdSense ads were deluged by invalid activity, triggering its termination as an AdSense publisher.

Plaintiff allegedly participated in and earned money from AdSense for more than a year without incident.[36]  In February 2014, "estimated earnings for ads by the plaintiff, as reported by Google, began to increase at a previously unseen rate. Plaintiff was took [sic] note of this

---

place the AdSense code on the site and your application will not be approved."  *See* https://support.google.com/adsense/answer/91205?hl=en (last visited Aug. 19, 2014).

[32] Wong Decl. Ex. 6 (cited at Compl. ¶ 17).

[33] TOS; Compl. Exs. A & C ¶ 10; see also Ex. B ¶ 6.

[34] *Id.*

[35] Wong Decl. Ex. 8. This article is identified as the source for a portion of the article attached as Wong Decl. Ex. 7 (cited at Compl. ¶ 35).

[36] Compl. ¶ 20.

earnings spike and self-reported it to Google."[37]  At the end of February 2014, Google "issued a report stating that plaintiff's estimated earnings for the covered period were over $40,000. To the plaintiff, it seemed unlikely, based on its history with the program, that the number was correct; it seemed far too high."[38]  Free Range estimates that its earnings from valid activity during that final pay period were "perhaps in the $8,000 to $11,000 range."[39]  In other words, Plaintiff estimated that at least 75% of the clicks on its Adsense ads were invalid and should not have been paid.

On March 4, 2014, Google terminated Free Range's AdSense account, as expressly authorized in the TOS.[40]  In the notice to Plaintiff, Google explained, "We're limited in the amount of information we can provide about your specific violation.  We understand this can be frustrating for you, but we've taken these precautionary measures because intentional violators can use this information to circumvent our detection systems."[41]  Indeed, protecting these trade secrets is of paramount importance to the survival of AdSense.

The notice also alerted Plaintiff to its right to appeal the decision and prompted Plaintiff to "provide a thorough analysis" of the issue, with the possibility of reopening its account.[42]  Plaintiff submitted an appeal with no analysis at all, merely restating that its clicking activity was "suspiciously high."[43]  After reviewing this brief submission, Google denied the appeal[44] and refunded the clawed-back money to the appropriate advertisers, per the TOS.[45]

**F.     Free Range sued Google.**

On May 20, 2014, Free Range brought this action against Google for its "refusal to pay terminated AdSense publishers the monies they have earned and are owed" from their final

---

[37] *Id.*  As acknowledged by Plaintiff (Compl. ¶¶ 20, 22), Google provides AdSense publishers with detailed performance reports.  *See also* Gray Decl. Ex. 3 ("Reporting Tools") (estimated earnings "aren't finalized until the end of the month and won't necessarily reflect the amount you will ultimately be paid . . . for validated clicks and impressions." https://support.google.com/adsense/answer/1709869?rd=1 (last visited Aug. 19, 2014)).
[38] Compl. ¶ 22.
[39] *Id.*
[40] Compl. ¶ 23(quoting Google's letter); Gray Decl. Ex. 4 (termination letter).
[41] Compl. ¶ 23; *see also* Gray Decl. Ex. 4.
[42] Gray Decl. Ex. 4.
[43] Gray Decl. Ex. 5.
[44] Gray Decl. Ex. 5 (Free Range's appeal and Google's response (discussed at Compl. ¶¶ 24-25)).
[45] TOS ¶ 5; Wong Decl. Exs. 8, 9 (discuss Google's advertiser refund practices).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**DEF. GOOGLE INC.'S MOTION TO DISMISS**
**CASE NO. 5:14-CV-02329-BLF**

1  "periodic payment" prior to termination.[46]  Plaintiff brings claims for (1) breach of contract; (2)

2  breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) violation

3  of the "unlawful" and "unfair" prongs of the California Unfair Competition Law; and (5)

4  declaratory relief under both the California and the Federal Declaratory Judgment Acts.

5  **III.   APPLICABLE STANDARDS**

6       A court may dismiss a claim under Rule 12(b)(6) when "there is no cognizable legal

7  theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v.*

8  *Block*, 250 F.3d 729, 732 (9th Cir. 2001) (citation omitted).  In deciding a motion under Rule

9  12(b)(6), "all material allegations of the complaint are accepted as true, as well as all reasonable

10  inferences to be drawn from them." *Id.* (citation omitted).  However, "labels and conclusions . . .

11  and a formulaic recitation of the elements of a cause of action will not" survive a motion to

12  dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The court is

13  "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping

14  legal conclusions cast in the form of factual allegations." *Stanislaus Food Prods. Co. v. USS-*

15  *POSCO Indus.*, 782 F. Supp. 2d 1059, 1064 (E.D. Cal. 2011) (citation and quotation omitted).[47]

16  **IV.   ARGUMENT**

17       **A.   Plaintiff fails to state a claim for breach of contract (Count I).**

18       Plaintiff does not, and cannot, allege that Google breached the AdSense Terms.  To

19  successfully plead a breach of contract, a plaintiff must allege (1) the existence of a valid

20  contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and

21  (4) damage to plaintiff arising from the breach. *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164

22  Cal. App. 4th 1171, 1178 (2008) (citation omitted).  Aside from pleading that the contract

23  between Plaintiff and Google was valid, the Complaint misses the mark on every element.

