Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

[*Additional counsel on signature page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FREE RANGE CONTENT, INC., a California corporation, COCONUT ISLAND SOFTWARE, INC., a Hawaii corporation, TAYLOR CHOSE, a Minnesota resident, and MATTHEW SIMPSON, a British Columbia, Canada resident, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC., a Delaware corporation,<br><br>Defendant. | No. 5:14-cv-02329-BLF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, UNJUST ENRICHMENT, VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, ACCOUNTING, AND FOR RELIEF PURSUANT TO THE CALIFORNIA DECLARATORY JUDGMENT ACT AND THE FEDERAL DECLARATORY JUDGMENT ACT**<br><br>**DEMAND FOR JURY TRIAL OF ANY ISSUES SO TRIABLE** |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     JURISDICTION ............................................................................................4

III.    PARTIES ......................................................................................................5

IV.     RELEVANT FACTS......................................................................................6

     A.      Google's AdSense program.................................................................6

          1.      Google's representations as to its AdSense program ...................6

          2.      AdSense is a California-based program .........................7

          3.      Google's promises to pay publishers...........................8

          4.      Google's AdSense termination provisions ...................10

          5.      Google's systematic withholding of 100% of publishers' last program earnings and related contractual provisions....................11

     B.      Google's Benefits from Withholding Terminated Publishers' Last Program Earnings from Them....................14

     C.      Plaintiffs' and Proposed Class Members' Bitter Experiences with Google's AdSense Program ...........................................14

          1.      Plaintiff FRC ...............................................14

          2.      Plaintiff Coconut Island Software, Inc. ........................20

          3.      Plaintiff Taylor Chose ......................................23

          4.      Plaintiff Matthew Simpson....................................27

          5.      Other Publishers, Similar Experiences ........................32

     D.      Reports from an Anonymous, Self-Described Former Employee of Google Regarding Google's Alleged Practice of Wrongfully Withholding Payment from AdSense Publishers ........................34

V.      CLASS ALLEGATIONS .............................................................................37

VI.     CLAIMS FOR RELIEF...............................................................................40

     FIRST CAUSE OF ACTION:  BREACH OF CONTRACT............................40

     A.      Google has breached the parties' contracts, entitling plaintiffs to damages for their performance thereunder..........................41

     B.      The contracts contain unconscionable terms that are unenforceable. ......................43

C.      The parties' contracts contain invalid and unenforceable liquidated damages provisions. .....................................................................................................................44

D.      When the unenforceable provisions are stricken from the contract, plaintiffs are left with recoverable damages for their performance under the contracts...........44

E.      Accounting ....................................................................................................................45

SECOND CAUSE OF ACTION:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ...........................................................................45

THIRD CAUSE OF ACTION:  UNJUST ENRICHMENT ...................................................48

FOURTH CAUSE OF ACTION:  VIOLATION OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)...............................................................50

A.      Violation of "Fraudulent" Prong of UCL ...................................................................51

B.      Violation of "Unlawful" Prong of UCL .....................................................................53

C.      Violation of "Unfair" Prong of UCL...........................................................................53

FIFTH CAUSE OF ACTION:  REQUEST FOR DECLARATORY RELIEF (CALIFORNIA DECLARATORY JUDGMENT ACT, CAL. CIV. PROC. CODE § 1060) ...................55

SIXTH CAUSE OF ACTION:  REQUEST FOR DECLARATORY RELIEF (FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)) ........................................55

PRAYER FOR RELIEF.................................................................................................................56

JURY TRIAL DEMANDED ........................................................................................................56

1       For their complaint against the defendant, plaintiffs, on their own behalf and on behalf of

2   all others similarly situated, allege as follows:

3                           **I.       INTRODUCTION**

4       1.       Google Inc. ("Google") owns and operates the AdSense advertising program.  One

5   part of the program is the AdSense for Content service.  By offering this service, Google induces

6   website operators—called publishers—to host advertisements on their websites in exchange for the

7   promise that Google will pay them a majority of the fees paid for these ads by advertisers.

8   Publishers earn funds when they display these advertisements to visitors or when visitors interact

9   with them.

10      2.       AdSense generates billions of dollars payable to AdSense publishers and billions of

11  dollars in profit to Google.  (http://adsense.blogspot.com/2012/12/working-better-together-

12  protecting.html ("Last year [2011] alone, we shared $6.5 billion with our AdSense publishers.")

13  (last accessed Sept. 8, 2014); http://investor.google.com/earnings/2014/Q2_google_earnings.html

14  ("Our partner sites generated revenues of $3.42 billion, or 21% of total revenues, in the second

15  quarter of 2014.  This represents a 7% increase over second quarter of 2013 network revenues of

16  $3.19 billion.") (last accessed Sept. 9, 2014).)  Were it not for publishers, their web properties, and

17  their content, there would be no AdSense program.  It is the publishers who invest time, money,

18  and energy in creating and maintaining websites that drive the consuming public to see and interact

19  with AdSense program ads, and they reasonably come to depend on the income that their web

20  properties generate.

21      3.       But as the plaintiffs and many other publishers have found, Google often shuts

22  down AdSense accounts very suddenly, including long-standing accounts that Google has profited

23  from over the years, without providing detail sufficient to permit the publisher to understand why

24  his or her account was terminated.  For example, as with two of the plaintiffs here, Google

25  sometimes terminates accounts due to its purported detection of "invalid activity," which can

26  include valid clicks, but it admits that its "[d]etection of [i]nvalid [c]licks" is performed via

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 1
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

"automated algorithms" in the "vast majority" of cases[1]; in other words, a machine may well determine the fate of a publisher's livelihood, no matter his or her good faith in hewing to Google's rules. Machines can certainly err, or they can fail to account for benign causes for a given set of clicks. But affected publishers are denied the opportunity to understand the supposed basis for termination of their accounts because Google withholds critical information from them *as a matter of policy* (albeit one that is not a part of the AdSense contract).[2]

4.     Further, as the plaintiffs found with respect to their own accounts, Google terminates publisher accounts even when publishers are materially compliant with Google's contract terms and policies. Google also terminates accounts when the websites at issue are materially the same as when Google approved the publishers' AdSense program applications. In fact, Google terminates accounts even after the publishers have been proactive in self-reporting potential issues with their websites—as Google encourages them to do—so that the publishers can determine if there are any problems that need fixing. Google even terminates accounts after its own representatives have praised the publishers' websites and reassured publishers that all is well with their accounts.

5.     As if these sudden, unwarranted, and unfair account terminations were not enough, Google also withholds all program earnings lawfully payable to the publishers at the time of termination. Google denies the terminated publisher *the entirety* of the expected funds, notwithstanding that the publisher earned all or at least a substantial portion of these funds by serving hundreds or thousands of ads without issue. This was the experience of the plaintiffs, and Google admits the practice is regular and systematic, in spite of contract language promising that

---

[1] http://www.google.com/ads/adtrafficquality/invalid-click-protection.html (last accessed Feb. 23, 2015).

[2] https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 (last accessed Feb. 23, 2015) ("Because we have a need to protect our proprietary detection system, we're unable to provide our publishers with *any information about their account activity*, including any web pages, users, or third-party services that might have been involved.") (emphasis added). Google does not explain how it is that telling a publisher which web pages that Google deems affected by bad clicks, or which website users it believes to have generated those clicks, or which "third-party services" it claims to have been involved, would imperil its "proprietary detection system." Google simply expects publishers to acquiesce in the grave information deficit it causes, even if it means the loss to the publisher of substantial sums of money.

Google will apply discretion in considering whether to withhold funds.  (*See*, *e.g.*, ¶¶ 30, 44, 58, 67, 80, *infra*.)

6.      Depending on when in a month it terminates a publisher, Google withholds payments due for the month before termination as well as all the days of the termination month up through the date of termination; in other words, Google regularly withholds payment corresponding to well over a month's, and closer to two months', ad serves.  Google withheld tens of thousands of dollars collectively from the plaintiffs here.  (*See*, *e.g.*, ¶¶ 30, 44, 58, 67, 80, *infra*.)

7.      And accounts abound of Google refusing to pay tens or hundreds of thousands of dollars—and even more—to other terminated publishers under its withhold-it-all policy.  (*See*, *e.g.*, "This Tech Company Says It Lost $1 million Because It Didn't Follow Google's Rules," *Business Insider*, Dec. 18, 2014 (http://www.businessinsider.com/google-search-ad-policies-cost-this-company-1-million-2014-12) (describing the withholding of funds from terminated publishers in the amounts of "nearly $1 million," "$500,000," "$200,000," "$300,000," "$46,000," "$35,000," and $35,000.") (last accessed February 23, 2015).)  As one self-described AdSense publisher reported: "It's common knowledge among SEOs that AdSense tends to be disabled a few days before the supposed payout.  I haven't lost any big sum—only $2000 but I know one person that lost $40,000.  It was all legitimate traffic coming straight from Google themselves, no click fraud no bought traffic etc.  PS: I was using AdSense from 2008 to 2013—over 5 years so it's not like only new users got banned."[3]

8.      Google's wrongful refusal to pay terminated AdSense publishers the monies they have earned and are owed is the subject of this lawsuit.  Under the law of the state of California, which governs plaintiffs' claims and the claims of the proposed class, Google's actions constitute or result in breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of the California Unfair Competition Law.

9.      Plaintiffs, on behalf of themselves and all Google AdSense publishers whose AdSense accounts were or are subject to Google's localized terms and conditions for the U.S.,

---

[3] https://news.ycombinator.com/item?id=7672910 (last accessed May 7, 2014).

1   American Samoa, Anguilla, Antigua and Barbuda, Aruba, Australia, Bahamas, Barbados, Belize,

2   Bermuda, Bulgaria, Canada, Cayman Islands, Czech Republic, Dominica, Egypt, Falkland Islands,

3   Grenada, Guyana, Haiti, Jamaica, Japan, Jordan, Libya, Montenegro, Montserrat, Morocco,

4   Netherland Antilles, New Zealand, Puerto Rico, Qatar, Saint Kitts and Nevis, Saint Lucia, Saint

5   Vincent and the Grenadines, Saudi Arabia, Serbia, Serbia and Montenegro, Singapore, Trinidad

6   and Tobago, Turkey, Turks and Caicos Islands, United Arab Emirates, United States Minor

7   Outlying Islands, Virgin Islands, Western Sahara, and Yemen, seek damages based on, and/or

8   restitution of, the sums wrongfully withheld from them and members of the proposed class; a

9   declaration that Google's adhesive contract terms purportedly allowing it to withhold all AdSense

10   funds owed to terminated publishers are unconscionable and unenforceable, and that they are

11   invalid and unenforceable penalties in violation of California law governing liquidated damages[4];

12   and injunctive relief requiring Google to determine and pay all AdSense funds earned and payable

13   to plaintiffs and the class of terminated publishers, and to prevent Google from withholding

14   payment to AdSense publishers under the circumstances complained of going forward; and for all

15   appropriate accountings to plaintiffs and the proposed class.

16                          **II.   JURISDICTION**

17          10.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).

18   Upon information and belief, based on Google's figures regarding the number of terminated

19   publishers and its practice of withholding monies owed to these publishers upon termination, the

20   amount in controversy in this proposed class action will exceed $5,000,000, exclusive of interest

21   and costs.  Also, three plaintiffs hail from Hawaii, Minnesota, and the Canadian province of British

22   Columbia, respectively, such that at least one member of the class of plaintiffs necessarily is a

23   citizen of a state other than California, where Google is a citizen.  Furthermore, given the

24   nationwide and international character of Google's AdSense program, plaintiffs believe, and

25

26          [4] Respectfully, plaintiffs continue to maintain the validity of their claim, on their own behalf
      and on behalf of the proposed class, that the AdSense contract terms at issue constitute invalid and
27   unenforceable penalties in violation of California law governing liquidated damages, and they
      preserve references to this claim throughout this Second Amended Class Action Complaint for
28   purposes of reconsideration and an appeal, if necessary.

1  therefore allege, that more than two-thirds of the members of the proposed class are citizens of

2  states (including foreign states) other than California.

3       11.    This Court has personal jurisdiction over the defendant because the defendant is

4  licensed to do business in the state of California and in fact conducts business in this state; also,

5  Google's applicable, localized AdSense terms and conditions at paragraph 14 state that Google

6  consents to personal jurisdiction "in the federal or state courts of Santa Clara County, California,

7  USA . . . ."  (*See*, *e.g.*, https://www.google.com/adsense/localized-terms?rc=US&ce=1 (last

8  accessed May 7, 2014)[5].)

9       12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as

10  unlawful practices are alleged to have been committed in this federal judicial district, and the

11  defendant resides and regularly conducts business in this district.

12       13.    Assignment to the San Jose division of this Court is appropriate because the

13  defendant has its headquarters in Mountain View, Santa Clara County, California, which is located

14  in this division of the Northern District of California.  Also, it is believed, and therefore alleged,

15  that many members of the proposed class reside or do business in the San Jose division of the

16  Northern District of California.  Furthermore, Google's applicable, localized AdSense terms and

17  conditions specify that claims such as these will be "litigated exclusively in the federal or state

18  courts of Santa Clara County, California, USA . . . ."  (*See*, *e.g.*,

19  https://www.google.com/adsense/localized-terms?rc=US&ce=1 (last accessed May 7, 2014).)

### III.    PARTIES

21       14.    Plaintiff Free Range Content, Inc. ("FRC") is a California corporation and former

22  AdSense publisher.

23       15.    Plaintiff Coconut Island Software, Inc., is a Hawaii corporation and former AdSense

24  publisher.

25       16.    Plaintiff Taylor Chose is a Minnesota resident and former AdSense publisher.

---

[5] The localized AdSense terms and conditions applicable to the non-U.S. publishers who are part of the proposed class, ¶ 102, *infra*, also are available by way of this link.

SECOND AMENDED CLASS ACTION COMPLAINT - 5
Case No. 5:14-cv-02329-BLF
010450-11 718002 V1

17.     Plaintiff Matthew Simpson is a British Columbia, Canada resident whose account was terminated by Google as described herein.

18.     Defendant Google is a Delaware corporation with its headquarters and principal place of business in Mountain View, California.  Google is America's leader in Internet advertising.  It was number 46 on the U.S. Fortune 500 for 2014, with 2014 revenues of $60.629 billion and profits of $12.92 billion.  (http://fortune.com/fortune500/google-inc-46/ (last accessed March 2, 2015).)

## IV.     RELEVANT FACTS

### A.     Google's AdSense program

#### 1.     Google's representations as to its AdSense program

19.     Google's AdSense program affords Google the ability to sell ads to advertisers that will appear on various non-Google websites and other non-Google properties.  (*See*, *e.g.*, https://www.google.com/adsense/www/en_US/tour/index.html (last accessed May 7, 2014).)  One part of the AdSense program is the AdSense for Content product, by which publishers serve ads on websites alongside content that attracts traffic to those sites.  Other AdSense products include (or have included) AdSense for Search, AdSense for Video, AdSense for Games, AdSense for Mobile, AdSense for Domains, and AdSense for Shopping.  (*See*, *e.g.*, https://support.google.com/adsense/topic/3384707?hl=en&ref_topic=1705997 (last accessed Sept. 9, 2014); *see also* https://support.google.com/adsense/topic/1705997?hl=en&ref_topic=1250102 ("AdSense delivers targeted, relevant ads to more than just websites. Link your AdSense account to YouTube, Blogger and other hosted platforms to help you get the most mileage. We also offer AdSense for games, video, search and mobile content.") (last accessed Sept. 9, 2014).)  In each instance, the object is to publish ads sold to advertisers by Google.