24       **1.   Plaintiff's own allegations show its breach of the AdSense Terms.**

25       "A bedrock principle of California contract law is that '[h]e who seeks to enforce a

26  _____

[46] Compl. ¶¶ 2-4.

27  [47] As discussed in the concurrently filed Request for Judicial Notice, in deciding a motion to
   dismiss, courts may also consider documents incorporated by reference into a complaint, which

28  the Court should do here.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11.

DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF

1    contract must show that he has complied with the conditions and agreements of the contract on

2    his part to be performed.'"   *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005)

3    (quoting *Pry Corp. of Am. v. Leach*, 177 Cal. App. 2d 632, 639 (1960)).  The Complaint not only

4    fails to plead Plaintiff's performance of the Terms, it actually shows that Plaintiff breached them.

5         First, Free Range admits that a whopping 75-80% of the clicks it received in the disputed,

6    final payment period were invalid.[48]  The TOS explains that any such "invalid queries, invalid

7    impressions or invalid clicks on Ads" fall under the umbrella of "invalid activity" for which

8    Google may terminate a publisher's account.[49]  Likewise, the Program Policies state in clear

9    terms that "[a]ny method that artificially generates clicks or impressions on [ ] Google ads is

10   strictly prohibited."[50]  The rampant click fraud on the sites on which Plaintiff placed AdSense ads

11   was a material breach, precluding Plaintiff's breach of contract claim.

12        Second, the AdSense Terms also expressly forbid publishers from displaying ads on other

13   publishers' websites.[51]  However, the Complaint and the Repost website make clear that showing

14   AdSense ads on other publishers' sites was the *sine qua non* of Plaintiff's business model.

15   Because ads displayed in this manner are "strictly prohibited," literally all of Plaintiff's ads were

16   in material breach of the AdSense Terms.  Thus, in at least two respects, the Complaint

17   demonstrates Plaintiff's non-performance of the Terms, precluding Plaintiff's claim for breach.[52]

18                    **2.    Terms that Plaintiff does not mention, much less challenge, preclude a**
19                    **finding that Google breached or that Plaintiff has damages.**

20        Plaintiff's claim that Google breached their agreement distills down to one essential

21   allegation: because certain provisions authorizing Google to withhold payments from terminated

22

23   [48] Compl. ¶ 22 (Plaintiff concedes that it actually earned only between $8,000 and $11,000).

24   [49] *See* TOS; Compl. Exs. A & C ¶ 5; *see also* Compl. Ex. B ¶ 11.
     [50] Gray Decl. Ex. 1 (Program Policies).

25   [51] Gray Decl. Ex. 2 (Ad placement policies) and note 31 *supra*.
     [52] Even putting aside Plaintiff's non-compliance with the AdSense Terms, its allegations of
26   performance fall far short.  Plaintiff alleges that it "performed under the AdSense contract by,
     *inter alia*, serving the subject ads on [its] website[]."  *See* Compl. ¶ 52.  Plaintiff does not even
27   proffer the kind of conclusory allegations of full performance courts find insufficient.  *Cf. Careau
     & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1389-90 (1990) (plaintiff failed to
28   state a claim where it merely alleged that the conditions "had been met and satisfied.").

publishers are unenforceable, Google breached and damaged Plaintiffs by not paying it, upon termination, for its allegedly legitimate clicks.[53] What Plaintiffs fail to recognize, but their Complaint conclusively establishes, is that <u>Plaintiff had no valid clicks for which it was entitled to payment</u>. Consequently, Google's nonpayment was not a breach and Plaintiff has no damages.

First, the TOS expressly authorizes Google to withhold payments from publishers for invalid clicks, which Plaintiff does not challenge.[54] The TOS also defines "invalid activity" to include valid "clicks or impressions co-mingled with a significant amount of [invalid clicks or impressions]," which the Complaint does not even acknowledge, much less allege is unenforceable.[55] Plaintiff concedes that three quarters or more of its clicks in the disputed, final payment period were invalid.[56] This constitutes a "significant amount" of invalid clicks under every remotely plausible interpretation of that contract term.[57] Consequently, all Plaintiff's clicks are invalid, Plaintiff was not entitled to any payment and has not alleged a breach or damages.

Second, as just discussed, the display of AdSense ads on other publisher's sites is "strictly prohibited," yet that is how Plaintiff's ads were displayed. Consequently, Plaintiff is not entitled to any payment for such ads, and Google was entitled to terminate Plaintiff's account.

Google could not have breached the contract by "withholding" payments not actually due to Plaintiff, nor damaged Plaintiff by refusing to make such payments. Thus, even if the court were to credit Plaintiff's unsupported assertion that certain of the AdSense Terms are

---

[53] Not surprisingly, Plaintiff does not seek payment for its invalid clicks. *See, e.g.*, Compl. ¶ 22.