20.     Google touts AdSense as *sui generis*: a different beast altogether from potential competitors.  It refers to AdSense as an "innovative Google business solution that will help you unleash the true revenue potential of your site." (https://support.google.com/adsense/answer/9714?hl=en (last accessed Sept. 10, 2014).)  It touts as distinguishing features of AdSense the ability to:  "[r]un ads that will interest your users . . . ,

1    [l]everage Google search technology [no small matter given that Google is the world leader in

2    search] . . . , [r]un ads targeted to your audience . . . , and [g]et[] started" fast and easily.  (*Id.*)  In

3    addition, Google touts its unequalled access to advertisers: "With Google's AdWords advertisers

4    and certified ad networks, AdSense has the largest global advertiser pool on the web, which means

5    more competition for your unique content."

6    (http://static.googleusercontent.com/external_content/untrusted_dlcp/www.wweps.com/en/us/adse

7    nse/start/pdf/AdSense_GrowYourOnlineBusiness.pdf at 3 (last accessed Sept. 8, 2014).)  Given all

8    of these features of the AdSense program, the plaintiffs, like millions of other AdSense publishers,

9    were convinced that there was no real alternative to AdSense for publication of ads on web

10   properties.

11            **2.       AdSense is a California-based program**

12            21.       Upon information and belief, Google administers and operates its AdSense program,

13   and made the decisions and took the actions complained of herein, in California, including

14   specifically at its Mountain View, California headquarters.  More specifically, plaintiffs believe,

15   and therefore allege, that AdSense program payments issued from California, and that the decisions

16   and actions to disable publisher accounts and to withhold program payments from publishers were

17   made in California.  (*See*, *e.g.*,

18   http://www.bing.com/images/search?q=adsense+publisher+checks&FORM=HDRSC2 (displaying

19   images of various AdSense publisher checks bearing Google's Mountain View, California

20   address); http://www.google.com/about/careers/locations/mountain-view/ ("Inside Google

21   Mountain View (Global HQ)—[W]e've grown to fill a large Mountain View [California] campus

22   we call the Googleplex.  We've also expanded to offices throughout the region to offer a variety of

23   bay area [*sic*] jobs.  We work on products galore, like . . . AdSense . . . .  What kind of work do you

24   do at Google Mountain View?  The Googleplex is our corporate headquarters, so we do it all, from

25   engineering to sales, marketing, finance, legal, corporate communications and HR. Our products

26   include Android, Chrome, YouTube, Google+, Search, *Ads* and Commerce and Local.") (emphasis

27   added) (last accessed Sept. 6, 2014); *see also*

28   https://productforums.google.com/forum/#!msg/adsense/plqg5S8gGys/bKiwW4LwshoJ

(reproducing two emails an AdSense publisher received from "The Google AdSense Team" in

Mountain View, California) (last accessed Sept. 6, 2014).)

22.     Also, on or about February 29, 2014, plaintiff FRC received an email from Adam

Wolf at Google regarding AdSense Optimization.  The email gave a telephone number for Mr.

Wolf with a 650 area code, which covers Mountain View, California.

(http://en.wikipedia.org/wiki/Area_code_650 (last accessed Sept. 10, 2014).)  Additionally, a

LinkedIn page evidently belonging to Mr. Wolf indicates that he has been a Strategic Partner

Manager at Google since May 2012, and it lists as his job description: "Ad Serving, Network

Management, new Google products and User Experience for Strategic Partners in Google's

Publisher Network."  (https://www.linkedin.com/in/adamwolf13 (last accessed Sept. 6, 2014).)

The page lists Mr. Wolf's address as "San Francisco, California (San Francisco Bay Area)."  (*Id.*)

### 3.     Google's promises to pay publishers

23.     With respect to its AdSense for Content product, Google contracts with operators of

websites to publish ads in exchange for a percentage of the sums paid by advertisers to place and

run the ads.  (*See* https://support.google.com/adsense/answer/180195?hl=en (promising AdSense

for Content publishers a 68% revenue share and AdSense for Search publishers a 51% revenue

share, and indicating that Google does not "disclose the revenue share for other AdSense prod-

ucts . . . .") (last accessed Sept. 6, 2014).)  Thus, Google promises to pay publishers when visitors

to the publishers' web properties view, click on, or otherwise interact with these ads.  (*See*, *e.g.*, *id.*;

*see also* Ex. A (true and correct copy of AdSense U.S. Online Terms and Conditions, retrieved on

May 20, 2014 from https://www.google.com/adsense/localized-terms?rc=US&ce=1), ¶ 5 (promise

to pay)[6]; Ex. B (true and correct copy of AdSense U.S. Online Standard Terms and Conditions for

the early July 2012 timeframe, when plaintiff FRC became an AdSense program participant,

retrieved on May 20, 2014 from the Internet Archive via the Wayback Machine

(https://web.archive.org/web/20120706155053/https://www.google.com/adsense/localized-terms)),

---

[6] "Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google."  (*Id.*)

¶ 11 (promise to pay)[7]; and Ex. C (true and correct copy of the AdSense U.S. Online Terms of

Service then current when plaintiff FRC's AdSense account was disabled on or about March 1,

2014, retrieved on May 20, 2014 from the Internet Archive via the Wayback Machine

(https://web.archive.org/web/20140220205332/https://www.google.com/adsense/localized-terms)),

¶ 5 (promise to pay)[8].)

24.     In other words, such activity generates earnings on the part of publishers.  As

described in the paragraph immediately below, Google refers to "earnings" which it then

undertakes to withhold.

25.     Notably, the AdSense terms and conditions also provide: "Payments to you may be

withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any

amounts arising from invalid activity, as determined by Google in its sole *discretion*."  (Ex. A, ¶ 5;

Ex. C, ¶ 5; *see also* Ex. B, ¶ 11 (promising investigation).)  (But Google exercises no such

discretion with sums credited to advertisers upon termination of publishers' accounts.  In fact, in

extra-contractual documents, Google admits that whether it disables accounts for supposed invalid

activity or policy violations, it *always* withholds *all* earnings from the terminated publisher.[9]  (*See*

https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account

---

[7] "You shall receive a payment related to the number of valid clicks on Ads, the number of valid impressions of Ads, the number of valid completions of Referral Events initiated through Referral Buttons displayed in connection with your Property(ies), and/or other events performed in connection with the display of Ads on Your Property(ies), in each case as determined by Google for participants in the Program." (*Id.*)

[8] "Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google." (*Id.*)

[9] While Google states that it "return[s]" funds withheld from terminated publishers, its corresponding advertiser terms do not give advertisers the right to these funds.  The flip side of Google's advertising program is its AdWords product, by which advertisers contract to have their ads placed on AdSense publishers' websites.  (*See, e.g.*, https://support.google.com/adsense/answer/76231?hl=en ("The Google AdWords program enables you to create advertisements which will appear on relevant Google search results pages and our network of partner sites.") (last accessed Sept. 6, 2014).)  Among Google's AdWords terms and conditions is the following: "Customer understands that third parties may generate impressions or clicks on Customer's Ads for prohibited or improper purposes *and that its sole remedy is to make a claim for advertising credits within the Claim Period, after which Google will issue the credits following claim validation which must be used by the Use By Date*." (https://adwords.google.com/select/tsandcsfinder (emphasis added) (last accessed Sept. 7, 2014).)

1   disabled for invalid activity"—Q. "Will I be paid out for my AdSense earnings?"—A. "The

2   earnings on your account *will be* properly returned to the affected advertisers.") (emphasis added)

3   (last accessed Feb. 19, 2015); https://support.google.com/adsense/answer/2576043?hl=en

4   https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account

5   disabled for policy reasons"—Q. "Will I be paid out for my AdSense earnings?"—A. "The

6   earnings on your account *will be* properly returned to the affected advertisers.") (emphasis added)

7   (last accessed Feb. 19, 2015)).)

8          26.     Google's localized terms and conditions for American Samoa, Anguilla, Antigua

9   and Barbuda, Aruba, Australia, Bahamas, Barbados, Belize, Bermuda, Bulgaria, Canada, Cayman

10  Islands, Czech Republic, Dominica, Egypt, Falkland Islands, Grenada, Guyana, Haiti, Jamaica,

11  Japan, Jordan, Libya, Montenegro, Montserrat, Morocco, Netherland Antilles, New Zealand,

12  Puerto Rico, Qatar, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Saudi

13  Arabia, Serbia, Serbia and Montenegro, Singapore, Trinidad and Tobago, Turkey, Turks and

14  Caicos Islands, United Arab Emirates, United States Minor Outlying Islands, Virgin Islands,

15  Western Sahara, and Yemen are likewise available at https://www.google.com/adsense/localized-

16  terms (last accessed Mar. 2, 2015).  Each bears the same, or substantially the same, program

17  payment terms as set forth and described in ¶¶ 23-25, *supra*.[10]

18         **4.     Google's AdSense termination provisions**

19         27.     Google contracts with AdSense publishers consist of non-negotiable, adhesive terms

20  of participation.  (*See generally* Exs. A, B, and C.)  These contracts link to certain, specific non-

21  negotiated Google documents containing other adhesive terms.

22         28.     AdSense publishers are typically individuals or small businesses, such as the

23  plaintiffs in this matter.  Indeed, Google admits that the program attracts and serves all manner of

24  small publishers.  (Defendant Google Inc.'s Motion to Dismiss Plaintiffs' First Amended Class

25  Action Complaint (Dkt. No. 38) ("Google MTD") at 4 and n.1 (including cited materials)

26  ("AdSense is an online advertising service offered by Google that allows website publishers of all

27

28         [10] *See* ¶¶ 5, 10 thereof.

SECOND AMENDED CLASS ACTION COMPLAINT - 10
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

sizes to earn money by displaying Google-supplied ads on their sites. . . .  AdSense affords all types of publishers (including thousands of small businesses, individual bloggers, and other content producers who may lack dedicated advertising sales teams) access to a large pool of advertisers . . . .".)  Plaintiffs were not permitted to, and did not, negotiate any of these terms of service with the vastly larger and more powerful Google.

29.     Among Google's terms and conditions is the following: "Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason." (*See*, *e.g.*, Ex. A, ¶ 10; Ex. C, ¶ 10; *see also* Ex. B, ¶ 6.)  The agreement does not provide a right to terminate for *no* reason.  Thus, Google must have *a reason* to terminate and, as plaintiffs allege further herein, this conditional right to terminate must be exercised in good faith, or termination must be objectively reasonable, in light of the implied covenant of good faith and fair dealing and California's Unfair Competition Law.

**5.     Google's systematic withholding of 100% of publishers' last program earnings and related contractual provisions**

30.     Also among Google's terms and conditions are provisions purportedly allowing Google not to pay publishers for monies due them on their AdSense accounts upon Google's disabling of those accounts—though determinations not to pay terminated publishers, *if made at all*, are to be made in an exercise of Google's *discretion*.  (*See*, *e.g.*, Ex. A, ¶ 5 ("Payments will be calculated solely based on our accounting.  Payments to you *may* be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole *discretion*. . . .") (emphasis added), ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we *may* withhold unpaid amounts or charge back your account.") (emphasis added); Ex. B, ¶ 11 ("Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You . . . ."); Ex. C, ¶ 5 ("Payments will be calculated solely based on our accounting.  Payments to you *may* be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by

Google in its sole *discretion* . . . .") (emphasis added), ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we *may* withhold unpaid amounts or charge back your account.") (emphasis added).)  The AdSense agreement does *not* provide that Google *will* withhold 100% of publishers' last earnings upon termination.  Thus, as plaintiffs allege herein, any such conditional right on the part of Google to withhold payment must be exercised with discretion as to each terminated publisher, and in good faith (or withholding must be objectively reasonable), as required by the explicit terms of the contract, the implied covenant of good faith and fair dealing, and California's Unfair Competition Law.

31.    With respect to Google's withholding of funds for purported "invalid activity" on publishers' websites, "invalid activity," per Google's terms of service, is said to include "invalid clicks on Ads . . . ."  (*See*, *e.g.*, Ex. A, ¶ 5.)  These are purported to include clicks "generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from [the publishers'] IP addresses or computers under [their] control."  (*Id.*)  Thus, under these terms of service, a malicious competitor or other bad actor can undertake to sabotage an innocent publisher's AdSense account by bombing its site with ad clicks, for example, and Google might then point to its non-negotiated terms as supposed grounds for punishing that innocent publisher by withholding not only funds related to "invalid clicks," but also *all* monies earned for fully legitimate clicks.  (*See id.*)  But again, Google is contractually bound to apply *discretion* to the withholding of funds for invalid activity.  The contract does *not* provide that Google *will* withhold a publisher's last program earnings in their entirety for some amount of purportedly bad clicks (or for any other reason).

32.    Yet as Google admits, it *always* withholds a publisher's last earnings upon termination of his or her account for supposed invalid activity.  (*See* https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account disabled for invalid activity"—Q. "Will I be paid out for my AdSense earnings?"—A. "The earnings on your account *will be* properly returned to the affected advertisers.") (emphasis added) (last accessed Feb. 19, 2015).)  This practice of withholding *all* funds from affected publishers, with *no* application of discretion—and regardless of however many ads were legitimately served

1   by the publishers at the publishers' expense, and with the publishers' content as the driving force

2   for attracting legitimate ad consumers to their sites—is especially wrong given Google's massive

3   information-processing capabilities and its admitted ability to distinguish what it considers invalid

4   activity from that which it does not.  (*See* http://adsense.blogspot.com/2013/05/increasing-

5   accuracy-of-adsense-reporting.html ("As you may know, your earnings at the end of each month

6   currently reflect the amount you've earned *less any deductions for invalid activity. This is a step*

7   *we've always taken to ensure advertisers are not charged for such activity.* Until now, however,

8   clicks and impressions associated with this activity still appeared in AdSense performance reports.

9   Starting May 1st [2013], *we'll remove those associated clicks and impressions* to address this

10  discrepancy and provide you with the most accurate reporting." (emphasis added) (last accessed

11  Sept. 8, 2014).)

12          33.     Google itself acknowledges that innocent publishers can fall victim to "invalid

13  activity" that is not of their own doing, with the draconian consequence being account

14  termination—which leads to Google's refusal to pay the affected publisher any of what it earned

15  for the last program period.  (*See* http://adsense.blogspot.com/2012/12/working-better-together-

16  protecting.html ("But sometimes these tools [referring to tools Google purportedly uses "to keep

17  bad sites and bad traffic out of [its] network"] result in good publishers who become a source of

18  invalid activity having their accounts disabled without much recourse.") (last accessed Sept. 8,

19  2014).)  Yet Google continues to punish these good publishers by not only disabling their accounts,

20  but also by withholding all of their last program earnings, too, no matter how large or small, and no

21  matter how small the number of ads associated with what Google might consider invalid activity.