[54] TOS (Compl. Exs. A & C ¶ 5; Ex. B ¶ 11) ("Payments to you may be withheld to reflect or adjusted to exclude . . . any amounts arising from invalid activity").

[55] *Id.*

[56] Compl. ¶ 22 (Plaintiff claims it legitimately earned between $8,000 and $11,000).

[57] *See, e.g.*, the definition of "significant" from Merriam Webster's Collegiate Dictionary 1159 (11th ed. 2012) "having or likely to have influence or effect"; "of a noticeably or measurably large amount"; "probably caused by something other than mere chance." Further, the fact that 75% of clicks plaintiff received are admittedly invalid vividly illustrates the enormously individualized inquiry that would be needed, for every terminated publisher, in order to determine whether or not publishers had any injury at all. If this case moves forward, these individualized issues would present an insurmountable obstacle to class certification later in this action. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (a plaintiff "must affirmatively demonstrate his compliance" with Rule 23 and satisfy the Court, based on "a rigorous analysis," that the prerequisites of certification are satisfied) (citations omitted); *see also Tietsworth v. Sears, Roebuck and Co.*, No. 09-cv-0288, 2013 WL 1303100, at *3-4 (N.D. Cal., Mar. 28, 2013).

Cooley LLP
Attorneys At Law
San Francisco

13.

Def. Google Inc.'s Motion to Dismiss
Case No. 5:14-cv-02329-BLF

1   unenforceable (which it should not, as shown below), the Terms provide unchallenged,

2   independent grounds for Google's response to Plaintiff's invalid activity and policy violations.

3   This makes it impossible for Plaintiff to prove a breach by Google or damages to Plaintiff

### 3. The TOS terms that Plaintiff does challenge are neither unconscionable nor an impermissible liquidated damages provision.

Unable to actually plead a breach of contract, Plaintiff attempts to manufacture a breach claim by attacking the validity of *some of* the terms that authorized Google's actions.  Contrary to Plaintiffs allegations, however, the "terms purporting to permit Google to withhold payment of funds owed to publishers whose accounts it disables"[58] are neither unconscionable nor an invalid liquidated damages provision.  Rather, the unambiguous terms governing the parties' relationship explicitly spell out the consequences for publishers when invalid activity on their sites threatens the integrity of the AdSense ecosystem.

### a. The AdSense Terms are not unconscionable as a matter of law.

To be unconscionable, contract terms must be *both* procedurally and substantively unconscionable.  *Ulbrich v. Overstock.Com, Inc.,* 887 F. Supp. 2d 924, 932 (N.D. Cal. 2012); *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal. 4th 83, 114 (2000) ("unconscionability has both a 'procedural' and a 'substantive' element . . . The prevailing view is that [these two elements] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause") (emphasis in original). The AdSense Terms are neither.

### (1) Plaintiff cannot establish procedural unconscionability.

Procedural unconscionability only exists where the challenged contract term imposes surprise or oppression on the challenging party.  *See Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1245 (2007); *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1319 (2005) ("'Procedural unconscionability' concerns the manner in which the contract was negotiated and the circumstances of the parties at that time.  It focuses on factors of oppression and surprise.") (internal quotations and citation omitted).

**Surprise.**  Plaintiff does not allege that it was surprised by the AdSense Terms.  Nor can

---

[58] Compl. ¶ 53.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14.

DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF

it. "Surprise is defined as 'the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms.'" *Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991, 1004 (N.D. Cal. 2012) (quoting *Stirlen*, 51 Cal. App. 4th at 1532). Courts may deem a term unconscionable by virtue of surprise where it is buried in fine print or otherwise intentionally obscured. *Id.* at 1006.

Here, the TOS is short, straightforward, and written in plain English, as are the Program Policies (which are explicitly incorporated in the first paragraph of the TOS).[59] There is no fine print, and the terms are all presented in the same font and size. *See, e.g.*, *Am. Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1394 (1996) (finding no surprise where there were no hidden or unclear terms); *Tietsworth v. Sears, Roebuck & Co.*, No. 09-cv-0288, 2009 WL 3320486, at *9-10 (N.D. Cal. Oct. 13, 2009) (finding no surprise where a limitation, though in a consumer warranty agreement, was prominent in the warranty text).

Plaintiff makes no allegations to support a claim of surprise, nor does it allege that it was unaware of these terms before invalid activity was discovered on its account. Moreover, especially in the context of commercial agreements, courts reject claims of surprise in contracts of much greater complexity, reasoning that "[p]arties to commercial contracts fail to read them at their own peril." *West v. Henderson*, 227 Cal. App. 3d 1578, 1587 (1991)(rejecting a claim of surprise by party to a commercial lease despite the fact that the term at issue was a confusing 86-word sentence in a 20-page, single-spaced document), *overruled on other grounds by Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n,* 55 Cal. 4th 1169, 1182 (2013).