22  And to make matters worse, Google locks out publishers from their account information upon

23  termination, such that they are denied access to their account information including earnings data,

24  as well as even their publisher identification numbers.

25          34.     Google, by its own tally, has disabled a massive number of publisher accounts.  For

26  example, in a January 17, 2014 post entitled "Inside AdWords, Google's official blog for news tips

27  and information on AdWords"—a publication directed to the advertiser side of Google's

28  advertising ecosystem—Google states that "by the end of 2013" it had "[r]emoved more than

250,000 ad-funded publishers' accounts for various policy reasons."

(http://adwords.blogspot.com/2014/01/busting-bad-advertising-practices-2013.html?m=1 (last

accessed May 7, 2014).)  Given Google's contractual terms purportedly permitting it to withhold

payment to publishers with disabled accounts, the experience of the plaintiffs in seeing this policy

actually effected, and news and web reports, the total of earned funds that Google has refused to

pay its AdSense publishers is likely immense.

**B.      Google's Benefits from Withholding Terminated Publishers' Last Program Earnings from Them**

35.      Whatever Google does with earnings withheld from terminated publishers, it

benefits greatly.  As to any of the publishers' share kept by Google, the financial benefit is

obvious; it is enriched by the money withheld.  But even if in all instances Google actually returns

the terminated publisher's share and its own to supposedly affected advertisers—a paradigm which

plaintiffs certainly lack sufficient knowledge to admit—Google still benefits.  The practice would

draw considerable and valuable goodwill from the benefiting advertiser, which (a) already has had

its ads served, perhaps to great effect in terms of sales or other profitmaking; and (b) accordingly

sees its ad budget enhanced with unexpected funds—which it likely will spend with Google, which

has just given it free advertising (indeed, the advertiser would have to spend the money with

Google if "returning" funds to the advertiser means that the advertiser's account is merely credited,

per Google's AdWords policy, *see* n.9, *supra*).

36.      For these reasons, Google loses nothing, and likely gains much, whenever it

terminates publishers and returns the publishers' share of program funds, as well as its own share,

to advertisers.  Google gets the money back—and likely much more—from advertisers that are

pleased with their very good fortune.

**C.      Plaintiffs' and Proposed Class Members' Bitter Experiences with Google's AdSense Program**

**1.      Plaintiff FRC**

37.      Google has wrongfully withheld money due plaintiff FRC under its AdSense

program.

SECOND AMENDED CLASS ACTION COMPLAINT - 14
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

38.     FRC owns the Repost content syndication service and the website Repost.us.  In or about July 2012, plaintiff became an AdSense publisher for pages served on various websites under its Repost.us brand.[11]  This sort of publication is expressly permitted by Google.  (https://support.google.com/adsense/answer/1346295 ("Ads on the same page or site as another publisher.  If a website is in compliance with our program policies and the company or owner of the site has given you permission to display ads on their site, you may place our ad code along with the other publisher's ad code on the same page.  You will, however, need to contact your web hosting company or the owner of the website to obtain permission to display ads on their web-site. . . .") (last accessed Sept. 6, 2014).)  Websites on which AdSense ads were to be placed by FRC complied with Google's AdSense program policies, to the best of FRC's knowledge; accordingly, FRC alleges the same.  Any time a new site started taking content with AdSense ads, FRC would check it out for compliance with AdSense program policies.  Also, FRC monitored participating sites for compliance with AdSense policies.  Additionally, FRC obtained the requisite permission from the "company or owner of the site[s]" before proceeding with AdSense ad placement.[12]  Then, in good faith, FRC expended significant time and money in effecting publication of thousands of ads, from various advertisers, under the AdSense program.

---

[11] FRC became an AdSense publisher following Google's approval of its AdSense program application.  (See https://support.google.com/adsense/answer/10162?hl=en (referring to application process and stating that "[o]nce our systems detect that you've placed the ad code on a live page, we automatically continue the review process and check that your site complies with our policies.  When we've completed the second review, we send you an email letting you know the status of your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to FRC's account following Google's approval of FRC's application.

[12] Indeed, as explained in fn.13, *infra*, Google said nothing about FRC's ad placement in its termination notice—it merely identified supposed "invalid activity in [FRC's] AdSense account."  But to be clear, with respect to websites on which AdSense ads were served: FRC did not encourage accidental clicks. FRC did not display ads in such a way that they might have been mistaken for other website content.  FRC did not place ads under misleading headers or titles.  FRC did not use language to encourage users to click on ads.  FRC did not bring unnecessary or unnatural attention to its ads.  FRC did not place ads on pages or sites where dynamic content was the primary focus.  FRC did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.  FRC did not place ads on non-content-based pages.  FRC did not offer users compensation for clicking ads.  FRC did not disguise ads on its webpages.  FRC did not attempt to associate specific images with individual ads appearing on their sites.  FRC did not display its content below the fold.  FRC did not display ads in software applications.  FRC did not display ads in email messages.  FRC did not display ads from any other publishers.  FRC did not display more than the maximum of three standard ad units, three link units, and two search boxes

39.     Furthermore, and more specifically, FRC complied with all terms set forth in Google's AdSense terms and conditions, *see* Exs. A-C, including each of the linked AdSense Program Policies and the Google Branding Guidelines.  Also, FRC knows that program ads were served successfully because its representatives saw them in many instances and, further, because of Google's periodic reports of successful publication of these ads and its AdSense program payments to FRC.

40.     All went well until February 2014, when estimated earnings for ads by the FRC, as reported by Google, began to increase at a previously unseen rate.  This increase was depicted in the online dashboard that Google made available to FRC before it terminated FRC's account.  That dashboard also showed a difference between a higher earnings number and a lower payable number, suggesting to FRC that Google's automated systems were seizing on some sort of issue, real, or merely a function of something benign having caught the attention of the algorithm.

41.     FRC then reported the increase to Google, asking for help to ascertain why the increase was happening and also seeking aid to correct it if there actually was a problem. Additionally, FRC attempted to identify the reason for the spike on its own.  FRC was not responsible for this spike in earnings in the sense that it did nothing to cause invalid activity, including invalid clicks, if in fact there were any.  To this day, FRC is not personally aware of any invalid activity of any kind actually associated with its account.  FRC simply, in good faith, took note of: (a) Google's own data, as available on the online dashboard available to FRC before FRC was terminated, between earnings (or some such term, which was the higher number) and finalized earnings (or some such term, which was the lower number); and (b) spikes in clicks, as to which it asked Google to help to determine if the increases were actually problematic in any way.  To the best of FRC's personal knowledge, it complied with all of Google's contractual terms, policies, and guidelines.

---

on one webpage.  FRC did not display ads on password-protected pages.  FRC websites did not have more than three pop-ups.  And FRC did not display ads in pop-up windows.  FRC does not hereby admit that the foregoing statements of performance are based on binding or material contractual terms.

42.     Alternatively, in the event that invalid activity, including but not limited to invalid clicks, actually occurred on websites where FRC served AdSense ads, such activity was not caused by FRC or anyone affiliated with or known to FRC; therefore, any such invalid activity was not within the reasonable control of FRC.  For this reason, FRC's performance with respect to any such invalid activity, or its prevention, should be excused, including by way of the *force majeure* clause at paragraph 14 of the AdSense terms and conditions.  (*See* Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.").)

43.     Shortly after the FRC reached out to Google, it received a note asking it to set up an appointment to speak with a representative from the AdSense team.  FRC did as requested, scheduling a call for March 6, 2014.

44.     At the end of February 2014, Google had reported that FRC's estimated earnings for February 2014 were over $40,000.  To FRC, it seemed unlikely, based on its history with the program and Google's reports, that the number was correct; it seemed too high.  But certainly FRC was due, if not all the estimated earnings, some substantial portion of those estimated earnings, amounting to several thousands of dollars—perhaps in the $8,000 to $11,000 range, per FRC's recollection of Google's own performance report for February 2014 that was available to FRC online before Google terminated FRC and locked it out of its account—for AdSense ads that FRC had dutifully served in February 2014 before Google disabled its account.  It bears underscoring that while Google has attempted to mislead by speaking of FRC's reference in plaintiffs' first amended complaint to an $8,000 to $11,000 range as an admission by FRC that 75% or more of its clicks were invalid, *see* Google MTD (Dkt. No. 38) at 7,[13] such is not the case.  Rather, FRC was

---

[13] According to Google, it "disabled FRC's AdSense account in March 2014, following a dramatic spike in earnings, at least 75-80% of which even FRC itself attributes to invalid activity. (FAC, ¶¶ 29-31 (admitting that of $40,000 earned, between $8,000 and $11,000 was valid).)."  But there was no such admission in plaintiffs' first amended complaint.  (Dkt. No. 27, ¶¶ 29-31.)  As is plain from FRC's allegations, it simply was referring to *Google's* numbers.  And FRC could never determine the accuracy of Google's numbers due to Google's policy of not providing information when it disables accounts for supposed "invalid activity."  (*See* ¶ 45, *supra.*)

referring in good faith to what it recollected seeing on Google's dashboard before Google terminated its account.

45.     Then on March 4, 2014—two days before the March 6, 2014 call with the AdSense representative was to occur—FRC received word from the AdSense program that Google had disabled its account.  Google offered no explanation, other than a reference to its supposed detection of "invalid activity in [FRC's] AdSense account."  (Dkt. No. 39-7 at 2.)  Notably, "invalid activity," as defined by Google, is a nebulous concept and refers in Google's AdSense contract to invalid clicks but also to events other than invalid clicks.  (*See* Exs. A and C, ¶ 5 (referring, *inter alia*, to "[a]ds served to end users whose browsers have Java Script disabled").)  Yet as Google wrote in its termination notice, underscoring the lack of meaningful information that it had provided regarding the supposed reason for termination of FRC's account: "We're limited in the amount of information we can provide about your specific violation.  We understand this can be frustrating for you, but we've taken these precautionary measures because intentional violators can use this information to circumvent our detection systems."  (Dkt. No. 39-7 at 2.)  So what exactly was Google referring to by "invalid activity"?  It did not say.  (*Id.*)  Further, as is its practice, Google, upon disablement of FRC's account, also locked out FRC from access to its AdSense publisher account information and details.

46.     FRC was shocked to hear of its account termination, given that it had itself alerted Google to a potential problem with its account and sought in good faith to identify and correct whatever problem there actually might be.  It promptly filed in writing the appeal referenced in the termination notice, even though it was greatly hobbled by the fact that Google was withholding critical information from it, including the most basic information about what sort of "invalid activity" Google had supposedly detected; where the "invalid activity" had supposedly occurred (again, bearing in mind that Google defines "invalid activity" as including events other than problematic clicks, *see* Exs. A and C, ¶ 5); and where it supposedly came from.  Google mandates that appellants use a form to appeal,[14] and that form allows only a short explanation (limited, upon

---

[14] https://support.google.com/adsense/answer/2576043?hl=en
https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 (to appeal the

1   information and belief, to a mere 1,000 characters) of the bases for the appeal—or for whatever

2   bases the terminated publisher can muster, given his or her severe information deficit.  By way of

3   this appeal, FRC sought not only reinstatement of its account, but also the earnings owed it and

4   withheld by Google.

5          47.     Also, FRC's telephone conference with the Google AdSense representative took

6   place as planned on March 6, 2014.  During this call, the AdSense representative sounded

7   sympathetic but made it plain that he had no control over the matter.  The representative also

8   indicated that FRC would be paid its earnings for the last payment period only if Google granted its

9   appeal.  Shortly thereafter, FRC received a terse letter from Google, dated March 7, 2014, rejecting

10  its appeal.  Given the short turnaround time, FRC doubts, with good reason, that its appeal received

11  any sort of real attention.  In fact, given the paucity of information that FRC could address in its

12  appeal, thanks to Google's admitted refusal to provide meaningful details with its disablement

13  notice, Dkt. No. 39-7 at 2, coupled with the restrictive appeal form that Google required FRC to

14  use, Google's appeal process was an exercise in bad faith and unreasonableness; it was mere

15  pretense to confirming the decision already made.

16         48.     Thus, having disabled FRC's AdSense account, Google refused to pay FRC *any* of

17  the sums it owed FRC for having served many thousands of AdSense ads on Repost.com-branded

18  webpages during the last pay period.  Google made no attempt to limit what it withheld, whether

19  based on an assessment of the ad serves supposedly affected, or the time-scope of whatever

20  problem it supposedly had identified with FRC's AdSense account, or the supposed severity of the

21  purported problem, or on any other factor—Google simply withheld *all* of FRC's earnings for the

22  last payment period, as it admits it always does, ¶ 25, *supra*, with no discretion or good faith

23  applied, contrary to FRC's contractual expectations.

24

25

26

27  _____

disabling of a publisher's account, the publisher is advised on a help page (that is not linked to the
program terms and conditions) to "please contact [Google] **only** through [its] appeal form)
28  (emphasis in original) (last accessed Feb. 19, 2015).

49.     Like all of the plaintiffs, FRC was a much, much smaller entity than the behemoth Google.  FRC was afforded no opportunity, and was unable, to negotiate any of the AdSense terms of service or policies with Google.

**2.      Plaintiff Coconut Island Software, Inc.**

50.     Google has wrongfully withheld money due plaintiff Coconut Island Software, Inc. ("CIS") under its AdSense program.

51.     CIS was an AdSense publisher continuously from March 2005[15] through November 2012, when Google disabled its publisher account.  As is its practice, upon disablement of CIS's account, Google locked out CIS from access to its AdSense publisher account information and details.

52.     Like all of the plaintiffs, CIS is a much, much smaller entity than Google.  CIS was afforded no opportunity, and was unable, to negotiate any of the AdSense terms of service or policies with Google.

53.     During the time period when CIS's publisher account was active, CIS successfully served many thousands of ads for various advertisers under the AdSense program.  CIS served these ads on its websites, including www.healthcarehiring.com and www.e-physician.info.  CIS knows that program ads were served successfully on its websites because its owner saw those published ads in many instances, and also because of Google's periodic reports of successful publication of these ads and its receipt of AdSense program payments.  Indeed, for years, a substantial portion of the family income for CIS's owner came from Google AdSense payments.

54.     Also—and without admitting that the following statements of performance are based on binding or material contractual obligations—CIS websites bore extensive, unique, and original content.  Further, CIS did not place AdSense ads on sites with little to no original content,

---

[15] CIS's owner recalls that CIS became an AdSense publisher following Google's approval of its AdSense program application.  (*See* https://support.google.com/adsense/answer/10162?hl=en (referring to application process and stating that "[o]nce our systems detect that you've placed the ad code on a live page, we automatically continue the review process and check that your site complies with our policies. When we've completed the second review, we send you an email letting you know the status of your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to CIS's account following Google's approval of CIS's application.

or on pages with no content.  Additionally, CIS assured a good user experience through clear navigation and organization; users were able to easily click through its webpages and find the information they are seeking.[16]  In sum, and without admitting that they were part of the AdSense contract or admitting their materiality if they are deemed to be, CIS complied with Google's webmaster guidelines by offering significant value to end users by the provision of unique and relevant content on its websites, and it did not place ads on sites with little to no original content.