**Oppression.** Oppression is measured by the totality of circumstances at the time a party enters into a contract. *See Captain Bounce, Inc. v. Bus. Fin. Servs., Inc.*, No. 11-cv-0858, 2012 WL 928412, at *6-7 (S.D. Cal. Mar. 19, 2012). Despite the conclusory claim that Google "foisted" the contract upon Plaintiff, without opportunity to negotiate,[60] the circumstances of Plaintiff's agreement to the AdSense Terms also preclude a claim of oppression as matter of law.

Courts routinely uphold and enforce click-to-accept agreements like the TOS (including

---

[59] *See generally* TOS; Compl. Exs. A-C ¶ 1; Gray Decl. Ex. 1 (Program Policies).

[60] Compl. ¶ 53.

Cooley LLP
Attorneys At Law
San Francisco

15.

Def. Google Inc.'s Motion to Dismiss
Case No. 5:14-cv-02329-BLF

Google's own), even against individuals and presumably unsophisticated consumers.[61] Courts also commonly rule that a plaintiff's inability to negotiate a form agreement does not establish oppression. *See, e.g., Captain Bounce*, 2012 WL 928412, at *6-8 (business financing company's form contract with small business not unconscionable); *Cornejo v. Spenger's Fresh Fish Grotto*, No. 09-cv-5564, 2010 WL 1980236, at *7 (N.D. Cal. May 17, 2010) (arbitration clause in employment agreement was not unconscionable "even though the Agreement represents a paradigmatic contract of adhesion").

Further, Plaintiff's bare allegation that the AdSense Terms constitute an adhesive contract and therefore are unconscionable is both conclusory and incorrect. "Oppression refers not only to an absence of power to negotiate the terms of a contract, but also to the absence of reasonable market alternatives." *Morris*, 128 Cal. App. 4th at 1320; *accord, Captain Bounce*, 2012 WL 928412, at *7; *West*, 227 Cal. App. 3d at 1587. Where, as here, Plaintiff fails to allege that it "lack[ed] meaningful choice" regarding whether to accept Google's terms rather than opting for any number of viable competitors (or, indeed, any other means of monetizing its website), oppression will not be found. (Compl. ¶ 53.) *See, e.g., Captain Bounce*, 2012 WL 928412, at *7. Indeed, an article referenced in the Complaint and other judicially noticeable information demonstrates that there are many alternatives available and in direct competition with AdSense (e.g., Yahoo!/Bing Network and Pubmatic).[62]

Numerous courts reject claims of procedural unconscionability where viable substitutes exist, even where the agreement is not subject to negotiation. In *Captain Bounce*, for example, the court rejected a small business owner's claim that an agreement was oppressive, despite the plaintiff's inability to negotiate, since the plaintiff could have obtained the same cash advance or another form of financing elsewhere. 2012 WL 928412 at *7. Similarly, in *Morris*, the court

---

[61] *See, e.g., Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1059 (N.D. Cal. 2010) (terms of service to be a valid and enforceable clickwrap agreement between website operator and software developer in breach of contract claim); *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009) (finding valid and enforceable clickwrap agreement between individual website user and social media website); *Burcham v. Expedia, Inc.*, No. 07-cv-1963, 2009 WL 586513, at *2-3 (E.D. Mo. Mar. 6, 2009); *Feldman v. Google Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007).
[62] Wong Decl. Ex. 10 (cited at Compl. ¶ 27) (listing five AdSense alternatives for publishers whose AdSense accounts have been closed); *id*. Exs. 14-15 (AdSense competitors).

1    rejected the claim that a merchant credit card agreement's terms were procedurally

2    unconscionable where the plaintiff "failed to allege he could not have obtained merchant credit

3    card services from another source on different terms." 128 Cal. App. 4th at 1320.[63]

4          In addition to the factors discussed so far, the relative sophistication of the parties and "the

5    business-to-business context of the [agreement] is relevant." *Captain Bounce*, 2012 WL 928412,

6    at *7 ("Generally, courts have not been solicitous of businessmen in the name of

7    unconscionability . . . probably because courts view businessmen as possessed of a greater degree

8    of commercial understanding and substantially more economic muscle than the ordinary

9    consumer") (citation omitted); *see also Morris*, 128 Cal. App. 4th at 1322 ("[I]t is reasonable to

10   expect even an unsophisticated businessman to carefully read, understand, and consider all the

11   terms of an agreement affecting such a vital aspect of his business."). Courts may also consider

12   whether the challenged contract concerns life necessities.[64] Here, the complaint identifies no

13   indicia of oppression, and none exist. Plaintiff is a sophisticated business that entered into a non-

14   essential, commercial relationship to make money from its website.

15         Because Plaintiff cannot plead surprise or oppression with respect to the AdSense Terms,

16   the court cannot find the contract to be procedurally unconscionable.