55.     Furthermore, CIS complied with all terms set forth in Google's AdSense terms and conditions, *see* Exs. A-C, including each of the linked AdSense Program Policies and the Google Branding Guidelines.  CIS caused no invalid activity, including invalid clicks, on its websites, and it is not aware of any.[17]  Also, CIS knows that program ads were served successfully because its representatives saw them in many instances and, further, because of Google's periodic reports of successful publication of these ads and its AdSense program payments to CIS.

56.     Though Google deems participation in its AdSense program to be free, participation was not free to CIS.  Rather, over the years, CIS paid or spent thousands of dollars on website programming, software, hosting fees, connectivity fees, and equipment costs.  Also, its owner

---

[16] What is more, CIS did not encourage accidental clicks. CIS did not display ads in such a way that they might have been mistaken for other website content. CIS did not place ads under misleading headers or titles. CIS did not use language to encourage users to click on ads.  CIS did not bring unnecessary or unnatural attention to its ads.  CIS did not place ads on pages or sites where dynamic content was the primary focus.  CIS did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.  CIS did not place ads on non-content-based pages.  CIS did not offer users compensation for clicking ads.  CIS did not disguise ads on its webpages.  CIS did not attempt to associate specific images with individual ads appearing on their sites.  CIS did not display its content below the fold.  CIS did not display ads in software applications.  CIS did not display ads in email messages.  CIS displayed ads only from Google's AdSense network.  CIS did not display ads from any other publishers.  CIS did not display more than the maximum of three standard ad units, three link units, and two search boxes on one webpage.  CIS did not display ads on password-protected pages.  CIS websites did not have more than three pop-ups.  And CIS did not display ads in pop-up windows.  CIS does not hereby admit that the foregoing statements of performance are based on binding or material contractual terms.

[17] Alternatively, in the event that invalid activity, including but not limited to invalid clicks, occurred on websites where CIS served AdSense ads, such activity was not caused by CIS or anyone affiliated with or known to CIS; therefore, any such invalid activity was not within the reasonable control of CIS.  For this reason, CIS's performance with respect to any such invalid activity, or its prevention, should be excused, including by way of the *force majeure* clause at paragraph 14 of the AdSense terms and conditions.  (Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.").)

worked hard, and often full-time, at developing the websites where the AdSense program ads were run, and at generating content for those websites.  At all times he worked in good faith to comply with Google's AdSense contract, Google's program policies, and Google's webmaster guidelines.

57.     Google stated (in part) in its November 16, 2012 termination notice that CIS's publisher account was being disabled because Google's "specialists" purportedly had "found that it was not in compliance with [Google's] policies," but Google merely offered vague references to various "webmaster guidelines."  (Dkt. No. 39-9 at 2.)  And in the same notice, in an admission that there was no actual violations of specific policies, Google stated that CIS's "sites violate the *spirit* of [its] policies," such that it was disabling CIS's account.  (*Id.* (emphasis added).)  In fact, CIS did not violate any AdSense policy intentionally, and it is unaware of any unintentional policy violations.  To illustrate Google's bad faith and capriciousness in terminating CIS's publisher account, attached as Exhibit G are copies of screenshots of websites similar to CIS's which appear to be displaying AdSense advertisements to this day.

58.     When Google disabled CIS's publisher account, CIS, based on CIS's previous review of Google's earnings tool, was owed approximately $2,400.  That same day, November 16, 2012, according to Google's records provided with its motion to dismiss plaintiffs' first amended complaint, Dkt. No. 39-10 at 2, CIS appealed.[18]  Because of Google's failure to provide CIS with meaningful information as to why its account had been terminated, its owner could only speculate on what to address.  So he stated in part in CIS's appeal: "Please help me.  I have no idea why this happened.  I have been an adsense publisher for 7 years and have many websites, all of them displaying real content that has taken years of work to develop.  I have been to adsense-in-your-city and discussed sites with policy staff. . . ."  (*Id.*)  But it was to no avail.  A mere three days later, Google denied CIS's appeal, with no help or explanation whatsoever; all Google said to its longtime publisher was that its account "was found to violate [its] program policies," so it was disabled.  (*Id.*)  Given the short turnaround time and the lack of information in Google's notice, CIS doubts, with good reason, that its appeal received any sort of real attention.  In fact, given the

---

[18] CIS used the same form, with the same limitations, that FRC used.  (*See* ¶ 46 and n.14, *supra*.)

1  paucity of information that CIS could address in its appeal, thanks to Google's failure to provide

2  meaningful details with its disablement notice, coupled with the restrictive appeal form that Google

3  required CIS to use, Google's appeal process was an exercise in bad faith and unreasonableness; it

4  was mere pretense to confirming the decision already made.

5        59.    Thus, having disabled CIS's AdSense account, Google refused to pay CIS *any* of

6  the sums it owed CIS for having served ads on its webpages since the time it was last paid—a

7  period of well over a month, *i.e.*, all of October 2012 and half of the month of November 2012.

8  Google made no attempt to limit what it withheld, whether based on an assessment of the ad serves

9  supposedly affected, or the time-scope of whatever problem it supposedly had identified with CIS's

10  AdSense account, or the supposed severity of the purported problem, or on any other factor—

11  Google simply withheld *all* of CIS's earnings for the last payment period, as it admits it always

12  does, ¶ 25, *supra*, with no discretion or good faith applied, contrary to CIS's contractual

13  expectations.

14        **3.    Plaintiff Taylor Chose**

15        60.    Google has wrongfully withheld money due plaintiff Chose under its AdSense

16  program.

17        61.    Ms. Chose became an AdSense publisher in or about September 2013.[19]  Near or

18  about the end of November 2013, Google disabled Ms. Chose's publisher account.  As is its

19  practice, upon disablement of her account, Google locked out Ms. Chose from access to her

20  AdSense publisher account information and details.

21        62.    Like all of the plaintiffs, Ms. Chose is no match for Google's power—she is simply

22  an individual web publisher who sought in good faith to use Google's AdSense product.  Ms.

23

24

_____

25        [19] Ms. Chose became an AdSense publisher following Google's approval of her AdSense
program application.  (*See* https://support.google.com/adsense/answer/10162?hl=en (referring to
26  application process and stating that "[o]nce our systems detect that you've placed the ad code on a
live page, we automatically continue the review process and check that your site complies with our
27  policies. When we've completed the second review, we send you an email letting you know the
status of your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with
28  respect to her account following Google's approval of her application.

1    Chose was afforded no opportunity, and was unable, to negotiate any of the AdSense terms of

2    service or policies with Google.

3         63.    During the time period when Ms. Chose's publisher account was active, Ms. Chose

4    successfully served ads for various advertisers under the AdSense program.  She served these ads

5    on her website www.teens-read.com.  Ms. Chose knows that program ads were served successfully

6    on her website because she saw those published ads in several instances.  Also, prior to being

7    locked out of her account details, Ms. Chose saw Google's periodic reports of successful

8    publication of ads on her website.  Additionally, Ms. Chose's receipt of AdSense program

9    payments prior to her account disablement demonstrated that she had performed successfully under

10   the AdSense program.  Furthermore, Ms. Chose complied with all terms set forth in Google's

11   AdSense terms and conditions, *see* Exs. A-C, including each of the linked AdSense Program

12   Policies and the Google Branding Guidelines.  She caused no invalid activity on her website,

13   including invalid clicks, and she is not aware of any.[20]

14        64.    Also—and without admitting that the following statements of performance are

15   based on binding or material contractual obligations—Ms. Chose's website bore unique and

16   original content.  Further, she did not place AdSense ads on sites with little to no original content,

17   or on pages with no content.  Additionally, Ms. Chose assured a good user experience through

18   clear navigation and organization; users were able to easily click through her website in order to

19   find the content they were seeking.[21]  In sum, and without admitting that they were part of the

20

21   [20] Alternatively, in the event that invalid activity, including but not limited to invalid clicks,
     occurred on websites where Ms. Chose served AdSense ads, such activity was not caused by Ms.

22   Chose or anyone affiliated with or known to her; therefore, any such invalid activity was not within
     the reasonable control of Ms. Chose.  For this reason, Ms. Chose's performance with respect to any

23   such invalid activity, or its prevention, should be excused, including by way of the *force majeure*
     clause at paragraph 14 of the AdSense terms and conditions.  (Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither

24   party will be liable for inadequate performance to the extent caused by a condition (for example,
     natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet

25   disturbance) that was beyond the party's reasonable control.").)

26   [21] What is more, Ms. Chose did not encourage accidental clicks.  Ms. Chose did not display ads
     in such a way that they might have been mistaken for other website content.  Ms. Chose did not

27   place ads under misleading headers or titles.  Ms. Chose did not use language to encourage users to
     click on ads.  Ms. Chose did not bring unnecessary or unnatural attention to its ads.  Ms. Chose did

28   not place ads on pages or sites where dynamic content was the primary focus.  Ms. Chose did not
     place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.

AdSense contract or admitting their materiality if they are deemed to be, Ms. Chose complied with Google's webmaster guidelines by offering significant value to end users by the provision of unique and relevant content on its websites, and it did not place ads on sites with little to no original content.

65.     Furthermore, though Google deems participation in its AdSense program to be free, participation was not free to Ms. Chose.  Rather, Ms. Chose paid monthly hosting fees, in addition to the cost of purchasing her domain name.  Also, she expended time in generating content for her website, and content is what drives viewers to websites in the AdSense network, which benefits both advertisers and Google.

66.     Google stated in its November 27, 2013 termination notice that it is "important for sites displaying AdSense ads to offer significant value to the user by providing unique and relevant content, and not to place ads on auto-generated pages or pages with little to no content."  (Dkt. No. 39-11 at 2.)  Aside from providing four very general examples of what it might mean, Google provided no further explanation for why it disabled her account.  (*See id.*)  Google's notice made no sense to Ms. Chose because she created her own content, and because she had violated none of the four principles cited by Google.  In fact, Ms. Chose did not violate any AdSense policy intentionally, and she is unaware of any unintentional policy violations.  To illustrate Google's bad faith and capriciousness in terminating Ms. Chose's publisher account, attached as Exhibit H are copies of screenshots of a website which displayed AdSense advertisements the same way in which Ms. Chose published them.

---

Ms. Chose did not place ads on non-content-based pages.  Ms. Chose did not offer users compensation for clicking ads.  Ms. Chose did not disguise ads on its webpages.  Ms. Chose did not attempt to associate specific images with individual ads appearing on their sites.  Ms. Chose did not display its content below the fold.  Ms. Chose did not display ads in software applications.  Ms. Chose did not display ads in email messages.  Ms. Chose displayed ads only from Google's AdSense network.  Ms. Chose did not display ads from any other publishers.  Ms. Chose did not display more than the maximum of three standard ad units, three link units, and two search boxes on one webpage.  Ms. Chose did not display ads on password-protected pages.  Ms. Chose websites did not have more than three pop-ups.  And Ms. Chose did not display ads in pop-up windows.  Ms. Chose does not hereby admit that the foregoing statements of performance are based on binding or material contractual terms.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

67.     When Google disabled Ms. Chose's publisher account, she was owed approximately $25,000, based on her best estimate.  But the exact number is difficult to confirm because, as stated above, Google locks out publishers from their account details upon disabling their accounts.

68.     Having disabled Ms. Chose's AdSense account, Google refused to pay her *any* of the sums it owed her for having served ads on her website during the last pay period.  Google made no attempt to limit what it withheld, whether based on an assessment of the ad serves supposedly affected, or the time-scope of whatever problem it supposedly had identified with Ms. Chose's AdSense account, or the supposed severity of the purported problem, or on any other factor— Google simply withheld *all* of Ms. Chose's last program earnings, as it admits it always does, ¶ 25, *supra*, with no discretion or good faith applied, contrary to Ms. Chose's contractual expectations.

69.     Ms. Chose did not appeal the termination of her account.  The AdSense terms and conditions did not tell her that an appeal was possible, nor did her termination notice.  (Dkt. No. 39-11 at 2.)  In fact, it told her that no action was required.  (*Id.*)  She also did not dispute the withholding of her earned program funds, including pursuant to paragraph 5 of the terms and conditions.  (Ex. A, ¶ 5; Ex. C, ¶ 5.)  But she certainly did not mean to waive or forfeit her right to maintain this action in court.  Rather, in her view, the language at issue in paragraph 5 did not pertain to the withholding of her program payments upon termination; it referred to the notification of Google within "30 days of any such payment," and there was *no* payment to her upon termination.  Furthermore, it appeared in a paragraph with the heading "Payments," rather than in the paragraph entitled "Termination."  (*Cf.* Ex. A, ¶ 10; Ex. C, ¶ 10.)  Also, given that Google had locked out Ms. Chose from her account upon termination, she had no access to her publisher identification number, and it was her understanding that she needed that number to communicate with Google about her account.  Additionally, paragraph 5 of the terms and conditions, and the terms and conditions altogether, provided no address at which to notify Google in writing of any dispute.  (*See* Exs. A and C, ¶ 5.)  Also, in its termination notice, Google gave her no meaningful information on which to base a dispute regarding the withholding of her funds.  (Dkt. No. 39-11 at 2.)

70.     Indeed, in a help article entitled "Deductions from earnings FAQs," Google states that when it makes deductions from earnings "for invalid click activity or for activity that was not in compliance with Google policy," it "adjust[s] [the publisher's] earnings and reimburse[s] the advertisers who paid for these clicks."  (https://support.google.com/adsense/answer/2808531?hl=en (last accessed February 17, 2015).)  This is what Google told Ms. Chose it was doing upon termination of her account.  (Dkt. No. 39-11 at 2 ("As your account has been permanently disabled, we will withhold payment of your account balance. . . .  The earnings on your account will be returned to the affected advertisers.").)  And in the "Deductions from earnings FAQs," Google explicitly states in answer to the question, "I'd like to appeal the deduction.  Can I do so?"— "*Unfortunately you can't appeal the deduction*." (https://support.google.com/adsense/answer/2808531?hl=en (emphasis added).)  Coupled with the reasons set forth in the previous paragraph of the instant complaint, this statement on the part of Google further illustrates that in the situation alleged, Ms. Chose was not required to notify Google within 30 days that she disputed the earnings kept from her and returned to advertisers (per Google in its disablement notice to her).

71.     Under the circumstances described herein, the fact that Ms. Chose did not dispute the withholding of her final program earnings within 30 days should not work as a waiver or forfeiture, nor should it impede her ability to maintain this suit.  *See* CAL. CIV. CODE § 1442 ("CONDITIONS INVOLVING FORFEITURE, HOW CONSTRUED. A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created.").

**4.     Plaintiff Matthew Simpson**

72.     Google has wrongfully withheld money due plaintiff Simpson under its AdSense program.

73.     Mr. Simpson was an AdSense publisher from approximately February 2012[22] through approximately mid-June 2013, when Google disabled his publisher account.  As is its

---

[22] Mr. Simpson became an AdSense publisher following Google's approval of his AdSense program application, on or shortly after August 15, 2011.  (*See* https://support.google.com/adsense/answer/10162?hl=en (referring to application process and stating that "[o]nce our systems detect that you've placed the ad code on a live page, we

practice, upon disablement of Mr. Simpson's account, Google locked out Mr. Simpson from access to his AdSense publisher account information and details.