17                   **(2)      Substantive unconscionability is also absent here.**

18         Plaintiff's conclusory assertions of substantive unconscionability are also without merit.

19

20   [63] In *Belton*, the court found that defendant cable provider's service agreement could not be
     "oppressive" where the streaming radio service at issue had several viable (and free) alternatives.
21   151 Cal. App. 4th at 1245-46. *See also Berenblat v. Apple, Inc.*, No. 08-cv-4969, 2010 WL
     1460297, at *5 (N.D. Cal. Apr. 9, 2010) (warranty not procedurally unconscionable where
22   "Plaintiffs do not allege that they lacked other options for purchasing laptop computers or for
     obtaining additional warranty protection" and "consumers . . . choose to buy laptop computers
23   from other sellers") (citation omitted). As held in *Tietsworth*, the oppression analysis does not
     turn on whether one alternative is "better" than others. 2009 WL 3320486, at *10 (washing
24   machine warranty terms were not oppressive despite plaintiff's allegation that the salesperson
     informed plaintiff that the machines at issue were "the best").
25
     [64] *See Morris*, 128 Cal. App. 4th at 1320 (considering the immediacy of the need for the good or
26   service, and whether it was non-essential, such as where the contract was for business purposes);
     *West*, 227 Cal. App. 3d at 1587 (oppression on Plaintiff was "self-imposed" where plaintiff "was
27   not in pursuit of life's necessities; this was a business venture."); *Belton*, 151 Cal. App. 4th at
     1245 (streaming radio service at issue was a nonessential service).
28

A term is substantively unconscionable only if it is "so one-sided as to 'shock the conscience,' or [ ] impose harsh or oppressive terms. . . .   The phrases 'harsh,' 'oppressive,' and 'shock the conscience' are not synonymous with 'unreasonable.'"   *Walnut Producers of Cal. v. Diamond Foods, Inc.*, 187 Cal. App. 4th 634, 647-48 (2010) (quoting *Morris*, 128 Cal. App. 4th at 1322-23).   Terms considered substantively unconscionable are those that strip rights from one party or impose such an unanticipated burden on one party that they would not have entered into the agreement had they understood the consequences.   *See, e.g.*, *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 725 (N.D. Cal. 2012).   Especially in the commercial context, "unconscionability turns not only on a one-sided result, but also on an absence of justification for it."   *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1286 (9th Cir. 2006) (citation omitted).   Courts also make clear that the fact that a "business arrangement may well [be] less advantageous" to one party does not render the agreement substantively unconscionable.   *Petroleum Sales, Inc. v. Valero Ref. Co.*, No. 05-cv-3526, 2006 WL 3708062, at *18 (N.D. Cal. Dec. 14, 2006).

*Am. Software, Inc. v. Ali* is particularly instructive here.   46 Cal. App. 4th 1386.   In it, plaintiff Ali was terminated after having earned substantial commissions on several sales.   *Id.* at 1389.   By the terms of her employment agreement, she was ineligible to collect commissions received more than 30 days after her termination, and several such sales (and payments) occurred.   *Id.*   Rejecting her claim that the contract was substantively unconscionable when the company refused to pay the late commissions, the court explained that the contract terms with respect to compensation "involved certain risks to both parties to the bargain": Ali risked losing earned commissions, but her employer "took the risk that at the time of Ali's termination, she would not have earned sufficient commissions to cover the substantial draws [an amount paid monthly to her which was deducted from commissions earned] 'credited' to her."   *Id.* at 1393.

As in *Am. Software*, the provisions at issue here do no more than authorize the withholding of payments during a single payment period where violative conduct warranting termination is detected, limiting Google's discretion to this narrow situation.   The Complaint never shows how such terms remotely shock the conscience or impose unduly harsh or unanticipated terms.   The AdSense Terms are short and readable, and Google's actions in

accordance with them put no "unanticipated burden" on plaintiff whatsoever, particularly where, as here, the invalid clicks in the final period outnumbered the allegedly valid clicks by more than 3 to 1. Further, the AdSense Terms (along with Google's extensive help pages and other AdSense information) set forth clear and specific justifications for Google's discretion—to prevent fraudulent clicks and prohibit certain content, and to keep advertisers whole, all in order to maintain the integrity of the AdSense network. Google's diligence ultimately benefits publishers like Plaintiff by creating an attractive, reliable marketplace for advertisers, without whom publishers like Plaintiff could not make money through the AdSense program.

Finally, Plaintiff can hardly contend that terms permitting Google to close its account "shock the conscience" when the Repost terms of service reserved for Plaintiff the right to terminate its own users, at its sole discretion and without explanation.[65] What's more, as explained above, Plaintiff's admissions in the Complaint that (1) the vast majority of its clicks for the final pay period were invalid and (2) it placed AdSense ads on third-party websites, which violated the Program Policies, mean that it also concedes that it *was never entitled to payment in the first instance*.[66] It is simply not plausible that Plaintiff (or any similarly situated publisher) would be "shocked" to find that the invalid activity proscribed by the AdSense Terms led to the precise outcome those same terms promised would follow.

### b.   Prohibitions against liquidated damages do not apply here.

Plaintiff's attempt to strike down certain AdSense terms as liquidated damages fail for two reasons. First, the AdSense Terms contain no liquidated damages provision. Second, even were the Court to (generously) construe the challenged provision as being a form of liquidated damages, it is a reasonable estimation of damages and would be permissible and enforceable.