74.     Like all of the plaintiffs, Mr. Simpson is no match for Google's power—he is simply an individual web publisher who sought in good faith to use Google's AdSense product. Mr. Simpson was afforded no opportunity, and was unable, to negotiate any of the AdSense terms of service or policies with Google.

75.     During the time period when Mr. Simpson's publisher account was active, Mr. Simpson successfully served thousands of ads for various advertisers under the AdSense program. He served these ads mainly on his websites www.konacoffeebeans.org, www.classicalmusicheadphones.com, and www.case-cafe.com.  Mr. Simpson knows that program ads were served successfully on his websites because he saw those published ads in many instances, and also because of Google's periodic reports of successful publication of these ads and his receipt of AdSense program payments.  Furthermore, Mr. Simpson complied with all terms set forth in Google's AdSense terms and conditions, *see* Exs. A-C, including each of the linked AdSense Program Policies and the Google Branding Guidelines.

76.     Also—and without admitting that the following statements of performance are based on binding or material contractual obligations—Mr. Simpson's websites bore unique and original content.  Further, he did not place AdSense ads on sites with little to no original content, or on pages with no content.  Additionally, Mr. Simpson assured a good user experience through clear navigation and organization; users were able to easily click through his websites in order to find the content they were seeking.[23]  In sum, and without admitting that they were part of the AdSense

---

automatically continue the review process and check that your site complies with our policies. When we've completed the second review, we send you an email letting you know the status of your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to Mr. Simpson's account following Google's approval of his application.

[23] What is more, Mr. Simpson did not encourage accidental clicks. Mr. Simpson did not display ads in such a way that they might have been mistaken for other website content.  Mr. Simpson did not place ads under misleading headers or titles.  Mr. Simpson did not use language to encourage users to click on ads.  Mr. Simpson did not bring unnecessary or unnatural attention to its ads.  Mr. Simpson did not place ads on pages or sites where dynamic content was the primary focus.  Mr. Simpson did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.  Mr. Simpson did not place ads on non-content-based pages.  Mr. Simpson

contract or admitting their materiality if they are deemed to be, Mr. Simpson complied with Google's webmaster guidelines by offering significant value to end users by the provision of unique and relevant content on its websites, and he did not place ads on sites with little to no original content.

77.     Furthermore, though Google deems participation in its AdSense program to be free, participation was not free to Mr. Simpson.  Rather, Mr. Simpson paid website hosting fees and the cost of domain registrations, which cost some $150 per year.  Also, he expended time in generating content for his websites, and content is what drives viewers to websites in the AdSense network, which benefits both advertisers and Google.  Further, because Mr. Simpson's websites offered his headphone and coffee reviews, he spent approximately $700 on headphones and coffee while he was a publisher, so that he could review those items.  And he also spent 5-6 hours per day on various occasions giving advice on coffee and headphones in relevant forums, and these efforts served to drive traffic to his AdSense ad-bearing websites.

78.     Google stated in its June 2013 termination notice that Mr. Simpson's publisher account was being disabled supposedly because of a detection of "invalid activity on his site," Dkt. No. 39-12 at 2, but Google offered no explanation as to what invalid activity it purportedly had detected.  Notably, "invalid activity," as defined by Google, is a nebulous concept and refers in Google's AdSense contract to invalid clicks but also to events other than invalid clicks.  (*See* Exs. A and C, ¶ 5 (referring, *inter alia*, to "[a]ds served to end users whose browsers have Java Script disabled").)  Yet as Google wrote in its termination notice, underscoring the lack of meaningful information that it had provided regarding the supposed reason for termination of FRC's account: "We're limited in the amount of information we can provide about your specific violation.  We

did not offer users compensation for clicking ads.  Mr. Simpson did not disguise ads on its webpages.  Mr. Simpson did not attempt to associate specific images with individual ads appearing on their sites.  Mr. Simpson did not display its content below the fold.  Mr. Simpson did not display ads in software applications.  Mr. Simpson did not display ads in email messages.  Mr. Simpson displayed ads only from Google's AdSense network.  Mr. Simpson did not display ads from any other publishers.  Mr. Simpson did not display more than the maximum of three standard ad units, three link units, and two search boxes on one webpage.  Mr. Simpson did not display ads on password-protected pages.  Mr. Simpson websites did not have more than three pop-ups.  And Mr. Simpson did not display ads in pop-up windows.  Mr. Simpson does not hereby admit that the foregoing statements of performance are based on binding or material contractual terms.

1    understand this can be frustrating for you, but we've taken these precautionary measures because

2    intentional violators can use this information to circumvent our detection systems." (Dkt. No. 39-7

3    at 2.) So what exactly was Google referring to by "invalid activity"? It did not say. (*Id.*) In fact,

4    Mr. Simpson did not conduct any invalid activity on his websites intentionally, nor did he condone

5    any; further, he is unaware of any unintentional invalid activity on his websites that bore AdSense

6    ads. Mr. Simpson did nothing to cause invalid activity, including invalid clicks, if in fact there

7    were any. To this day, Mr. Simpson is not aware of any invalid activity of any kind actually

8    associated with its account. To the best of Mr. Simpson's personal knowledge, he complied with

9    all of Google's contractual terms, policies, and guidelines.

10           79.     Alternatively, in the event that invalid activity, including but not limited to invalid

11   clicks, occurred on websites where Mr. Simpson served AdSense ads, such activity was not caused

12   by Mr. Simpson or anyone affiliated with or known to Mr. Simpson; therefore, any such invalid

13   activity was not within the reasonable control of Mr. Simpson. For this reason, Mr. Simpson's

14   performance with respect to any such invalid activity, or its prevention, should be excused,

15   including by way of the *force majeure* clause at paragraph 14 of the AdSense terms and conditions.

16   (Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither party will be liable for inadequate performance to the extent

17   caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition,

18   governmental action, and Internet disturbance) that was beyond the party's reasonable control.").)

19           80.     When Google disabled Mr. Simpson's publisher account, he was owed

20   approximately $147.

21           81.     Having disabled Mr. Simpson's AdSense account, Google refused to pay him *any* of

22   the sums it owed him for having served ads on his websites during the last pay period. Google

23   made no attempt to limit what it withheld, whether based on an assessment of the ad serves

24   supposedly affected, or the time-scope of whatever problem it supposedly had identified with Mr.

25   Simpson's AdSense account, or the supposed severity of the purported problem, or on any other

26   factor—Google simply withheld *all* of Mr. Simpson's earnings for the last payment period, as it

27   admits it always does, ¶ 25, *supra*, with no discretion or good faith applied, contrary to Mr.

28   Simpson's contractual expectations.

82.     Mr. Simpson did not dispute the withholding of his earned program funds, including pursuant to paragraph 5 of the terms and conditions.  (Ex. A, ¶ 5; Ex. C, ¶ 5.)  But he certainly did not mean to waive or forfeit his right to maintain this action in court.  Rather, in his view, the language at issue in paragraph 5 did not pertain to the withholding of his program payments upon termination; it referred to the notification of Google within "30 days of any such payment," and there was *no* payment to him upon termination.  Furthermore, it appeared in a paragraph with the heading "Payments," rather than in the paragraph entitled "Termination."  (*Cf.* Ex. A, ¶ 10; Ex. C, ¶ 10.)  Also, given that Google had locked out Mr. Simpson from his account upon termination, he had no access to his publisher identification number, and it was his understanding that he needed that number to communicate with Google about his account.  Additionally, paragraph 5 of the terms and conditions, and the terms and conditions altogether, provided no address at which to notify Google in writing of any dispute.  (*See generally* Exs. A and C.)  Also, in its termination notice, Google gave him no meaningful information on which to base a dispute regarding the withholding of his funds.  (Dkt. No. 39-11 at 2.)

83.     Indeed, in a help article entitled "Deductions from earnings FAQs," Google states that when it makes deductions from earnings "for invalid click activity or for activity that was not in compliance with Google policy," it "adjust[s] [the publisher's] earnings and reimburse[s] the advertisers who paid for these clicks."  (https://support.google.com/adsense/answer/2808531?hl=en (last accessed February 17, 2015).)  This is what Google told Mr. Simpson it was doing upon termination of his account.  (Dkt. No. 39-11 at 2 ("As your account has been permanently disabled, we will withhold payment of your account balance. . . .  The earnings on your account will be returned to the affected advertisers.").)  And in the "Deductions from earnings FAQs," Google explicitly states in answer to the question, "I'd like to appeal the deduction.  Can I do so?"— "*Unfortunately you can't appeal the deduction*." (https://support.google.com/adsense/answer/2808531?hl=en (emphasis added).)  Coupled with the reasons set forth in the previous paragraph of the instant complaint, this statement on the part of Google further illustrates that in the situation alleged, Mr. Simpson was not required to notify

Google within 30 days that he disputed the earnings kept from him and returned to advertisers (per Google in its disablement notice to him).

84.     Under the circumstances described herein, the fact that Mr. Simpson did not dispute the withholding of his final program earnings within 30 days should not work as a waiver or forfeiture, nor should it impede his ability to maintain this suit.  *See* CAL. CIV. CODE § 1442 ("CONDITIONS INVOLVING FORFEITURE, HOW CONSTRUED. A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created.").

85.     Google uses localized terms of service for its AdSense publishers.  The Canadian terms of service, like the U.S. terms of service, provide that California law applies to "[a]ll claims arising out of or relating to th[e] Agreement or the Services" and that such claims "will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA . . . ." (https://www.google.com/adsense/localized-terms (Canadian terms, ¶ 14) (last accessed Sept. 6, 2014).)

### 5.     Other Publishers, Similar Experiences

86.     Google's wrongful refusal to pay publishers terminated from the AdSense program *any* of the sums owed to them for serving ads since the last program payment has spawned a plethora of bitter complaints detailed at various places on the web.  For example, as noted in the introduction, one self-described AdSense publisher stated the following: "It's common knowledge among SEOs that AdSense tends to be disabled a few days before the supposed payout.  I haven't lost any big sum—only $2000 but I know one person that lost $40,000.  It was all legitimate traffic coming straight from Google themselves, no click fraud no bought traffic etc.  PS: I was using AdSense from 2008 to 2013—over 5 years so it's not like only new users got banned." (https://news.ycombinator.com/item?id=7672910 (last accessed May 7, 2014.)  Another reported in part as follows:

> Oh joy, I just got this dreaded email this morning. I've spent since December creating 85 niche sites and generated around $400 so far, none of which I'm going to receive now because my account is disabled.

I'm just starting to go through my sites and try to figure out WHY and here are a couple of things I have noticed so far.

On my latest batch of 11 sites I forgot to disable adsense on the privacy policy and contact page (i only activated adsense on these sites 24 hours ago so they are my prime suspects)

On some of my earliest sites I only made the contact page available via the privacy policy page, so I'll need to improve the navigation on those sites.

Apart from that, I honestly can't see why my entire account was killed. I was receiving normal amounts of clicks based on the traffic I was getting so I don't think I had invalid click activity. . . .

(http://empireflippers.com/adsense-account-disabled/ (last accessed May 8, 2014).)  Numerous similar reports abound.

87.     Google's behavior also has engendered other lawsuits.  In *Ogtanyan v. Google Inc.*, Superior Court of the State of California, County of Santa Clara, No. 114-CV-259301 (filed January 17, 2014), which has survived a demurrer,[24] plaintiff entered into the AdSense agreement with Google and served ads on a website "from September to November 2013."  (*See* Ex. D (copy of complaint), ¶ 1.)  In November 2013, according to the complaint, Google owed almost $1 million to the publisher, but it terminated the account, "citing a vague violation of Google's policies," and withheld the entire sum.  (*Id.*, ¶ 2.)  The publisher appealed, but Google "summarily rejected" that appeal.  (*Id.*)  In his complaint, the publisher provides examples of other popular websites participating in the AdSense program which displayed ads in manners similar to the way he displayed ads—yet those websites still appear to be in good standing with Google.  (*Id.*, ¶¶ 21-24.)

88.     In *Super Cray Inc. v. Google Inc.*, N.D. Cal., No. 5:15-cv-00109 (filed January 8, 2015) (copy attached as Ex. E), plaintiff entered into the AdSense agreement with Google and "began displaying targeted advertisements to [] viewers [of its website] . . . in early September 2014."  (*See* Ex. E, ¶ 25.)  By October 21, 2014, according to the complaint, Google owed

---

[24] *See* Dkt. No. 63 herein (attaching copy of the Court's order on Google's motion for a demurrer).

$535,000 to the publisher, but it terminated the account, even after it had repeatedly assured the publisher of good performance (*id.*, ¶¶ 30-37), advising that its website "Layout Encourage[d] Accidental Clicks." (*Id.*, ¶ 42.)  Google then withheld the total amount owed to the plaintiff: "$535,000." (*Id.*)  This sum consists of earnings for well over a month, given that the plaintiff began serving ads "in early September 2014." (*Id.*, ¶ 25.)

89.     And in *AdSupply, Inc. v. Google Inc.*, Superior Court of the State of California, County of Los Angeles, No. BC547094 (filed May 30, 2014),[25] the publisher, which alleges itself to be a "highly-reputable marketing and advertising firm and network," Ex. F, ¶ 8, tells a similar story.  The publisher served ads during February 2014, such that it had earned $140,741.02, according to Google.  (*Id.*, ¶ 19.)  But Google disabled the publisher's account and paid it nothing, despite its having served "thousand[s] of AdSense advertisements as documented and reflected on Google's very own AdSense program in real time."  (*Id.*, ¶ 33.)

**D.     Reports from an Anonymous, Self-Described Former Employee of Google Regarding Google's Alleged Practice of Wrongfully Withholding Payment from AdSense Publishers**

90.     On April 29, 2014, an anonymous, self-described "former Google employee" took to the web to "leak information to the public of what [he or she] witnessed and took part in while being an employee."  (http://pastebin.com/qh6Tta3h (last accessed May 7, 2014).)  The individual wrote that "[his or her] position was to deal with AdSense accounts, more specifically the accounts of publishers (not advertisers)."  (*Id.*)  The individual indicates that he or she is keeping his or her identity a secret for now, and he or she did not reveal the subject information sooner, because of "[h]aving signed many documents such as NDA's and non-competes," and out of fear of "many repercussions . . . , especially in the form of legal retribution from Google."  (*Id.*)

91.     The individual goes on to describe an alleged first-quarter 2009 Google AdSense division meeting in which "division higher ups" participated.  (*Id.*)  In this "very long meeting," according to this individual, there was discussion to the effect that "Google had suffered some very serious losses in the financial department several months earlier."  (*Id.*)  The upshot was that

---

[25] *See* Ex. F (copy of complaint).  On information and belief, the matter has been transferred to the Superior Court of California for the County of Santa Clara.