### (1)   There is no liquidated damages provision in the Terms.

A liquidated damages provision only exists where a provision requires a breaching party "to pay [a sum] or a deposit which [the party] agrees to forfeit for *breach of some contractual*

---

[65] Wong Decl. Ex. 13 (Repost Terms).

[66] Plaintiff's position presents a conflict between its own interest in getting paid and the putative class of publishers' interest in keeping advertisers happy and enhancing their trust by disabling fraudulent accounts and refunding them for all ads displayed on sites found to be suspect.

1   *obligation.*"  *ABI, Inc. v. City of L.A.*, 153 Cal. App. 3d 669, 685 (1984) (emphasis in original)

2   (no liquidated damages where the contract language was "far from purporting to be a preestimate

3   of damages for breach of contract"); *see also Outdoor Recreation Grp. v. Crymson Co., Ltd.*, No.

4   99-cv-55690, 2000 WL 1685032, at *2 (9th Cir. Nov. 9, 2000) ("A liquidated damages provision,

5   by definition, must impose an obligation on the breaching party to pay the damages it endeavors

6   to liquidate.") (citation omitted).  The AdSense Terms contain no such clause.

7        The AdSense system is simple: publishers display ads, but they are *only* entitled to

8   revenue from clicks or impressions *after* Google determines their validity and compliance with

9   the AdSense Terms.[67]  To evaluate whether activity is valid, clicks are analyzed through both

10  automated and manual reviews.[68]  As explained above, Plaintiff admits that the bulk of its clicks

11  were invalid and that invalid clicks create no entitlement to payment.  Again, Plaintiff also does

12  not challenge the TOS's statement that clicks "co-mingled with a significant amount of" invalid

13  clicks, will be treated as invalid.[69]  Because Plaintiff, in this way, effectively concedes that it was

14  not entitled to payment, it cannot claim that Google extracted "liquidated damages" from it.  Thus,

15  like in *ABI*, no provision requires Plaintiff to *pay* for the breach of some contractual provision,

16  and there is, therefore, no liquidated damages provision in the AdSense Terms.

17              **(2)    Even if the challenged provision were a liquidated
                         damages provision, it would be enforceable.**

18        Under California Civil Code Section 1671, "a provision in a contract liquidating the

19  damages for the breach of the contract is *valid unless* the party seeking to invalidate the provision

20  establishes that the provision was unreasonable under the circumstances existing at the time the

21  contract was made."   Cal. Civ. Code § 1671(b) (emphasis added).   Such a provision is

22  unreasonable only "if it bears no reasonable relationship to the range of actual damages that the

23  parties could have anticipated would flow from a breach." *Ridgley v. Topa Thrift & Loan Ass'n*,

24

25  _____

26  [67] *See* TOS; Compl. Exs. A & C ¶ 5; Ex. B ¶ 11 ("you will receive a payment related to the
    number of valid clicks on Ads . . . valid impressions of Ads . . . or other valid events performed in
    connection with the display of Ads . . . *in each case as determined by Google*.")(emphasis added).

27  [68] *See, e.g.,* Wong Decl. Ex. 8 ("Our teams and automated systems work around the clock to stop
    bad actors and protect our publishers, advertisers and users."); *id.* Ex. 6.

28  [69] Compl.¶ 22; *see* Compl. Exs. A & C ¶ 5; Ex. B ¶ 11.

17 Cal. 4th 970, 977 (1998).   In determining reasonableness, courts consider only the circumstances "at the time the contract was made" and not in retrospect. *El Centro Mall, LLC v. Payless ShoeSource, Inc.*, 174 Cal. App. 4th 58, 63 (2009) (quotation omitted).  Moreover, "[a] liquidated damages provision is not invalid merely because it is intended to encourage a party to perform, so long as it represents a reasonable attempt to anticipate the losses to be suffered." *Weber, Lipshie & Co. v. Christian*, 52 Cal. App. 4th 645, 656 (1997) (citation omitted).

Here, the amount withheld and refunded to advertisers (including Google's revenue share) was a reasonable estimation of damages at the time the contract was formed, given the hard to measure, but plainly negative, effects of invalid click activity.   The damage to the overall AdSense ecosystem that results from three quarters of a publisher's web traffic being fraudulent is real, but extraordinarily difficult to quantify.  *See Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1398-99 (1991) (finding that Civil Code Sections 1670 and 1671 "merely restated the preexisting common law," which provided that "stipulated damages were permitted when actual damages 'were wholly uncertain and incapable of estimation otherwise than by mere conjecture . . . .'") (citation omitted). Withholding payment for a single pay period is a reasonable estimation of the damage Free Range caused by having this magnitude of invalid activity.[70]   Accordingly, these purported liquidated damages are "valid" under Section 1671.

### B.   The AdSense Terms preclude Plaintiff's claim for breach of the Implied Covenant of Good Faith and Fair Dealing (Count II).