1    Google was going to "'carry out extreme quality control on AdSense publishers.'" (*Id.*)  This was

2    said to mean that "AdSense itself hands out too many checks each month to publishers, and that the

3    checks were too large and that needed to end right away." (*Id.*)  Other "smaller meetings"

4    reportedly followed, and "the word was," according to this individual, that "they [Google] were

5    planning to cut off a large portion of publisher's payments." (*Id.*)

6          92.     Purportedly, "the first big batch of bans happened in March of 2009.  The main

7    reason, the publishers made too much money.  But something quite devious happened." (*Id.*)

8    According to this individual, "[w]e were told to begin banning accounts that were close to their

9    payout period (which is why account bans never occur immediately after a payout).  The purpose

10   was to get that money owed to publishers back to Google AdSense, while already having served up

11   the ads to the public." (*Id.*)

12         93.     According to this individual, "[f]rom 2009 to 2012 there were many more big

13   batches of bans.  The biggest of all banning sessions occurred in April 2012.  The AdSense

14   division had enormous pressure from the company to make up for financial losses, and for

15   Google's lack of reaching certain internal financial goals for the quarter prior." (*Id.*)  Purportedly,

16   Google AdSense employees "were threatened with job losses if we didn't enforce the company's

17   wishes." (*Id.*)

18         94.     After "[s]everal publishers [reportedly] launched legal actions which were settled,"

19   Google, according to this individual, "came up with a new policy." (*Id.*)  This policy purportedly

20   was "officially called AdSense Quality Control Color codes (commonly called AQ3C by

21   employees)." (*Id.*)  According to this individual, "[t]hose publisher's [sic] that could do the most

22   damage by having their account banned were placed in a VIP group that was to be left alone.  The

23   rest of the publishers would be placed into other groupings accordingly." (*Id.*)  He or she also

24   states that "[t]he new AQ3C also implemented 'quality control' quotas for the account auditors, so

25   if you didn't meet the 'quality control' target (aka account bans) you would be called in for a

26   performance review." (*Id.*)

27         95.     The author of the post goes on to describe four groups, segregated by color,

28   requiring various levels of attention from AdSense employees.  These purportedly ranged from

SECOND AMENDED CLASS ACTION COMPLAINT - 35
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

urgent (red) to VIP (green), the latter of which he or she describes as the "'untouchables.'" (*Id.*) AdSense publishers in these four groups purportedly were subject to differing degrees of scrutiny, with publishers placed in the three non-green groups being subject to "ban[]s" for various "reason[s]." (*Id.*) All bans were to "occur as close to a payout period as possible with the most amount of money accrued," according to the anonymous poster. (*Id.*)

96.     The individual goes on to write of a purported scheme whereby Google also used skewed "Google Analytics" data to bilk publishers out of some or all of the money owed them. (*See id.*)

97.     Google has denied these allegations made by the anonymous poster. (*E.g.*, http://www.zdnet.com/adsense-leak-controversy-heats-up-as-google-denies-favoritism-theft-allegations-7000028913/ (last accessed May 7, 2014).)

98.     An individual purporting to be the same anonymous poster has replied to Google's denial. (http://pastebin.com/DXTu8Mcm (last accessed May 20, 2014).) This individual purports to take back nothing from the previous post and claims to "have communications, … files, … lists, … [and] names." (*Id.*) The individual indicates that he or she will release "it [his or her information and material] to the legal representatives of the class action lawsuit against Google in regards to AdSense," if such an action is brought. (*Id.*)

99.     True and correct copies of the original April 29, 2014 post, and the second referenced post, dated April 30, 2014, are attached as Exhibits I and J, respectively.

100.     As of the date of this second amended complaint, plaintiffs cannot confirm the veracity of the allegations made by the individual or individuals in these two posts. If true, the posts could help to illuminate why Google took such harsh and unfair action against the plaintiffs, notwithstanding their good faith efforts to comply with Google's policies. They also could help to explain why so many publishers have complained of similar actions on the part of Google. But in any event, if the information in the referenced two posts does not prove to be true either in whole or part, Google nonetheless has behaved unlawfully in refusing to pay publishers, including the plaintiffs, sums earned by them for serving AdSense ads in the period prior to Google's disabling of those publishers' accounts.

1

# V.     CLASS ALLEGATIONS

2

101.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(1), (2), and (3).

3

102.     Plaintiffs bring this action on behalf of themselves and the following class, for

4

damages, declaratory, and injunctive relief:

5

> All Google AdSense publishers whose AdSense accounts were/are subject to
> Google's localized terms and conditions for the U.S., American Samoa, Anguilla,
> Antigua and Barbuda, Aruba, Australia, Bahamas, Barbados, Belize, Bermuda,
> Bulgaria, Canada, Cayman Islands, Czech Republic, Dominica, Egypt, Falkland
> Islands, Grenada, Guyana, Haiti, Jamaica, Japan, Jordan, Libya, Montenegro,
> Montserrat, Morocco, Netherland Antilles, New Zealand, Puerto Rico, Qatar, Saint
> Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Saudi Arabia,
> Serbia, Serbia and Montenegro, Singapore, Trinidad and Tobago, Turkey, Turks and
> Caicos Islands, United Arab Emirates, United States Minor Outlying Islands, Virgin
> Islands, Western Sahara, and Yemen whose AdSense account was disabled or
> terminated, and whose last AdSense program payment (or payments) was (or were)
> withheld in its (or their) entirety, and permanently, by Google.

6

7

8

9

10

11

Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries;

12

defendant's current or former employees, officers, directors, agents, and representatives; and the

13

district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

14

family members.  Plaintiffs will seek to amend this proposed class as necessary, or to add a class or

15

classes as necessary, in order to obtain all the relief sought by way of this complaint.

16

103.     As for the publishers included in the proposed class definition in the preceding

17

paragraph whose AdSense accounts were/are subject to non-U.S. terms and conditions, the contract

18

terms at issue are the same, or substantially the same, as those applicable, or purportedly

19

applicable, to U.S. publisher accounts.

20

104.     **Numerosity:**  The exact number of the members of the proposed class is unknown

21

and is not available to the plaintiffs at this time, but, upon information and belief, the class will

22

consist of many tens or even hundreds of thousands of members, such that individual joinder in this

23

case is impracticable.

24

105.     **Commonality:**  Numerous questions of law and fact are common to the claims of

25

the plaintiffs and members of the proposed class.  These include, but are not limited to:

26

27

28

1              a.      Whether Google withholds 100% of earned but unpaid funds from

2 publishers whose accounts it disables or terminates, purportedly under terms of its AdSense

3 contracts with those publishers;

4              b.      Whether terms of Google's AdSense contracts purportedly giving Google

5 the right to withhold earned funds from publishers participating in its AdSense program are

6 unconscionable and unenforceable;

7              c.      Whether the terms of Google's AdSense contracts purportedly giving

8 Google the right to withhold earned funds from publishers participating in its AdSense program are

9 actually liquidated damages terms that set forth penalties in violation of California law on

10 liquidated damages, such that they are unenforceable[26];

11              d.      Whether Google has breached its contracts with publishers for no reason, as

12 a pretense for withholding earned program funds from them;

13              e.      Whether Google has breached its AdSense contracts with publishers by

14 refusing to pay them monies earned for serving ads, or for other performance;

15              f.      Whether Google has breached the implied covenant of good faith and fair

16 dealing in administering its AdSense contracts in and following termination actions with its

17 AdSense publishers as alleged herein, including by way of applying no discretion to its decisions,

18 and by uniformly and systematically withholding all program earnings due them when their

19 accounts are terminated;

20              g.      Whether plaintiffs and members of the proposed class are entitled to

21 declaratory relief with respect to the illegality of the terms of Google's AdSense contracts insofar

22 as they purport to allow Google to withhold monies earned from AdSense program publishers, and

23 as to the illegality of its conduct as alleged herein, and injunctive relief in order to compel Google

24 to apply good faith, reasonable discretion, and/or objective reasonableness to any truly justifiable

25 withholdings, if any, and also to halt Google's unlawful practices as alleged in this complaint, and

26

27

---

[26] Plaintiffs do not omit this question in order to preserve it for appeal.

28

1    whether plaintiffs and the proposed class are entitled to their attorneys' fees, costs, and expenses

2    for securing such relief;

3           h.      Whether plaintiffs and members of the proposed class are entitled to

4    accountings as requested;

5           i.      Whether plaintiffs and members of the proposed class are entitled to any

6    damages or restitution, including payments of AdSense program payments wrongfully withheld

7    from them by Google, and to their attorneys' fees, costs, and expenses related to any recovery of

8    such monetary relief; and

9           j.      Whether plaintiffs and members of the proposed class are entitled to any

10   damages or restitution incidental to the declaratory or injunctive relief they seek, and to their

11   attorneys' fees, costs, and expenses related to any recovery of such monetary relief.

12       106.   **Typicality:**  Plaintiffs' claims are typical of the claims of the members of the

13   proposed class.  The factual and legal bases of Google's liability are the same and resulted in injury

14   to plaintiffs and all of the other members of the proposed class.

15       107.   **Adequate representation:**  Plaintiffs will represent and protect the interests of the

16   proposed class both fairly and adequately.  Plaintiffs have retained counsel competent and

17   experienced in complex class-action litigation.  Plaintiffs have no interests that are antagonistic to

18   those of the proposed class, and its interests do not conflict with the interests of the proposed class

19   members it seeks to represent.

20       108.   **Prevention of inconsistent or varying adjudications:**  If prosecution of myriad

21   individual actions for the conduct complained of were undertaken, there likely would be

22   inconsistent or varying results.  This would have the effect of establishing incompatible standards

23   of conduct for the defendant.  Certification of plaintiffs' proposed class would prevent these

24   undesirable outcomes.

25       109.   **Injunctive and declaratory relief:**  By way of its conduct described in this

26   complaint, the defendant has acted on grounds that apply generally to the proposed class.

27   Furthermore, the defendant purports to apply common contractual terms in effecting the actions

28

1   complained of with respect to members of the proposed class.  Accordingly, the injunctive and

2   declaratory relief requested are appropriate respecting the class as a whole.

3        110.   **Predominance and superiority:**  This proposed class action is appropriate for

4   certification.  Class proceedings on these facts and this law are superior to all other available

5   methods for the fair and efficient adjudication of this controversy, given that joinder of all

6   members is impracticable.  Even if members of the proposed class could sustain individual

7   litigation, that course would not be preferable to a class action because individual litigation would

8   increase the delay and expense to the parties due to the complex factual and legal controversies

9   present in this matter.  Here, the class action device will present far fewer management difficulties,

10  and it will provide the benefit of a single adjudication, economies of scale, and comprehensive

11  supervision by this Court.  Further, uniformity of decisions will be ensured.

12  **VI.    CLAIMS FOR RELIEF**

13  **APPLICATION OF CALIFORNIA LAW**

14       111.   Plaintiffs' state-law claims in this matter, and those of the proposed class, are

15  governed by California law per the terms of Google's AdSense contracts.  (Ex. A, ¶ 14; Ex. B, ¶

16  17; Ex. C, ¶ 14 and the corresponding paragraphs of the localized terms applicable to the accounts

17  of other members of the proposed class, which localized terms are available at

18  https://www.google.com/adsense/localized-terms?null=SO (last accessed March 4, 2015).)

19  Additionally, as alleged above, all of Google's objectionable and unlawful acts and omissions, as

20  complained of herein, and Google's harms done to plaintiffs and the proposed class, were done in

21  California.

22  **FIRST CAUSE OF ACTION**

23  **BREACH OF CONTRACT**

24       112.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

25  set forth herein.

26       113.   Plaintiffs and members of the proposed class entered into contracts with Google

27  regarding their participation in Google's AdSense program.  (*See* Exs. A, B, and C.)  Save for

28  certain terms alleged to be invalid and unenforceable, these contracts are valid.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.      Google has breached the parties' contracts, entitling plaintiffs to damages for their performance thereunder.**

114.      The AdSense contracts at issue contain terms promising that Google will pay publishers for, *inter alia*, serving ads on their websites sold by Google to various advertisers. (Ex. A, ¶ 5; Ex. B, ¶ 11; Ex. C, ¶ 5.)

115.      As alleged herein, plaintiffs and publisher-members of the proposed class have performed under the AdSense contract by, *inter alia*, adhering to all of Google's contract terms and applicable policies, and by displaying the subject ads on their websites and other properties.  (*See* ¶¶ 38-39, 53-55, 63-64, 75-76, *supra*.)

116.      Notwithstanding plaintiffs' performance, or excuse for performance, Google, purportedly relying on other terms of the contracts, terminated plaintiffs' accounts and offered no meaningful reason for doing so, thereby breaching the parties' contract which permits termination of publishers' accounts only for some reason.  (*See* Ex. A, ¶ 10 ("Google may at any time terminate the Agreement . . . for any *reason*.") (emphasis added); Ex. B, ¶ 11 (containing "for any reason" proviso); Ex. C, ¶ 10 (same as Ex. A); *see also* ¶¶ 45-46, 57, 66, 78, *supra*).)  Plaintiffs, having performed in all material or significant respects under their contracts with Google, or being excused therefrom, gave Google no reason to terminate their contracts.  This is illustrated, in part, by Google allowing other publishers to continue serving AdSense ads on sites similar to those on which plaintiffs CIS and Chose served AdSense ads.  (*See* ¶¶ 57, 66, *supra*.)

117.      Google also has breached the parties' contract by uniformly and systematically withholding *all* funds due to publishers at the time of termination, with no granularity whatsoever, and without the application of the discretion promised in the contract.  (*See* Ex. A, ¶ 5 ("Payments to you *may* be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole *discretion*.") (emphasis added), ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we *may* [not *will*] withhold unpaid amounts or charge back your account.") (emphasis added); Ex. C, ¶¶ 5, 10 (same); *see also* ¶¶ 48, 59, 68, 81, *supra*.)  Regardless of whether, for example, 1% of the ads or 60% of the ads served in the subject time period may, in

Google's view, have been associated with what Google deems invalid activity or policy violations, Google, as an admitted matter of extra-contractual policy, systematically withholds 100% of the money at issue from all terminated publishers.  (*See* ¶¶ 25, 32, *supra*.)  Google takes this action notwithstanding its acknowledged ability to determine which ads may, in its view, have been associated with what it deems invalid activity, and which ads were not.  Moreover, Google takes this action even if a publisher himself or herself was not the cause of, and had nothing to do with, the supposed violation of Google policy leading to disablement of his or her account.  Whatever the circumstances, Google systematically withholds all program funds earned by publishers upon their termination.

118.    As alleged above, plaintiffs have performed their duties under the contracts at issue by doing all, or substantially all, of the significant or material things the contracts required them to do, or they were excused from having to do those things.  This has given rise to Google's duty to perform by paying plaintiffs all the earnings due them.

119.    Furthermore, where conditions precedent to Google's performance (*i.e.*, paying AdSense publishers their earnings) were concerned, Google's conduct in the above regard, including the systematic withholding of 100% of program earnings upon termination of plaintiffs' publishers' accounts, was arbitrary, capricious, and unreasonable in that a uniform and complete withholding was effected, whatever the circumstances.  In light of Google's admitted ability to segregate what it deemed invalid activity or breaching activity from non-problematic activity, and in light of the widely varying and often large amounts of ad serves and earned money at stake, and other factors alleged herein, Google's behavior was not reasonable by any objective standard.