To prevail on a claim for breach of the implied covenant of good faith and fair dealing under California law, Plaintiff will have to show: (1) a valid contract; (2) Plaintiff performed all or substantially all of its obligations under the contract; (3) Google unfairly interfered with Plaintiff's rights to receive benefits under the contract; and (4) Plaintiff was damaged by Google's actions.  *See Avila v. Countrywide Home Loans*, No. 10-cv-5485, 2010 WL 5071714, at

---

[70] Moreover, given that the evidence in this action, if it is not dismissed, will ultimately show that the money was refunded to advertisers, this provision is an even more justifiable approach to undoing the harm pervasive invalid clicks do to the AdSense system, namely that they tend to diminish advertiser confidence in the fairness of the system.  A refund of the final amount that would have been paid to the offending publisher demonstrates Google's commitment to fairness and to the protection of advertisers' trust (and, therefore, active publishers' economic interests).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21.

DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF

1    *5 (N.D. Cal. Dec. 7, 2010).   Moreover, the breach must go beyond the "statement of a mere

2    contract breach" that "rel[ies] on the same alleged acts [to] simply seek the same damages or

3    other relief already claimed in a companion contract cause of action." *Careau*, 222 Cal. App. 3d

4    at 1395.   The Complaint fails to meet these requirements, in numerous respects.

5          The implied covenant allegations here are merely duplicative of the Plaintiff's breach of

6    contract claim.   Plaintiff claims in both the breach of contract and implied covenant causes of

7    action that it entered into a contract with Google[71]; that it performed by placing ads on its

8    website[72]; and that Google refused to pay for the revenue earned by those ads.[73]   No implied

9    covenant claim exists, however, where it "relies on the same acts, and seeks the same damages, as

10   its claim for breach of contract," *Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358,

11   1370 (1999), because the claim must "involv[e] something beyond breach of the contractual duty

12   itself."   *Careau*, 222 Cal. App. 3d at 1394 (citation omitted).   Moreover, as the claim has

13   essentially the same elements as a breach of contract claim, the dispositive arguments set forth

14   above apply with equal force to the implied covenant claim.   (*See, supra*, Section IV(A).)

15         Additionally, Google's termination (and subsequent withholding of payment) cannot

16   frustrate the agreed purpose of the Terms, because Google had an express right to terminate the

17   agreement where Plaintiff did not comply with it.   As the California Supreme Court observed in

18   *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992), "[w]e are

19   aware of no reported case in which a court has held the covenant of good faith may be read to

20   prohibit a party from doing that which is expressly permitted by an agreement."

21   *See also Epis, Inc. v. Fid. & Guar. Life Ins. Co.*, 156 F. Supp. 2d 1116, 1127-28 (N.D. Cal. 2001).

22   Plaintiff's claim under the implied covenant, accordingly, fails as a matter of law.

23         **C.      Plaintiff fails to state a claim for unjust enrichment (Count III).**

24         Plaintiff's unjust enrichment claim should also be dismissed because there is no such

25   independent cause of action in California.   *See, e.g.*, *Levine v. Blue Shield of Cal.*, 189 Cal. App.

26

---

27   [71] Compl. ¶¶ 50, 57-58.
     [72] *Id.* ¶¶ 52, 59.
28   [73] *Id.* ¶¶ 52-53, 59-60.

1  4th 1117, 1138 (2010) ("[t]here is no cause of action in California for unjust enrichment")

2  (citations omitted); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 814-15 (N.D. Cal. 2011)

3  (same) (collecting cases).  Nor may Plaintiff bring a claim in quasi-contract for unjust enrichment

4  where "an enforceable, binding agreement exists defining the rights of the parties."  *Paracor Fin.,*

5  *Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) (citation omitted); *see also*

6  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1389 (2012) (precluding unjust enrichment

7  claim where plaintiffs "pleaded the existence of an enforceable agreement and their unjust

8  enrichment claim did not deny the existence or enforceability of that agreement").

9      Plaintiff expressly concedes that it agreed to the AdSense Terms and that this agreement

10  controls the parties' duties here (regardless of whether specific provisions are enforceable).[74]

11  Accordingly, this Court should dismiss the unjust enrichment claim with prejudice.  *Gerlinger v.*

12  *Amazon.Com, Inc.* 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004).

13      **D.      Plaintiff fails to state a claim under the UCL (Count IV).**

14          **1.      The UCL does not apply to business-to-business contracts.**

15      As an initial matter, Plaintiff lacks standing to sue under the UCL.  "Where a UCL action

16  is based on contracts not involving either the public in general or individual consumers who are

17  parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks."

18  *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007) (demurrer

19  upheld where "the alleged victims are neither competitors nor powerless, unwary consumers, but

20  . . . [each] presumably has the resources to seek damages or other relief . . . should it choose to do

21  so") (citation and quotation omitted).   AdSense is a *business-to-business* program – *i.e.*, one

22  involving entities outside of the UCL's intended protection, as the UCL was enacted to protect

23  consumers and competitors "by promoting fair competition in commercial markets for goods and

24  services."  *Id.*; *see also Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058,

25  1083 (N.D. Cal. 2012) (finding that a UCL claim fails where the claim was "based on a breach of

26  a contract that does not implicate the public in general or individual consumers") (citation

[74] Compl. ¶¶ 13, 15, 16, 50-53.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23.

DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF

1  omitted).[75]  Because Free Range cannot plead that its contractual relationship with Google

2  involves the public in general, consumers or Google competitors, this Court should dismiss the

3  entire UCL claim with prejudice.

**2.  The facts alleged state no claim under the UCL's unlawful prong.**

5  Plaintiff claims that Google's conduct is "unlawful" under the UCL because Google acted

6  "on the basis of contractual terms" that are unconscionable and an improper liquidated damages

7  provision under California law.[76]  But, as detailed above, such claims have no merit and, thus,

8  cannot serve as the necessary predicate for an "unlawful" UCL claim.  *See, e.g., Avila*, 2010 WL

9  5071714, at *6 (dismissing a § 17200 claim premised on a violation of an underlying law for

10  which plaintiff had had failed to state a claim); *Ingels v. Westwood One Broad. Servs., Inc.,* 129

11  Cal. App. 4th 1050, 1060 (2005) ("A defendant cannot be liable under [Section] 17200 for

12  committing unlawful business practices without having violated another law.") (citation and

13  quotation omitted).[77]

**3.  Plaintiff alleges no facts stating a claim under the UCL's unfair prong.**

15  Plaintiff fares no better with its claim under the unfair prong of the UCL.  California

16  courts have not coalesced around a single definition about what makes conduct "unfair" under the

17  UCL, but the Complaint does not pass muster under any accepted definition.

18  First, Plaintiff does not explain how Google's alleged conduct violates a legislatively

19  declared public policy that is "tethered to specific constitutional, statutory, or regulatory

20  provisions."  *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)

21  (affirming dismissal where "plaintiff failed to allege any violation or incipient violation of any

22  statutory or regulatory provision, or any significant harm to competition") (citations omitted);

[75] *Dillon v. NBCUniversal Media, LLC*, No. 12-cv-9728, 2013 WL 3581938, at *7 (C.D. Cal. June 18, 2013); *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141, 1154-55 (E.D. Cal. 2013).
[76] Compl. ¶ 70.
[77] Likewise, Plaintiff's prospects cannot be improved by an argument that its remaining contract claims are "unlawful" under the UCL.  *Puentes v. Wells Fargo Home Mortgage, Inc.,* 160 Cal. App. 4th 638, 645 (2008) (breach of contract, standing alone, is inadequate to support a section 17200 claim); *Nat'l Rural Telecomm. Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074 (C.D. Cal. 2003) (breach of contract can only form the predicate for a UCL claim "*provided it also constitutes conduct that is 'unlawful, or unfair, or fraudulent'*") (emphasis in original).

**DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF**

*Belton*, 151 Cal. App. 4th at 1239-40.  Likewise, the Complaint does not allege that Google's alleged conduct was "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Drum*, 182 Cal. App. 4th at 257; *see also Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1270-71 (2006).  Here, Plaintiff admits that at least 75% of the activity in its last month as an AdSense publisher was invalid.  Nowhere in its complaint does it challenge the term that permitted Google to withhold payment for any invalid activity, and defined to include "clicks or impressions co-mingled with a significant amount of" invalid activity, as all Plaintiff's clicks were here.  Given this, the Complaint does not allege that Google behaved in any immoral or unethical way, and there is no arguable unfairness at all.[78]

For these reasons, under any recognized test for unfairness, Plaintiff's allegations fail.

**E.      Plaintiff fails to state a claim for declaratory relief (Counts V and VI).**

"Declaratory relief is an equitable remedy which fails to the extent that the underlying claims fail."  *Wornum v. Aurora Loans Servs.*, No. 11-cv-2189, 2011 WL 3516055, at *10 (N.D. Cal. Aug. 11, 2011) (citation omitted).  Plaintiff seeks a declaration that certain of the Terms are unconscionable and invalid provisions for liquidated damages.[79]  Because those claims fail on their merits (*see supra* Section IV(A)(3)), Plaintiff cannot obtain declaratory relief.

**V.      CONCLUSION**

For the foregoing reasons, Plaintiff fails to state a claim.  Google respectfully requests that the Court grant its motion and dismiss the Complaint and each claim with prejudice.

Dated: August 20, 2014                               COOLEY LLP


                                                     */s/ Jeffrey M. Gutkin*
                                                     Jeffrey M. Gutkin (216083)
                                                     Attorneys for Defendant
                                                     GOOGLE INC.

109852107

---

[78] Some courts employ a third test, weighing the claimed injury against the benefit to consumers. *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).  However, the Ninth Circuit declined to adopt that test.  *See Williamson v. Reinalt-Thomas Corp.*, No. 11-cv-3548, 2012 WL 1438812, at *11 (N.D. Cal. Apr. 25, 2012).

[79] Compl. ¶¶ 73-74, 76-77.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25.

DEF. GOOGLE INC.'S MOTION TO DISMISS
CASE NO. 5:14-CV-02329-BLF