120.    Alternatively, where conditions precedent to Google's performance (*i.e.*, paying AdSense publishers their earnings) were concerned, Google's conduct in the above regard, including the systematic withholding of 100% of program earnings upon termination of plaintiffs' publishers' accounts, was done in bad faith.  Neither the decision to withhold 100% of plaintiffs' unpaid program earnings, nor the act of withholding those funds, were done in good faith.  Instead, they were simply examples of Google's systematic and uniform policies and practice to withhold the publishers' last earnings completely.

121.     Plaintiffs and members of the class have been damaged by Google's breaches of contract.  Google owes the plaintiffs and proposed class members their program earnings to the full extent allowed by the parties' contracts, together with prejudgment interest.

**B.      The contracts contain unconscionable terms that are unenforceable.**

122.     Further, the contractual terms purporting to permit Google to withhold payment of funds owed to publishers whose accounts it disables, *see* Ex. A, ¶¶ 5, 10, Ex. B, ¶ 11, and Ex. C, ¶¶ 5, 10, which Google reads and applies as permitting it to withhold such funds in their entirety, are unconscionable.  Accordingly, they are unenforceable.  *See* CAL. CIV. CODE § 1670.5(a).

123.     These oppressive terms appear in contracts of adhesion that were foisted upon small entities and individuals, which had no bargaining power, by a giant and powerful corporation, Google, that drafted them and presented them as a take-it-or-leave-it proposition.  (*See* Ex. A, ¶¶ 5, 10; Ex. B, ¶ 11; Ex. C, ¶¶ 5, 10; *see also* ¶¶ 49, 52, 62, 74, *supra*.)  There was no negotiation, and there was an absence of meaningful choice.  Therefore, the identified terms are procedurally unconscionable.

124.     Also, the terms at issue are so one-sided as to shock the conscience; they are harsh and oppressive in that they purport, according to Google, to allow Google to withhold all program funds corresponding to ads placed on the publishers' properties, however limited in scope or time the supposed offense or policy violation might have been,[27] and even when the publisher had nothing to do with whatever Google deems to be cause for termination of his or her account.  (*See* Ex. A, ¶¶ 5, 10; Ex. B, ¶ 11; Ex. C, ¶¶ 5, 10; *see also* ¶ 33, *supra*.)  Google applies these terms to withhold hundreds, thousands, tens of thousands, hundreds of thousands, and even a million dollars or more from terminated publishers for earnings periods well in excess of a month, no matter what the circumstances.  (*See* ¶¶ 44, 58-59, 67-68, 80-81, 87-89, *supra*.)  Therefore, the identified terms

---

[27] Though Google claims that an argument to the effect that these terms, in its own view, allow it to withhold 100% of funds even if one out of 1,000 clicks are supposedly invalid or problematic in some way, Google in fact withholds 100% of unpaid program earnings across the board from terminated publishers, and gives them virtually no reason as to why.  A reasonable inference flows that Google in fact withholds 100% of funds under these terms even when it can identify few clicks or ad serves as problematic.

1    are substantively unconscionable.  Thus, being both procedurally and substantively

2    unconscionable, these terms are unenforceable.  *See id.*

3    **C.    The parties' contracts contain invalid and unenforceable liquidated damages**
     **provisions.[28]**

4

5    125.    Additionally, these terms constitute invalid provisions for liquidated damages.  CAL.

6    CIV. CODE § 1671(b).  When Google disables a publisher account, it withholds all funds associated

7    with the publisher account.  These are its liquidated damages for purported violations of its terms

8    of service.  But under California law governing liquidated damages provisions, the terms in

9    question constitute penalties in that the sums Google can purportedly withhold from publishers,

10   *i.e.*, *all* sums at issue, bear no reasonable relationship to any actual damages or injury that Google

11   might have suffered from the supposed breach of the AdSense contracts by publishers.  Indeed,

12   Google's purported contractual right to withhold all such funds bears no reasonable relationship to

13   the range of actual damages that the parties could have anticipated would flow from a breach of

14   Google's AdSense terms of service or policies.  Setting liquidated damages at 100% of the total

15   sum at issue does not represent the result of a reasonable endeavor by the parties to estimate a fair

16   average compensation for any loss that might be sustained, for in fact, there was no such endeavor

17   at all.  No matter how limited the supposed offense, Google can (and does) refuse to pay all the

18   funds owed, notwithstanding all the performance on the part of the publisher in the payment period

19   prior to Google's disabling of its account.  Thus, these terms were unreasonable under the

20   circumstances existing at the time the contract was made, rendering them invalid and

21   unenforceable.  *See id.*

22   **D.    When the unenforceable provisions are stricken from the contract, plaintiffs are left**
     **with recoverable damages for their performance under the contracts.**

23   126.    With these payment-withholding terms stricken from the contracts as unenforceable,

24   Google's liability to plaintiffs and the proposed class for breach of contract is stark.  As alleged

25   above, plaintiffs have performed their duties under the contracts by doing all, or substantially all, of

26   the significant or material things the contracts required them to do, or they were excused from

27

28   _____
     [28] *See* n.4, *supra*, regarding the preservation of this claim for appeal.

     SECOND AMENDED CLASS ACTION COMPLAINT - 44
     Case No. 5:14-cv-02329-BLF
     010450-11  718002 V1

having to do those things.  This has given rise to Google's duty to perform by paying them all the earnings due them.

127.   Plaintiffs and members of the proposed class have been damaged by Google's breach of contract in the amount of sums payable to them but withheld when their AdSense accounts were disabled, together with pre-judgment interest.

**E.      Accounting**

128.   As additional relief or as part of their remedy, plaintiffs and the proposed class are entitled to an accounting of all AdSense program sums earned, payable, or otherwise associated with their publisher accounts at the time they were disabled, including without limitation as to all sums associated with the publishers' service of AdSense-related ads on their websites or other properties, or other performance under any AdSense program, and any subset of such sums that Google purports to be associated with the claimed violation of AdSense terms of service or policies.

129.   Such an accounting will enable a determination of the amount of damages owed to each plaintiff and member of the proposed class, especially in these circumstances where Google locks out publishers from their accounts upon termination; where the plaintiffs and proposed class members have relationships with Google based on Google's collection and administration of funds owed to them; and where Google is the party that knows what supposed violations or invalid activities it had in mind when it terminated publishers' accounts, and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs and members of the putative class.

**SECOND CAUSE OF ACTION**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

130.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

131.   Plaintiffs and members of the proposed class entered into contracts with Google regarding their participation in Google's AdSense program.  (*See* Exs. A, B, and C.)  Save for certain terms alleged to be invalid and unenforceable, these contracts are valid.

132.    As alleged above, plaintiffs have performed their duties under the contracts by doing all, or substantially all, of the significant or material things the contracts required them to do, or they were excused from having to do those things.  This has given rise to Google's duty to perform by paying them all the earnings due them

133.    There exists in every contract, including Google's AdSense agreements with the plaintiffs and members of the proposed class, an implied covenant of good faith and fair dealing.  Google has breached this covenant by unfairly interfering with plaintiffs' right to receive the benefits of the contracts at issue.

134.    First, Google terminated plaintiffs' accounts and offered no meaningful reasons for doing so, thereby breaching the parties' contract which permits termination of publishers' accounts only for some reason.  (*See* Ex. A, ¶ 10 ("Google may at any time terminate the Agreement . . . *for any reason*.") (emphasis added); Ex. B, ¶ 11 (promising investigation); Ex. C, ¶ 10 (same).)  Further, Google purported to terminate plaintiff FRC's AdSense account for supposed "invalid activity," even though FRC endeavored at all times to comply with Google's policies and itself brought potential issues to Google's attention so that it could resolve them to Google's satisfaction.  (*See* ¶¶ 38-39, 41, *supra*.)  Then, as a matter of extra-contractual policy, Google denied FRC meaningful information regarding Google's claim of "invalid activity" on FRC's account and refused FRC's sincere and reasonable request for details.  (*See* ¶¶ 45-47, *supra*.)  Because of this behavior, FRC could make no meaningful appeal.  (*See also* ¶ 46, *supra*.)  Nonetheless, FRC attempted to appeal, advising Google that it was "unaware of violating any policy" and reminding Google that it had sought help from Google in ascertaining if there was any problem with the high click rates it was seeing.  (Dkt. No. 39-8 at 2.)  FRC also complained that its appeal form, which only allows 1,000 characters for explanation, was woefully inadequate.  (*Id.*)  But Google simply brushed off FRC's request, without any good-faith review.  (*See* ¶ 47, *supra*.)

135.    Similarly, Google terminated the other three plaintiffs' accounts for no good or discernable reasons.  (*See* ¶¶ 57, 66, 78, *supra*.)  Indeed, websites run by other publishers and similar to plaintiff CIS's and plaintiff Chose's continue to display AdSense ads.  (*See* ¶¶ 57, 66, *supra*.)  Further, as with FRC, Google withheld meaningful information from the other plaintiffs as

1    a matter of its extra-contractual policy.  (*See* ¶¶ 57-58, 66, 78, *supra*.)  Google likewise brushed

2    off, and offered no good-faith, meaningful review of its long-time publisher CIS's appeal, which in

3    any event publishers cannot meaningfully articulate on the minimalist form Google demands they

4    use, and it ignored CIS's request for more information.  (*See* ¶ 58, *supra*.)

5        136.    Second, Google violated the covenant by withholding *all* sums payable to the

6    plaintiffs for ads already served on their websites during the period preceding termination of their

7    accounts, purporting to return these funds to advertisers.  (*See* ¶¶ 25, 32, *supra*.)  Google made no

8    effort whatsoever to limit the funds it refused to pay to the plaintiffs in any way—even though the

9    contract promises the use of discretion and said only that funds *might* be withheld (not that they

10   *would* be withheld).  (*See* Ex. A, ¶ 5 ("Payments to you *may* be withheld to reflect or adjusted to

11   exclude any amounts refunded or credited to advertisers and any amounts arising from invalid

12   activity, as determined by Google in its sole *discretion*.") (emphasis added), ¶ 10 ("If we terminate

13   the Agreement due to your breach or due to invalid activity, we *may* [not *will*] withhold unpaid

14   amounts or charge back your account.") (emphasis added); Ex. B, ¶ 11 (promising investigation);

15   Ex. C, ¶¶ 5, 10 (same as Ex. A).)  For example, Google did not limit the funds it withheld to ads

16   appearing on specific webpages, nor did it limit its action to a specific time period when activity

17   that purportedly violated its policies had occurred.  Instead, as a matter of its extra-contractual

18   policy, Google systematically withheld 100% of plaintiffs' program earnings for the periods

19   preceding their termination of their accounts.  (*See* ¶¶ 25, 32, *supra*.)  Upon information and belief,

20   other members of the proposed class, have suffered similar fates and violations of the covenant.

21       137.    Where discretion, or absolute discretion, is given under the contract to Google, Exs.

22   A, ¶¶ 5, 10; Ex. B, ¶ 11; Ex. C, ¶¶ 5, 10, Google claims that it did merely what the contract said it

23   could do under its grant of that discretion; therefore, according to Google, the implied covenant of

24   good faith and fair dealing cannot apply because it would be at odds with the contract's express

25   grant of discretionary power or absolute discretion.  Here, however, the covenant of good faith and

26   fair dealing must be implied with respect to Google's discretion, or absolute discretion, because

27   otherwise, if the provisions at issue were read literally, then an unenforceable, illusionary

28

1    agreement would result given that publishers receive no money or other consideration from Google

2    beyond what would be an illusory promise of payment.

3        138.    Plaintiffs and members of the proposed class have been damaged by Google's

4    breach of the implied covenant of good faith and fair dealing in the amount of sums owed to them

5    but not paid when their AdSense accounts were disabled, together with pre-judgment interest.

6        139.    As additional relief or as part of their remedy under this alternative claim, plaintiffs

7    and the proposed class are entitled to an accounting of all AdSense program sums earned, payable,

8    or otherwise associated with their publisher accounts at the time they were disabled, including

9    without limitation as to all sums associated with the publishers' service of AdSense-related ads on

10   their websites or other properties, or other performance under any AdSense program, and any

11   subset of such sums that Google purports to be associated with the claimed violation of AdSense

12   terms of service or policies.

13       140.    Such an accounting will enable a determination of the amount of damages owed to

14   each plaintiff and member of the proposed class, especially in these circumstances where Google

15   locks out publishers from their accounts upon termination; where the plaintiffs and proposed class

16   members have relationships with Google based on Google's collection and administration of funds

17   owed to them; and where Google is the party that knows what supposed violations or invalid

18   activities it had in mind when it terminated publishers' accounts, and to what extent these

19   violations or activities correspond to ads served and other performance on the part of the plaintiffs

20   and members of the putative class.

21                          **THIRD CAUSE OF ACTION**

22                          **UNJUST ENRICHMENT**

23       141.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

24   set forth herein.

25       142.    Plaintiffs plead this cause of action in the alternative to their causes of action for

26   breach of contract and breach of the implied covenant of good faith and fair dealing.  Plaintiffs

27   have alleged that certain terms of the contract addressing the withholding of program earnings from

28   terminated publishers are invalid and unenforceable.  Plaintiffs plead this claim to the extent

necessary to provide them a means of recovering program earnings due them if the terms at issue are held to be unenforceable.  For purposes of this cause of action, plaintiffs deny the enforceability of the terms at issue, and, as needed to enable the recovery of the earnings due them for serving AdSense program ads, the unenforceability of their entire AdSense contracts with Google.

143.    To the detriment of plaintiffs and the proposed class, Google has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.  More specifically, Google has been unjustly benefited by retaining monies due and payable to publishers, including the plaintiffs and members of the proposed class, for serving on their websites advertisements sold by Google to various advertisers.

144.    As between the plaintiffs and the proposed class on one hand, and Google on the other, it would be unjust for Google to retain the benefits attained by its wrongful actions.  Moreover, even if Google remitted some or all of the withheld funds to its advertisers, it did so by its wrongful choice, to the publishers' detriment, after first wrongfully choosing to withhold all of the sums payable to publishers when it terminated their accounts.  Thus, Google remains liable to plaintiffs and members of the proposed class for these funds.  Accordingly, under this alternative cause of action, should plaintiffs ultimately rely upon it, plaintiffs and members of the proposed class seek full restitution of the referenced sums which Google withheld from them and by which Google was unjustly enriched, together with pre-judgment interest, or the value of the benefit by which Google was unjustly enriched, based on the wrongful conduct alleged herein.

145.    As additional relief or as part of their remedy under this alternative claim, plaintiffs and the proposed class are entitled to an accounting of all AdSense program sums earned, payable, or otherwise associated with their publisher accounts at the time they were disabled, including without limitation as to all sums associated with the publishers' service of AdSense-related ads on their websites or other properties, or other performance under any AdSense program, and any subset of such sums that Google purports to be associated with the claimed violation of AdSense terms of service or policies.

146.    Such an accounting will enable a determination of the amount of damages owed to each plaintiff and member of the proposed class, especially in these circumstances where Google

locks out publishers from their accounts upon termination; where the plaintiffs and proposed class members have relationships with Google based on Google's collection and administration of funds owed to them; and where Google is the party that knows what supposed violations or invalid activities it had in mind when it terminated publishers' accounts, and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs and members of the putative class.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)

147.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

148.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

149.    California's Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice.  CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

150.    Google has engaged in, and, upon information and belief, continues to engage in, fraudulent, unlawful, and unfair business acts and practices prohibited by California's UCL.  These acts and practices, which were undertaken in California, include the inducing of AdSense publishers to serve ads on their websites for Google advertisers on the promise of payment to the publishers of a share of the money paid to Google by the advertisers for that service (¶ 23, *supra*); causing publishers to serve those ads on their websites (*e.g.*, ¶¶ 1-2, *supra*); disabling publisher accounts before monies earned for serving those ads are due to be paid (*e.g.*, ¶¶ 3,5, *supra*); maintaining an extra-contractual policy providing that all final program earnings would be withheld systematically and uniformly from publishers whose accounts were disabled, without the use of any discretion whatsoever, notwithstanding promises to the contrary in Google's contracts (¶¶ 25, 32, *supra*); and then systematically and uniformly withholding not some, but *all*, of the funds due to the publishers for serving ads or otherwise performing during the final payment

1  periods, without any attempt to limit, let alone rationally limit, the sum withheld, and without the

2  application of discretion or good faith (*e.g.*, ¶ 5, *supra*).  These acts and practices broadly and

3  detrimentally affect consumers of Google's AdSense products; in addition, the plaintiffs and fellow

4  publishers are small and unsophisticated entities, or individuals, ¶ 28, *supra*, who have fallen prey

5  to the conduct of a much larger and sophisticated entity as set forth herein.

6      151.    Google's conduct has harmed plaintiffs and members of the proposed class, as well

7  as the broader public interest as alleged herein.  Google advertises its AdSense program widely,

8  and thousands and thousands of small publishers, including individuals, have become customers of

9  the service, or product, it offers.  Despite publishers' actions, including those of the plaintiffs, to

10 comply with Google's policies and to act in good faith in response to any notices from Google of

11 policy infringements, Google refuses to pay publishers, including the plaintiffs, what is owed them

12 for serving ads during the period prior to disabling the publishers' accounts.  As a matter of a

13 policy and practice outside the parties' contracts, Google simply withholds all the monies due to

14 terminated publishers, however limited in scope or time a purported policy violation or purported

15 contract breach (including purported breaches which, if they actually occurred, were not material

16 breaches), or a publisher's supposed offense, may be.

17 **A.      Violation of "Fraudulent" Prong of UCL**

18     152.    First, Google's behavior violates the "fraudulent business act or practice" prong of

19 the UCL.  Nowhere do Google's AdSense contract with publishers advise the plaintiffs, or class

20 members, of its policy that upon termination of the publisher's account, it *will* withhold 100% of

21 the publishers' unpaid program earnings for the period, however long, prior to termination.

22     153.    Google's AdSense contracts with publishers, *see* Exs. A-C, including those in place

23 in the months before each plaintiffs' account termination, and by extension, in the months before

24 the account terminations of class members, do *not* provide or advise that, as a matter of policy or

25 course, upon termination of a publisher's account, Google will automatically withhold 100% of the

26 publishers' unpaid program earnings.  To the contrary, these contracts speak in terms of an

27 application of (a) *discretion* to decisions to withhold or adjust payments, Exs. A and C, ¶ 5; and (b)

28 advise only that Google *may*—not *will*—withhold unpaid accounts, Exs. A and C, ¶ 10; Ex. B, ¶ 11

1   ("Google reserves the right to withhold payment or charge back Your account due to any of the

2   foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of

3   any of the foregoing or any breach of this Agreement by You . . . .").[29]  Each plaintiff reviewed

4   these contracts prior to their becoming AdSense publishers, and periodically thereafter.

5        154.   Thus, Google omitted in its representations to plaintiffs made in contracts applicable

6   to their service of AdSense ads in the one-to-two month period before termination of their

7   accounts, *see* Exs. A-C and ¶ 59, *supra*, that upon termination, Google would always withhold

8   100% of their program funds as a systematic and uniform function of its extra-contractual policy,

9   and as a systematic and uniform practice, unknown to plaintiffs.  Had this information been

10  disclosed to the plaintiffs, they would have behaved differently; they would not have expended

11  time, energy, and money in their websites serving AdSense program ads if they had known that

12  Google would always withhold 100% of their unpaid program earnings if it terminated their

13  accounts.

14       155.   But since at least November 16, 2012 (and likely since much earlier), when plaintiff

15  CIS was terminated and Google advised it that it would be withholding 100% of its program funds,

16  Dkt. No. 39-9 at 2, with no indication that it had considered withholding any lesser percentage of

17  funds, Google has had an extra-contractual policy by which it withholds 100% of the program

18  funds due terminated publishers as a systematic and uniform matter of course.  (*See* ¶¶ 25, 32, 57-

19  58, *supra*.)  Each of the remaining three plaintiffs entered into their AdSense contracts or served

20  ads under contracts reiterated *after* Google revealed this policy to CIS for the first time, ¶¶ 38, 61,

21

22       [29] The form of AdSense contract attached as Exhibit B to this complaint, which is dated
    February 25, 2008 (*see* its final page), appears, based on an examination of Internet Archives
23  (https://archive.org/index.php) files, to have been in effect at least through April 18, 2013.  This
    conclusion is based on an archives snapshot taken that date, but that version of the AdSense terms
24  may have been in effect a month or two longer.  By June 14, 2013, the form of agreement had
    switched over to that set forth in Exs. A and C hereto.  As Google sets forth in the Declaration of
25  Jim Gray filed in support of its motion to dismiss plaintiffs' first amended complaint ("Gray
    Decl."), Dkt. No. 39, "paragraphs 1, 4, 5, and 10 of Ex. C to the first amended complaint,"—which
26  also is attached hereto as Ex. C—"are substantially the same (though the formatting and wording
    was different) in the November 2012 version of the TOS."  (Gray Decl., ¶ 3.)  Thus, in the months
27  preceding each plaintiff's account termination, a version of Google's contract was in place that,
    like Ex. A hereto, nowhere indicated that Google would always withhold 100% of a publishers'
28  final program earnings at termination of its account.

73, *supra*, by withholding 100% of CIS's last program earnings upon termination of its accounts, and Google did not reveal this policy to them at the time of entry into their AdSense agreements. Google itself knew of this extra-contractual policy at least as of the time it entered into AdSense agreements with plaintiffs FRC, Chose, and Simpson, and further investigation and discovery will reveal if it also knew of this extra-contractual policy before it entered into an AdSense agreement with plaintiff CIS.  By entering into AdSense contracts with at least three of the plaintiffs—and with thousands upon thousands of AdSense publishers whose contracts were dated at least as early as November 16, 2012—while omitting to advise them in those contracts of critical information as to its extra-contractual 100%-withholding policy, Google has violated the "fraudulent" prong of the UCL.

**B.     Violation of "Unlawful" Prong of UCL**

156.     Second, Google withholds 100% of unpaid program funds from terminated publishers on the basis of contractual terms purportedly permitting such conduct, but which actually violate California law (a) making unlawful and unenforceable contractual terms that are unconscionable; and (b) rendering unlawful and unenforceable invalid provisions for liquidated damages.[30]  *See* CAL. CIV. CODE § 1670.5(a); CAL. CIV. CODE § 1671(b).  Additionally, by omitting critical information from plaintiffs in its program contracts regarding its policy of withholding 100% of unpaid program funds upon account termination, Google has violated CAL. CIV. CODE § 1709, which makes deceit unlawful.  *See also* CAL. CIV. CODE § 1710 ("A deceit, within the meaning of the last section, is either:  . . . (3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact.").  Having violated these provisions of California law, Google has violated the "unlawful" prong of the UCL.

**C.     Violation of "Unfair" Prong of UCL**

157.     Third, Google's actions, including conduct based on unconscionable contract terms and deceit, are patently unfair.  As described above, Google systematically withholds all monies

---

[30] *See* n.4, *supra*, regarding the preservation of plaintiffs liquidated damages-related claims for a possible appeal.

1   due to publishers for performance already rendered when Google terminates the publishers'

2   accounts, no matter how limited in scope or time the supposed offense identified by Google that

3   led to termination.  Also, Google has engaged in deceit by not advising publishers in its contracts

4   of this policy and practice.

5          158.   Thus, Google's fraudulent, unlawful, and unfair business acts and practices as

6   described herein demonstrate and constitute unfair competition in violation of California's UCL.

7   *See* CAL. CIV. CODE § 17200 ("[U]nfair competition shall mean and include any unlawful, unfair

8   or fraudulent business act or practice . . . .").  These acts and practices also detrimentally affect the

9   public interest, in that they undermine the lawfulness and fairness of business practices in

10  California, and outside California under contracts mandating the application of California law,

11  among thousands and thousands of publishers, to whom Google broadly advertises and makes its

12  AdSense program, and contracts, available.  Thousands and thousands of individuals and small

13  businesses are thereby affected as they consumer Google's AdSense service or product.

14         159.   Under the UCL, plaintiffs and the proposed class are entitled to restitution of the

15  monies owed them for their performance under the AdSense program, but retained by Google

16  wrongfully, together with pre-judgment interest, and to an injunction barring Google from

17  withholding in the future all such funds owed to AdSense publishers whose accounts it disables.

18         159.   Additionally, pursuant to the broad injunctive and equitable powers given the Court

19  under the UCL, *see* CAL. CIV. CODE § 17203, plaintiffs and the proposed class are entitled to an

20  accounting of all AdSense program sums earned, payable, or associated with their publisher

21  accounts at the time they were disabled, including without limitation as to all sums associated with

22  the publishers' service of AdSense-related ads on their websites or other properties, or other

23  performance under any AdSense program, and any subset of such sums that Google purports to be

24  associated with the claimed violation of AdSense terms of service or policies.  Such an accounting

25  will enable a determination of the amount of restitution owed to each plaintiff and member of the

26  proposed class, especially in these circumstances where Google locks out publishers from their

27  accounts upon termination; where the plaintiffs and proposed class members have relationships

28  with Google based on Google's collection and administration of funds owed to them; and where

Google is the party that knows what supposed violations or invalid activities it had in mind when it terminated publishers' accounts, and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs and members of the putative class.

## FIFTH CAUSE OF ACTION

### REQUEST FOR DECLARATORY RELIEF
(CALIFORNIA DECLARATORY JUDGMENT ACT, CAL. CIV. PROC. CODE § 1060)

160.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

161.    Google's contractual terms invoked by it to withhold all funds owed to AdSense publishers when Google disables their AdSense accounts, violate California law as set forth herein. As alleged herein and otherwise, these contractual terms are (a) unconscionable and (b) constitute invalid provisions for liquidated damages.[31]  Accordingly, they are unenforceable.  *See*, *e.g.*, CAL. CIV. CODE § 1670.5(a); CAL. CIV. CODE § 1671(b).  Yet Google purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is an actual controversy between the plaintiffs and class members on the one hand, and Google on the other.

162.    Pursuant to CAL. CIV. PROC. CODE § 1060 and otherwise, plaintiffs and members of the proposed class are entitled to an order declaring these terms unconscionable, invalid, and unenforceable as against them and all AdSense publishers.

## SIXTH CAUSE OF ACTION

### REQUEST FOR DECLARATORY RELIEF
(FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a))

163.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

164.    Google's contractual terms invoked by it to withhold all funds owed to AdSense publishers when Google disables their AdSense accounts violate California law as set forth herein. As alleged herein and otherwise, these contractual terms are (a) unconscionable and (b) constitute invalid provisions for liquidated damages.  Accordingly, they are unenforceable.  *See*, *e.g.*, CAL.

---

[31] *See* n.4, *supra*, regarding the preservation of plaintiffs liquidated damages-related claims for a possible appeal.

Civ. Code § 1670.5(a); Cal. Civ. Code § 1671(b).[32]  Yet Google purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is an actual controversy between the plaintiffs and class members on the one hand, and Google on the other.

165.    Pursuant to 28 U.S.C. § 2201(A) and otherwise, plaintiffs and members of the proposed class are entitled to an order declaring these terms unconscionable, invalid, and unenforceable as against them and all AdSense publishers.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the following relief:

A.    That the Court certify this case as a class action on the nationwide basis requested, and that it appoint plaintiffs as class representatives and their counsel to be class counsel;

B.    That the Court award plaintiffs and the proposed class all appropriate relief, including an accounting or accountings; monetary relief, whether by way of restitution or damages, together with pre-judgment interest at the highest rate permitted by law; injunctive relief requiring that Google undertake to calculate and pay all program earnings due the plaintiffs and the proposed class and that it cease the practices with respect to its AdSense program complained of herein; and declaratory relief, adjudging such practices unlawful, and the contractual terms upon which Google purports to rely unenforceable, in addition to recovery of their own and the proposed class's attorneys' fees, costs, and expenses;

C.    That the Court grant plaintiffs and the proposed class such additional orders or judgments as may be necessary to redress or prevent the unlawful practices complained of herein; and

D.    That the Court award plaintiffs and the proposed class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

---

[32] *See* n.4, *supra*, regarding the preservation of plaintiffs liquidated damages-related claims for a possible appeal.

SECOND AMENDED CLASS ACTION COMPLAINT - 56
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

1   DATED:  March 5, 2015                    HAGENS BERMAN SOBOL SHAPIRO LLP

2                                            By _____/s/ Steve W. Berman_____
                                                        Steve W. Berman
3                                            Steve W. Berman (*pro hac vice*)
                                             Robert F. Lopez (*pro hac vice*)
4                                            1918 Eighth Avenue, Suite 3300
                                             Seattle, WA  98101
5                                            Telephone:  (206) 623-7292
                                             Facsimile:  (206) 623-0594
6                                            steve@hbsslaw.com
                                             robl@hbsslaw.com
7

8                                            Jeff D. Friedman
                                             715 Hearst Avenue, Suite 202
9                                            Berkeley, CA  94710
                                             Telephone:  (510) 725-3000
10                                           Facsimile:  (510) 725-3001
                                             jefff@hbsslaw.com
11

12                                           *Attorneys for Plaintiffs and the Proposed Class*

13                                           LEVETOWN & JENKINS, LLP

14                                           By _____/s/ John Jenkins_____
                                                       John Jenkins
15                                           John Jenkins (CA Bar No. 161959)
                                             Levetown & Jenkins, LLP
16                                           4675 MacArthur Court, Suite 1470
                                             Newport Beach, CA 92660
17                                           Telephone:  (866) 237-1014
                                             Facsimile:  (866) 278-2973
18                                           john@levjen.com

19
                                             Andrew Levetown
20                                           Levetown & Jenkins, LLP
                                             One Metro Center
21                                           700 12th Street, N.W., Suite 700
                                             Washington, DC  20005
22                                           Telephone:  (202) 379-4899
                                             Facsimile:  (866) 278-2973
23                                           alevetown@levjen.com

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 57
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on March 5, 2015, I electronically filed the foregoing document using

3

the CM/ECF system which will send notification of such filing to the email addresses registered in

4

the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have

5

caused to be mailed a paper copy of the foregoing document via the United States Postal Service to

6

the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF

7

system.

8

9

Dated: March 5, 2015                                    /s/ *Steve W. Berman*_____
                                                       Steve W. Berman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 58
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1