Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

[*Additional counsel on signature page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FREE RANGE CONTENT, INC., a California corporation, COCONUT ISLAND SOFTWARE, INC., a Hawaii corporation, TAYLOR CHOSE, a Minnesota resident, and MATTHEW SIMPSON, a British Columbia, Canada resident, on behalf of themselves and all others similarly situated,<br><br>                           Plaintiffs,<br><br>   v.<br><br>GOOGLE INC., a Delaware corporation,<br><br>                         Defendant. | No. 5:14-cv-02329-BLF<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, UNJUST ENRICHMENT, VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, AND FOR RELIEF PURSUANT TO THE CALIFORNIA DECLARATORY JUDGMENT ACT AND THE FEDERAL DECLARATORY JUDGMENT ACT**<br><br>**DEMAND FOR JURY TRIAL OF ANY ISSUES SO TRIABLE** |

1

# TABLE OF CONTENTS

2

**Page**

3    I.      INTRODUCTION ...................................................................................................1

4    II.     JURISDICTION ....................................................................................................4

5    III.    PARTIES ................................................................................................................5

6    IV.     RELEVANT FACTS...............................................................................................6

7            A.      Google's AdSense program ........................................................................6

8                    1.      Google's representations as to its AdSense program .......................6

9                    2.      AdSense is a California-based program ...........................................7

10                   3.      Google's promises to pay publishers...............................................8

11                   4.      Google's AdSense termination provisions .....................................10

12                   5.      Google's systematic withholding of 100% of publishers' last
                             program earnings ...........................................................................11

13
14                   6.      Google's Unreasonable, Invalid, and Unenforceable Liquidated
                             Damages Provisions .......................................................................14

15                           a.      The provisions at issue purport to apply in the event of a breach
                                     of contract or a contractual term, including breach in the form
16                                   of "invalid activity." ...........................................................15

17                           b.      The provisions at issue provide for the withholding of a fixed
                                     and certain sum...................................................................17
18
                             c.      The liquidated damages provisions in Google's AdSense
19                                   agreements are unreasonable, such that they also are invalid
                                     and unenforceable................................................................19
20

21           B.      Google's Benefits from Withholding Terminated Publishers' Last
                     Program Earnings from Them .....................................................................21

22           C.      Plaintiffs' and Proposed Class Members' Bitter Experiences with Google's
                     AdSense Program ......................................................................................22
23

24                   1.      Plaintiff FRC ..................................................................................22

                     2.      Plaintiff Coconut Island Software, Inc. ........................................27
25

26                   3.      Plaintiff Taylor Chose ...................................................................31

                     4.      Plaintiff Matthew Simpson.............................................................35
27

                     5.      Other Publishers, Similar Experiences ..........................................40
28

D.     Reports from an Anonymous, Self-Described Former Employee of Google Regarding Google's Alleged Practice of Wrongfully Withholding Payment from AdSense Publishers .................................................................42

V.     CLASS ALLEGATIONS ...............................................................................44

VI.     CLAIMS FOR RELIEF..................................................................................47

FIRST CAUSE OF ACTION:  VIOLATION OF CAL. CIV. CODE § 1671(b) ............................48

SECOND CAUSE OF ACTION:  BREACH OF CONTRACT........................................................49

A.     Google has breached the parties' contracts, entitling plaintiffs to damages for their performance thereunder. ..........................................................49

B.     The contracts contain unconscionable terms that are unenforceable. ......................51

C.     The parties' contracts contain invalid and unenforceable liquidated damages provisions. .............................................................................52

D.     When the unenforceable provisions are stricken from the contract, plaintiffs are left with recoverable damages for their performance under the contracts...........53

E.     Accounting ...............................................................................53

THIRD CAUSE OF ACTION:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.............................................................................54

FOURTH CAUSE OF ACTION:  UNJUST ENRICHMENT.........................................................57

FIFTH CAUSE OF ACTION:  VIOLATION OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)..............................................58

A.     Violation of "Fraudulent" Prong of UCL........................................................60

B.     Violation of "Unlawful" Prong of UCL ..........................................................62

C.     Violation of "Unfair" Prong of UCL ..............................................................62

SIXTH CAUSE OF ACTION:  REQUEST FOR DECLARATORY RELIEF (CALIFORNIA DECLARATORY JUDGMENT ACT, CAL. CIV. PROC. CODE § 1060) ..................64

SEVENTH CAUSE OF ACTION:  REQUEST FOR DECLARATORY RELIEF (FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)) .......................................65

PRAYER FOR RELIEF .................................................................................................66

JURY TRIAL DEMANDED ..........................................................................................67

1    For their complaint against the defendant, plaintiffs, on their own behalf and on behalf of

2    all others similarly situated, allege as follows:

3    ## I.    INTRODUCTION

4    1.    Google Inc. ("Google") owns and operates the AdSense advertising program.  One

5    part of the program is the AdSense for Content service.  By offering this service, Google induces

6    website operators—called publishers—to host advertisements on their websites in exchange for the

7    promise that Google will pay them a majority of the fees paid for these ads by advertisers.

8    Publishers earn funds when they display these advertisements to visitors or when visitors interact

9    with them.

10    2.    AdSense generates billions of dollars payable to AdSense publishers and billions of

11    dollars in profit to Google.  (*See*, *e.g.*, http://adsense.blogspot.com/2012/12/working-better-

12    together-protecting.html ("Last year [2011] alone, we shared $6.5 billion with our AdSense

13    publishers.") (last accessed Sept. 8, 2014);

14    http://investor.google.com/earnings/2014/Q2_google_earnings.html ("Our partner sites generated

15    revenues of $3.42 billion, or 21% of total revenues, in the second quarter of 2014.  This represents

16    a 7% increase over second quarter of 2013 network revenues of $3.19 billion.") (last accessed Sept.

17    9, 2014).)  Were it not for publishers, their web properties, and their content, there would be no

18    AdSense program.  It is the publishers who invest time, money, and energy in creating and

19    maintaining websites that drive the consuming public to see and interact with AdSense program

20    ads, and they reasonably come to depend on the income that their web properties generate.

21    3.    But as the plaintiffs and many other publishers have found, Google often shuts

22    down AdSense accounts very suddenly, including long-standing accounts that Google has profited

23    from over the years, without providing detail sufficient to permit the publisher to understand why

24    his or her account was terminated.  For example, as with two of the plaintiffs here, Google

25    sometimes terminates accounts due to its purported detection of "invalid activity," which can

26    include invalid clicks, but it admits that its "[d]etection of [i]nvalid [c]licks" is performed via

27

28

THIRD AMENDED CLASS ACTION COMPLAINT - 1
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

"automated algorithms" in the "vast majority" of cases[1]; in other words, a machine may well determine the fate of a publisher's livelihood, no matter his or her good faith in hewing to Google's rules.  Machines can certainly err, or they can fail to account for benign causes for a given set of clicks.  But affected publishers are denied the opportunity to understand the supposed basis for termination of their accounts because Google withholds critical information from them *as a matter of policy* (albeit one that is not a part of the AdSense contract).[2]

4.     Further, as the plaintiffs found with respect to their own accounts, Google terminates publisher accounts even when publishers are materially compliant with Google's contract terms and policies.  Google also terminates accounts when the websites at issue are materially the same as when Google approved the publishers' AdSense program applications.  In fact, Google terminates accounts even after the publishers have been proactive in self-reporting potential issues with their websites—as Google encourages them to do—so that the publishers can determine if there are any problems that need fixing.  Google even terminates accounts after its own representatives have praised the publishers' websites and reassured publishers that all is well with their accounts.

5.     As if these sudden, unwarranted, and unfair account terminations were not enough, Google, by way of unenforceable liquidated damages provisions in its AdSense contracts, also withholds all program earnings lawfully payable to the publishers at the time of termination.  Google denies the terminated publisher *the entirety* of the expected funds, notwithstanding that the publisher earned all or at least a substantial portion of these funds by serving hundreds or thousands of ads without issue.  This was the experience of the plaintiffs, and Google admits the

---

[1] http://www.google.com/ads/adtrafficquality/invalid-click-protection.html (last accessed Feb. 23, 2015).

[2] https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 (last accessed Feb. 23, 2015) ("Because we have a need to protect our proprietary detection system, we're unable to provide our publishers with *any information about their account activity*, including any web pages, users, or third-party services that might have been involved.") (emphasis added).  Google does not explain how it is that telling a publisher which web pages that Google deems affected by bad clicks, or which website users it believes to have generated those clicks, or which "third-party services" it claims to have been involved, would imperil its "proprietary detection system." Google simply expects publishers to acquiesce in this grave information deficit, even as it withholds substantial sums of money from them.

THIRD AMENDED CLASS ACTION COMPLAINT - 2
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

practice is regular and systematic, in spite of contract language promising that Google will apply discretion in considering whether to withhold funds.  (*See*, *e.g.*, ¶¶ 30, 57, 71, 80, 93, *infra*.)

6.    Depending on when in a month it terminates a publisher, Google withholds payments due for the month before termination as well as all the days of the termination month up through the date of termination; in other words, Google regularly withholds payment corresponding to well over a month's, and closer to two months', ad serves.  Google withheld tens of thousands of dollars collectively from the plaintiffs here.  (*See*, *e.g.*, ¶¶ 30, 57, 71, 80, 93, *infra*.)

7.    Indeed, accounts abound of Google refusing to pay tens or hundreds of thousands of dollars—and even more—to other terminated publishers under its withhold-it-all policy.  (*See*, *e.g.*, "This Tech Company Says It Lost $1 million Because It Didn't Follow Google's Rules," *Business Insider*, Dec. 18, 2014 (http://www.businessinsider.com/google-search-ad-policies-cost-this-company-1-million-2014-12) (describing the withholding of funds from terminated publishers in the amounts of "nearly $1 million," "$500,000," "$200,000," "$300,000," "$46,000," "$35,000," and $35,000.") (last accessed February 23, 2015).)  As one self-described AdSense publisher reported: "It's common knowledge among SEOs that AdSense tends to be disabled a few days before the supposed payout.  I haven't lost any big sum—only $2000 but I know one person that lost $40,000.  It was all legitimate traffic coming straight from Google themselves, no click fraud no bought traffic etc.  PS: I was using AdSense from 2008 to 2013—over 5 years so it's not like only new users got banned."[3]

8.    Google's wrongful refusal to pay terminated AdSense publishers the monies they have earned and are owed is the subject of this lawsuit.  Under the law of the state of California, which governs plaintiffs' claims and the claims of the proposed class, Google's actions constitute or result in breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of the California Unfair Competition Law.  Further, under California law, the liquidated damages provisions present in Google's AdSense terms and conditions, which Google invokes to withhold 100% of earned revenue from terminated publishers, are invalid in that

---

[3] https://news.ycombinator.com/item?id=7672910 (last accessed May 7, 2014).

the provisions were unreasonable under the circumstances existing at the time the contracts were made.

9. Plaintiffs, on behalf of themselves and all Google AdSense publishers whose AdSense accounts were or are subject to Google's localized terms and conditions for the United States, American Samoa, Anguilla, Antigua and Barbuda, Aruba, Australia, Bahamas, Barbados, Belize, Bermuda, Bulgaria, Canada, Cayman Islands, Czech Republic, Dominica, Egypt, Falkland Islands, Grenada, Guyana, Haiti, Jamaica, Japan, Jordan, Libya, Montenegro, Montserrat, Morocco, Netherland Antilles, New Zealand, Puerto Rico, Qatar, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Saudi Arabia, Serbia, Serbia and Montenegro, Singapore, Trinidad and Tobago, Turkey, Turks and Caicos Islands, United Arab Emirates, United States Minor Outlying Islands, Virgin Islands, Western Sahara, and Yemen seek damages based on, and/or restitution of, the sums wrongfully withheld from them and members of the proposed class; a declaration that Google's adhesive contract terms purportedly allowing it to withhold all AdSense funds owed to terminated publishers are unconscionable and unenforceable, and that they are invalid and unenforceable penalties in violation of California law governing liquidated damages; and injunctive relief requiring Google to determine and pay all AdSense funds earned and payable to plaintiffs and the class of terminated publishers, and to prevent Google from withholding payment to AdSense publishers under the circumstances complained of going forward; and for all appropriate accountings to plaintiffs and the proposed class.

## II.    JURISDICTION

10. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). Upon information and belief, based on Google's figures regarding the number of terminated publishers and its practice of withholding monies owed to these publishers upon termination, the amount in controversy in this proposed class action will exceed $5,000,000, exclusive of interest and costs. Also, three plaintiffs hail from Hawaii, Minnesota, and the Canadian province of British Columbia, respectively, such that at least one member of the class of plaintiffs necessarily is a citizen of a state other than California, where Google is a citizen. Furthermore, given the nationwide and international character of Google's AdSense program, plaintiffs believe, and

1    therefore allege, that more than two-thirds of the members of the proposed class are citizens of

2    states (including foreign states) other than California.

3         11.    This Court has personal jurisdiction over the defendant because the defendant is

4    licensed to do business in the state of California and in fact conducts business in this state; also,

5    Google's applicable, localized AdSense terms and conditions at paragraph 14 state that Google

6    consents to personal jurisdiction "in the federal or state courts of Santa Clara County, California,

7    USA . . . ."  (*See*, *e.g.*, https://www.google.com/adsense/localized-terms?rc=US&ce=1 (last

8    accessed May 7, 2014)[4].)

9         12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as

10   unlawful practices are alleged to have been committed in this federal judicial district, and the

11   defendant resides and regularly conducts business in this district.

12        13.    Assignment to the San Jose division of this Court is appropriate because the

13   defendant has its headquarters in Mountain View, Santa Clara County, California, which is located

14   in this division of the Northern District of California.  Also, it is believed, and therefore alleged,

15   that many members of the proposed class reside or do business in the San Jose division of the

16   Northern District of California.  Furthermore, Google's applicable, localized AdSense terms and

17   conditions at paragraph 14 specify that claims such as these will be "litigated exclusively in the

18   federal or state courts of Santa Clara County, California, USA . . . ."  (*See*, *e.g.*,

19   https://www.google.com/adsense/localized-terms?rc=US&ce=1 (last accessed May 7, 2014).)

20                               **III.    PARTIES**

21        14.    Plaintiff Free Range Content, Inc. ("FRC") is a California corporation and former

22   AdSense publisher.

23        15.    Plaintiff Coconut Island Software, Inc., is a Hawaii corporation and former AdSense

24   publisher.

25        16.    Plaintiff Taylor Chose is a Minnesota resident and former AdSense publisher.

26

27         [4] The localized AdSense terms and conditions applicable to the non-U.S. publishers who are
28   part of the proposed class, ¶ 102, *infra*, also are available by way of this link.

THIRD AMENDED CLASS ACTION COMPLAINT - 5
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

17.     Plaintiff Matthew Simpson is a British Columbia, Canada resident whose account was terminated by Google as described herein.

18.     Defendant Google is a Delaware corporation with its headquarters and principal place of business in Mountain View, California.  Google is America's leader in Internet advertising.  It was number 46 on the U.S. Fortune 500 for 2014, with 2014 revenues of $60.629 billion and profits of $12.92 billion.  (http://fortune.com/fortune500/google-inc-46/ (last accessed March 2, 2015).)

## IV.     RELEVANT FACTS

### A.     Google's AdSense program

#### 1.     Google's representations as to its AdSense program

19.     Google's AdSense program affords Google the ability to sell ads to advertisers that will appear on various non-Google websites and other non-Google properties.  (*See*, *e.g.*, https://www.google.com/adsense/www/en_US/tour/index.html (last accessed May 7, 2014).)  One part of the AdSense program is the AdSense for Content product, by which publishers serve ads on websites alongside content that attracts traffic to those sites.  Other AdSense products include (or have included) AdSense for Search, AdSense for Video, AdSense for Games, AdSense for Mobile, AdSense for Domains, and AdSense for Shopping.  (*See*, *e.g.*, https://support.google.com/adsense/topic/3384707?hl=en&ref_topic=1705997 (last accessed Sept. 9, 2014); *see also* https://support.google.com/adsense/topic/1705997?hl=en&ref_topic=1250102 ("AdSense delivers targeted, relevant ads to more than just websites. Link your AdSense account to YouTube, Blogger and other hosted platforms to help you get the most mileage. We also offer AdSense for games, video, search and mobile content.") (last accessed Sept. 9, 2014).)  In each instance, the object is to publish ads sold to advertisers by Google.

20.     Google touts AdSense as *sui generis*: a different beast altogether from potential competitors.  It refers to AdSense as an "innovative Google business solution that will help you unleash the true revenue potential of your site." (https://support.google.com/adsense/answer/9714?hl=en (last accessed Sept. 10, 2014).)  It touts as distinguishing features of AdSense the ability to: "[r]un ads that will interest your users . . . ,

1    [l]everage Google search technology [no small matter given that Google is the world leader in

2    search] . . . , [r]un ads targeted to your audience . . . , and [g]et[] started" fast and easily.  (*Id.*)  In

3    addition, Google touts its unequalled access to advertisers: "With Google's AdWords advertisers

4    and certified ad networks, AdSense has the largest global advertiser pool on the web, which means

5    more competition for your unique content."

6    (http://static.googleusercontent.com/external_content/untrusted_dlcp/www.wweps.com/en/us/adse

7    nse/start/pdf/AdSense_GrowYourOnlineBusiness.pdf at 3 (last accessed Sept. 8, 2014).)  Given all

8    of these features of the AdSense program, the plaintiffs, like millions of other AdSense publishers,

9    were convinced that there was no real alternative to AdSense for publication of ads on web

10   properties.

11              **2.       AdSense is a California-based program**

12              21.       Upon information and belief, Google administers and operates its AdSense program,

13   and made the decisions and took the actions complained of herein, in California, including .at its

14   Mountain View, California headquarters.  More specifically, plaintiffs believe, and therefore

15   allege, that AdSense program payments issued from California, and that the decisions and actions

16   to disable publisher accounts and to withhold program payments from publishers were made in

17   California.  (*See*, *e.g.*,

18   http://www.bing.com/images/search?q=adsense+publisher+checks&FORM=HDRSC2 (displaying

19   images of various AdSense publisher checks bearing Google's Mountain View, California

20   address); http://www.google.com/about/careers/locations/mountain-view/ ("Inside Google

21   Mountain View (Global HQ)—[W]e've grown to fill a large Mountain View [California] campus

22   we call the Googleplex.  We've also expanded to offices throughout the region to offer a variety of

23   bay area [*sic*] jobs.  We work on products galore, like . . . AdSense . . . .  What kind of work do you

24   do at Google Mountain View?  The Googleplex is our corporate headquarters, so we do it all, from

25   engineering to sales, marketing, finance, legal, corporate communications and HR. Our products

26   include Android, Chrome, YouTube, Google+, Search, *Ads* and Commerce and Local.") (emphasis

27   added) (last accessed Sept. 6, 2014); *see also*

28   https://productforums.google.com/forum/#!msg/adsense/plqg5S8gGys/bKiwW4LwshoJ

1      (reproducing two emails an AdSense publisher received from "The Google AdSense Team" in

2      Mountain View, California) (last accessed Sept. 6, 2014).)

3               22.      Also, on or about February 29, 2014, plaintiff FRC received an email from Adam

4      Wolf at Google regarding AdSense Optimization.  The email gave a telephone number for Mr.

5      Wolf with a 650 area code, which covers Mountain View, California.

6      (http://en.wikipedia.org/wiki/Area_code_650 (last accessed Sept. 10, 2014).)  Additionally, a

7      LinkedIn page evidently belonging to Mr. Wolf indicates that he has been a Strategic Partner

8      Manager at Google since May 2012, and it lists as his job description: "Ad Serving, Network

9      Management, new Google products and User Experience for Strategic Partners in Google's

10     Publisher Network."  (https://www.linkedin.com/in/adamwolf13 (last accessed Sept. 6, 2014).)

11     The page lists Mr. Wolf's address as "San Francisco, California (San Francisco Bay Area)."  (*Id.*)

12           **3.**      **Google's promises to pay publishers**

13              23.      With respect to its AdSense for Content product, Google contracts with operators of

14     websites to publish ads in exchange for a percentage of the sums paid by advertisers to place and

15     run the ads.  (*See* https://support.google.com/adsense/answer/180195?hl=en (promising AdSense

16     for Content publishers a 68% revenue share and AdSense for Search publishers a 51% revenue

17     share, and indicating that Google does not "disclose the revenue share for other AdSense prod-

18     ucts . . . .") (last accessed Sept. 6, 2014).)  Thus, Google promises to pay publishers when visitors

19     to the publishers' web properties view, click on, or otherwise interact with these ads.  (*See*, *e.g.*, *id.*;

20     *see also* Ex. A (true and correct copy of AdSense U.S. Online Terms and Conditions, retrieved on

21     May 20, 2014 from https://www.google.com/adsense/localized-terms?rc=US&ce=1), ¶ 5 (promise

22     to pay)[5]; Ex. B (true and correct copy of AdSense U.S. Online Standard Terms and Conditions for

23     the early July 2012 timeframe, when plaintiff FRC became an AdSense program participant,

24     retrieved on May 20, 2014 from the Internet Archive via the Wayback Machine

25     (https://web.archive.org/web/20120706155053/https://www.google.com/adsense/localized-terms)),

26

27

28

---

[5] "Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google."  (*Id.*)

¶ 11 (promise to pay)[6]; and Ex. C (true and correct copy of the AdSense U.S. Online Terms of Service then current when plaintiff FRC's AdSense account was disabled on or about March 1, 2014, retrieved on May 20, 2014 from the Internet Archive via the Wayback Machine (https://web.archive.org/web/20140220205332/https://www.google.com/adsense/localized-terms)), ¶ 5 (promise to pay)[7].)

24.   In other words, such activity generates earnings on the part of publishers.  As described in the paragraph immediately below, Google refers to "earnings" which it then undertakes to withhold.

25.   Notably, the AdSense terms and conditions also provide: "Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole *discretion*."  (Ex. A, ¶ 5; Ex. C, ¶ 5; *see also* Ex. B, ¶ 11 (promising investigation).)  (But Google exercises no such discretion with sums credited to advertisers upon termination of publishers' accounts.  In fact, in extra-contractual documents, Google admits that whether it disables accounts for supposed invalid activity or policy violations, it *always* withholds *all* earnings from the terminated publisher.[8]  (*See*

---

[6] "You shall receive a payment related to the number of valid clicks on Ads, the number of valid impressions of Ads, the number of valid completions of Referral Events initiated through Referral Buttons displayed in connection with your Property(ies), and/or other events performed in connection with the display of Ads on Your Property(ies), in each case as determined by Google for participants in the Program." (*Id.*)

[7] "Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google." (*Id.*)

[8] While Google states that it "return[s]" funds withheld from terminated publishers, its corresponding advertiser terms do not give advertisers the right to these funds.  The flip side of Google's advertising program is its AdWords product, by which advertisers contract to have their ads placed on AdSense publishers' websites.  (*See, e.g.*, https://support.google.com/adsense/answer/76231?hl=en ("The Google AdWords program enables you to create advertisements which will appear on relevant Google search results pages and our network of partner sites.") (last accessed Sept. 6, 2014).)  Among Google's AdWords terms and conditions are the following: "Google *may, in its sole discretion*, extend, revise or revoke credit at any time. . . .  Customer understands that third parties may generate impressions or clicks on Customer's Ads for prohibited or improper purposes *and that its sole remedy is to make a claim for advertising credits within the Claim Period,* after which Google will issue the credits following claim validation which must be used by the Use By Date.  TO THE FULLEST EXTENT PERMITTED BY LAW, (A) ADVERTISER AND CUSTOMER WAIVE ALL CLAIMS RELATING TO ANY PROGRAM CHARGES UNLESS A CLAIM IS MADE WITHIN THE

1   https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account

2   disabled for invalid activity"—Q. "Will I be paid out for my AdSense earnings?"—A. "According

3   to our AdSense Terms and Conditions, publishers disabled for invalid click activity may not

4   receive any further payment.  The earnings on your account *will be* properly returned to the

5   affected advertisers.") (emphasis added) (last accessed Feb. 19, 2015;

6   https://support.google.com/adsense/answer/2576043?hl=en ("AdSense account disabled for policy

7   reasons"—Q. "Will I be paid out for my AdSense earnings?"—A. "According to our AdSense

8   Terms and Conditions, publishers disabled for policy reasons may not receive any further payment.

9   The earnings on your account *will be* properly returned to the affected advertisers.") (emphasis

10  added) (last accessed Feb. 19, 2015)).)

11        26.     Google's localized terms and conditions for American Samoa, Anguilla, Antigua

12  and Barbuda, Aruba, Australia, Bahamas, Barbados, Belize, Bermuda, Bulgaria, Canada, Cayman

13  Islands, Czech Republic, Dominica, Egypt, Falkland Islands, Grenada, Guyana, Haiti, Jamaica,

14  Japan, Jordan, Libya, Montenegro, Montserrat, Morocco, Netherland Antilles, New Zealand,

15  Puerto Rico, Qatar, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Saudi

16  Arabia, Serbia, Serbia and Montenegro, Singapore, Trinidad and Tobago, Turkey, Turks and

17  Caicos Islands, United Arab Emirates, United States Minor Outlying Islands, Virgin Islands,

18  Western Sahara, and Yemen are likewise available at https://www.google.com/adsense/localized-

19  terms (last accessed Mar. 2, 2015).  Each bears the same, or substantially the same, program

20  payment terms as set forth and described in ¶¶ 23-25, *supra*.[9]

21        **4.     Google's AdSense termination provisions**

22        27.     Google contracts with AdSense publishers consist of non-negotiable, adhesive terms

23  of participation.  (*See generally* Exs. A, B, and C.)  These contracts link to certain, specific non-

24  negotiated Google documents containing other adhesive terms.

25  

26  CLAIM PERIOD AND (B) *THE ISSUANCE OF ADVERTISING CREDITS (IF ANY) IS AT GOOGLE'S REASONABLE DISCRETION* AND IF ISSUED, MUST BE USED BY THE USE BY DATE."  (https://adwords.google.com/select/tsandcsfinder (Billing country: United States; Currency: US Dollar), ¶ 7 (emphasis added) (last accessed Sept. 7, 2014).)

27  

28        [9] *See* ¶¶ 5, 10 thereof.

28.     AdSense publishers are typically individuals or small businesses, such as the plaintiffs in this matter.  Indeed, Google admits that the program attracts and serves all manner of small publishers.  (Defendant Google Inc.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. No. 38) ("Google MTD") at 4 and n.1 (including cited materials) ("AdSense is an online advertising service offered by Google that allows website publishers of all sizes to earn money by displaying Google-supplied ads on their sites. . . .  AdSense affords all types of publishers (including thousands of small businesses, individual bloggers, and other content producers who may lack dedicated advertising sales teams) access to a large pool of advertisers . . . .").)  Plaintiffs were not permitted to, and did not, negotiate any of these terms of service with the vastly larger and more powerful Google.

29.     Among Google's terms and conditions is the following: "Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason." (*See, e.g.*, Ex. A, ¶ 10; Ex. C, ¶ 10; *see also* Ex. B, ¶ 6.)  The agreement does not provide a right to terminate for *no* reason.  Thus, Google must have *a reason* to terminate and, as plaintiffs allege further herein, this conditional right to terminate must be exercised in good faith, or termination must be objectively reasonable, in light of the implied covenant of good faith and fair dealing and California's Unfair Competition Law.

**5.     Google's systematic withholding of 100% of publishers' last program earnings**

30.     Also among Google's terms and conditions are provisions purportedly allowing Google not to pay publishers for monies due them on their AdSense accounts upon Google's disabling of those accounts—though determinations not to pay terminated publishers earned revenue, *if made at all*, are to be made in an exercise of Google's *discretion*.  (*See, e.g.*, Ex. A, ¶ 5 ("Payments will be calculated solely based on our accounting.  Payments to you *may* be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole *discretion*. . . .") (emphasis added), ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we *may* withhold unpaid amounts or charge back your account.") (emphasis added); Ex. B, ¶ 11 ("Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or

1   any breach of this Agreement by You, pending Google's reasonable investigation of any of the

2   foregoing or any breach of this Agreement by You . . . ."); Ex. C, ¶ 5 ("Payments will be calculated

3   solely based on our accounting.  Payments to you *may* be withheld to reflect or adjusted to exclude

4   any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as

5   determined by Google in its sole *discretion* . . . .") (emphasis added), ¶ 10 ("If we terminate the

6   Agreement due to your breach or due to invalid activity, we *may* withhold unpaid amounts or

7   charge back your account.") (emphasis added).)  The AdSense agreement does *not* provide that

8   Google *will* withhold 100% of publishers' last earnings upon termination (nor need it so provide in

9   order to be considered a liquidated damages provision; the purported right to withhold all such

10  sums is sufficient—though the liquidated damages provisions in Google's terms and conditions are

11  invalid and unenforceable, as alleged in this complaint).  Thus, as plaintiffs allege herein, any such

12  conditional right on the part of Google to withhold payment must be exercised with discretion as to

13  each terminated publisher, and in good faith (or withholding must be objectively reasonable), as

14  required by the explicit terms of the contract, the implied covenant of good faith and fair dealing,

15  and California's Unfair Competition Law.

16          31.     With respect to Google's withholding of funds for purported "invalid activity" on

17  publishers' websites, "invalid activity," per Google's terms of service, is said to include "invalid

18  clicks on Ads . . . ."  (*See*, *e.g.*, Ex. A, ¶ 5.)  These are purported to include clicks "generated by

19  any person, bot, automated program or similar device, including through any clicks or impressions

20  originating from [the publishers'] IP addresses or computers under [their] control."  (*Id.*)  Thus,

21  under these terms of service, a malicious competitor or other bad actor can undertake to sabotage

22  an innocent publisher's AdSense account by bombing its site with ad clicks, for example, and

23  Google might then point to its non-negotiated terms as supposed grounds for punishing that

24  innocent publisher by withholding not only funds related to "invalid clicks," but also *all* monies

25  earned for fully legitimate clicks.  (*See id.*)  But again, Google is contractually bound to apply

26  *discretion* to the withholding of funds for invalid activity.  The contract does *not* provide that

27  Google *will* withhold a publisher's last program earnings in their entirety for some amount of

28  purportedly bad clicks (or for any other reason).

32.     Yet as Google admits, it *always* withholds a publisher's last earnings upon termination of his or her account for supposed invalid activity, based upon its purported right to do so under its AdSense terms and conditions.  (*See* https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account disabled for invalid activity"—Q. "Will I be paid out for my AdSense earnings?"—A. "According to our AdSense Terms and Conditions, publishers disabled for invalid click activity may not receive any further payment.  The earnings on your account *will be* properly returned to the affected advertisers.") (emphasis added) (last accessed Feb. 19, 2015).)  This practice of withholding *all* funds from affected publishers, with *no* application of discretion—and regardless of however many ads were legitimately served by the publishers at the publishers' expense, and with the publishers' content as the driving force for attracting legitimate ad consumers to their sites—is especially wrong given Google's massive information-processing capabilities and its admitted ability to distinguish what it considers invalid activity from that which it does not.  (*See* http://adsense.blogspot.com/2013/05/increasing-accuracy-of-adsense-reporting.html ("As you may know, your earnings at the end of each month currently reflect the amount you've earned *less any deductions for invalid activity. This is a step we've always taken to ensure advertisers are not charged for such activity.* Until now, however, clicks and impressions associated with this activity still appeared in AdSense performance reports.  Starting May 1st [2013], *we'll remove those associated clicks and impressions* to address this discrepancy and provide you with the most accurate reporting." (emphasis added) (last accessed Sept. 8, 2014).)

33.     Google itself acknowledges that innocent publishers can fall victim to "invalid activity" that is not of their own doing, with the draconian consequence being account termination—which leads to Google's refusal to pay the affected publisher any of what it earned for the last program period.  (*See* http://adsense.blogspot.com/2012/12/working-better-together-protecting.html ("But sometimes these tools [referring to tools Google purportedly uses "to keep bad sites and bad traffic out of [its] network"] result in good publishers who become a source of invalid activity having their accounts disabled without much recourse.") (last accessed Sept. 8, 2014).)  Yet Google continues to punish these good publishers by not only disabling their accounts,

but also by withholding all of their last program earnings, too, no matter how large or small, and no matter how small the number of ads associated with what Google might consider invalid activity. And to make matters worse, Google locks out publishers from their account information upon termination, such that they are denied access to their account information including earnings data, as well as even their publisher identification numbers.

34.     Google, by its own tally, has disabled a massive number of publisher accounts.  For example, in a January 17, 2014 post entitled "Inside AdWords, Google's official blog for news tips and information on AdWords"—a publication directed to the advertiser side of Google's advertising ecosystem—Google states that "by the end of 2013" it had "[r]emoved more than 250,000 ad-funded publishers' accounts for various policy reasons." (http://adwords.blogspot.com/2014/01/busting-bad-advertising-practices-2013.html?m=1 (last accessed May 7, 2014).)  Given Google's contractual terms purportedly permitting it to withhold payment to publishers with disabled accounts, the experience of the plaintiffs in seeing this policy actually effected, and news and web reports, the total of earned funds that Google has refused to pay its AdSense publishers is likely immense.

**6.     Google's Unreasonable, Invalid, and Unenforceable Liquidated Damages Provisions**

35.     More specifically, the contractual terms purportedly permitting Google to withhold all unpaid amounts, or earned but unpaid revenue, from terminated publishers are liquidated damages provisions.  These terms purport to authorize Google to withhold a fixed and certain sum of 100% of unpaid but earned program revenue upon disabling a publisher's account for breach of contract.  (*See* Ex. A, ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account."); Ex. B, ¶ 11 ("Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You . . . ."); Ex. C, ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account.").)

36.     Additionally, in pertinent part, Google's AdSense terms and conditions provide that "[p]ayments to [publishers] may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity . . . ."  (Ex. A, ¶ 5; C, ¶ 5.)  As to this latter provision, should Google point to it as justifying its withholding from terminated publishers 100% of their earned but unpaid program revenue, it, too, is a liquidated damages provision, for California law provides that in the determination of whether a term is a liquidated damages clause, the Court looks to the substance, not the form, of the contractual term.

37.     But as plaintiffs allege herein, Google's liquidated damages provisions are unreasonable terms that penalize terminated publishers unlawfully; therefore, they are invalid and unenforceable.

      **a.     The provisions at issue purport to apply in the event of a breach of contract or a contractual term, including breach in the form of "invalid activity."**

38.     The provisions at issue purport to apply where there is a breach of the AdSense terms and conditions (or any of them), including supposed breach due to "invalid activity."  While paragraph 10 of Exs. A and C hereto refers to termination "due to [the publisher's] breach or due to invalid activity," and while paragraph 11 of Ex. B refers to "any of the foregoing or any breach of this Agreement by [the publisher]," each paragraph is referring simply to termination for different kinds of breach.  "Invalid activity" (or "any of the foregoing") is but one form of breach among others.  In Google's own emphatic view, its contract provides that breach may occur whenever one of its AdSense terms and conditions or policies is violated, including those dealing with invalid activity.  (*See*, *e.g.*, http://www.google.com/intl/en_ALL/ads/adtrafficquality/publishers/faq.html (last accessed Sept. 15, 2005) ("If we disable your account due to invalid activity or any other violation of the AdSense Program Policies, you are not allowed to participate in AdSense . . . .").)

39.     Google's treatment of plaintiffs illustrates this perfectly, for Google contends that *all four plaintiffs* breached their AdSense contracts, leading upon disablement of their accounts to the withholding of 100% of their earned but unpaid program funds.  (*See*, *e.g.*, Google MTD (Dkt. No. 38) at 2 ("Here, each Plaintiff violated one or more of the AdSense Terms of Service (attached to the FAC). Among other breaches, Plaintiffs placed ads on sites that violated Google's policies

1   and/or on sites that experienced significant amounts of fraudulent or "invalid" clicks."); Google's

2   Reply in Support of its Motion To Dismiss First Amended Class Action Complaint (Dkt. No. 45)

3   ("Google Reply") at 1 ("After having agreed to the plain, concise AdSense Terms and benefited

4   from participating in the AdSense program, Plaintiffs breached the agreement . . . .") and 2-6

5   (contending that all four plaintiffs breached the AdSense terms and conditions, including terms

6   incorporated by reference).)

7          40.     Thus, Google has made clear that it meant for its liquidated damages provision to

8   apply with respect to all sorts of alleged breaches of contract by publishers.  These alleged

9   breaches include not only supposed (if nebulous) policy violations by plaintiffs Chose and CIS,

10   where their termination notices did not refer to invalid activity, but also invalid activity supposedly

11   associated with plaintiffs FRC's and Simpson's accounts—regardless of whether FRC or Mr.

12   Simpson (or any other publisher) was innocent with respect to such activity.  (*See*, *e.g.*, Google

13   MTD at 14 (Dkt. No. 38) ("This rampant click fraud on the sites on which FRC placed AdSense

14   ads constituted a material breach . . . ."); *see also id.* at 13 n. 16 ("Plaintiffs allege that they did not

15   'intentionally' cause the invalid click activity or violate Google polices.  That allegation is

16   irrelevant, even if true, as what matters is whether advertisers are being billed inappropriately, not

17   publishers' subjective intent."); Google Reply (Dkt. No. 45) at 3-4 ("FRC asserts that it did not

18   breach the Terms because 'it did not cause' the invalid clicks on its ads.  [] But the source of the

19   invalid activity is irrelevant under the AdSense Terms, which make no distinction based on the

20   publishers' intent, or who the source of the invalidity [*sic*] activity is. . . .  Even if the Court were to

21   credit, at this stage, FRC's contention that it did not cause the invalid activity, the click fraud on

22   FRC's sites still damaged Google, its advertisers, and ultimately the interests of AdSense

23   publishers themselves and would constitute a breach."); and, *e.g.*,

24   https://support.google.com/adsense/answer/1348739?hl=en&ref_topic=1348566 (last accessed

25   Sept. 15, 2015) ("What is sabotage and how to prevent it"—". . . ultimately it is the publisher's

26   responsibility to ensure that the activity on his or her ads is valid."), *which links to*

27   https://support.google.com/adsense/answer/57153?vid=0-635779217078571487-1262980484 (last

28   accessed Sept. 15, 2015), the latter providing in part: "According to our AdSense Terms and

THIRD AMENDED CLASS ACTION COMPLAINT - 16
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

Conditions, publishers disabled for invalid click activity may not receive any further payment. The earnings on your account will be properly returned to the affected advertisers.")

41.     And Google has acted accordingly.  Whether publisher accounts are disabled for purported "invalid activity" or other sorts of "policy reasons"—*i.e.*, for breach in either situation—Google invokes its liquidated damages provision in the same way: to withhold 100% of the terminated publisher's earned but unpaid revenue.  (*See* https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account disabled for invalid activity"—Q. "Will I be paid out for my AdSense earnings?"—A. "According to our AdSense Terms and Conditions, publishers disabled for invalid click activity may not receive any further payment.  The earnings on your account *will be* properly returned to the affected advertisers.") (emphasis added) (last accessed Feb. 19, 2015); https://support.google.com/adsense/answer/2576043?hl=en ("AdSense account disabled for policy reasons"—Q. "Will I be paid out for my AdSense earnings?"—A. "According to our AdSense Terms and Conditions, publishers disabled for policy reasons may not receive any further payment.  The earnings on your account *will be* properly returned to the affected advertisers.") (emphasis added) (last accessed Feb. 19, 2015)).)

> **b.     The provisions at issue provide for the withholding of a fixed and certain sum.**

42.     Also, the provisions purport to give Google the right, upon its termination of a publisher's account for breach, to withhold a fixed and certain sum: 100% of "unpaid amounts." (*See* Ex. A, ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account."); Ex. B, ¶ 11 ("Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You . . . ."); Ex. C, ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account.").)  The very language of the terms at issue—"unpaid amounts" or the withholding of "payment"—indicates that there is something earned to be withheld.  So does another term used in

1     the same paragraph 10: "earned balance," which is synonymous in its effect—as to both terms,

2     Google will withhold sums earned by the publisher for serving ads but not yet paid to the publisher.

3     And in fact, as plaintiffs allege, and as Google copiously admits, it reads the "unpaid amounts"

4     provision to mean that upon termination for breach, it has the right to withhold 100% of earned but

5     unpaid sums in the publisher's account, whether it be $0 or $1,000 or much, much more.  The

6     language itself puts publishers on notice that Google purports to have reserved this right to itself in

7     its form contract (though the liquidated damages term is invalid and unenforceable).

8         43.     As for Google's other admissions as to the provision providing for the withholding

9     upon breach of a fixed and certain sum, plaintiffs already have cited to: (a)

10     https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 ("AdSense account

11     disabled for invalid activity"—Q. "Will I be paid out for my AdSense earnings?"—A. "According

12     to our AdSense Terms and Conditions, publishers disabled for invalid click activity may not

13     receive any further payment.  The earnings on your account *will be* properly returned to the

14     affected advertisers.") (emphasis added) (last accessed Feb. 19, 2015); and to (b)

15     https://support.google.com/adsense/answer/2576043?hl=en ("AdSense account disabled for policy

16     reasons"—Q. "Will I be paid out for my AdSense earnings?"—A. "According to our AdSense

17     Terms and Conditions, publishers disabled for policy reasons may not receive any further payment.

18     The earnings on your account *will be* properly returned to the affected advertisers.") (emphasis

19     added) (last accessed Feb. 19, 2015).  These provisions make plain that upon termination for

20     breach (including for invalid activity), Google understands that it has the right to withhold 100% of

21     unpaid "earnings" in every instance.  And in fact, it does so systematically, as plaintiffs allege and

22     as the foregoing statements make plain.

23         44.     Other statements by Google comport with the foregoing.  (*See*, *e.g.*,

24     https://support.google.com/adsense/answer/32852?hl=en (last accessed Sept. 15, 2015) ("Home

25     page reports: understand your earnings . . . .  If your account is disabled for invalid activity, all

26     revenue in the account will be refunded to advertisers and you will not be eligible to receive

27     payment."); https://support.google.com/adsense/answer/9745?hl=en&ref_toipic=1727182 ("What

28     is the difference between earnings and payments? . . .  Earnings are the revenue that you accrue

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

through your participation in AdSense. . . .").)  In other words, as all of the foregoing illustrates, Google acknowledges that there is a sum of earned but unpaid revenue in a publisher's account at termination, post-regular adjustments, and it is this sum—all of it—that is withheld upon termination.  These sums are regularly reported on the publisher's Home page.  They were earned by publishers for dutifully serving valuable ads for AdWords or other Google advertisers, but Google withholds them in their entirety at termination.  At termination, there is not the regular adjustment contemplated by paragraph 5 to the iteration of the terms and conditions at Exs. A and C hereto; instead, Google opens up a trapdoor, and the enumerated and reported earnings fall through it, such that no part of those earnings will be paid to publishers.

**c.      The liquidated damages provisions in Google's AdSense agreements are unreasonable, such that they also are invalid and unenforceable.**

45.      But while there are liquidated damages provisions in Google's iterations of its AdSense terms and conditions, they are invalid, and, therefore, they are unenforceable as provided in CAL. CIV. CODE § 1671(b) because they were "unreasonable under the circumstances existing at the time the contract was made."  At termination for breach, and whatever the circumstances or degree of magnitude of the alleged breach of one or more of the terms and conditions themselves, or of the incorporated terms such as the program policies, Google's AdSense contract gives it the ultimate right to withhold 100% of unpaid amounts, however much those amounts might be, whether they be in the hundreds of dollars, thousands of dollars, hundreds of thousands of dollars, or even much more.  California law provides, however, that "[w]here a fixed sum is agreed upon as liquidated damages for several breaches of varying degrees, it is to be inferred that a penalty was intended."  *See*, *e.g.*, *Dollar Tree Stores, Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1072 (N.D. Cal. 2012) (citing *Smith v. Royal Manufacturing Co.*, 185 Cal. App. 3d 315, 324 (1960)). Here, Google's sledgehammer provisions are penalties, pure and simple.  No matter how subjective or small the supposed breach, and no matter its type, as illustrated amply by the notices to plaintiffs Chose, CIS, and Simpson here, and as illustrated by the various examples of breaching behavior set forth or hinted at in Google's contract documents, the provisions at issue purport to give Google the ultimate right to keep all unpaid earnings from publishers at termination.  Other accounts of

what Google did with respect to other publishers, as described in, or attached to, this complaint, further illustrate the point. (*See* ¶¶ 99-101, *infra*.)

46.    Additionally, Google purports to withhold earned funds for the purpose of refunding those funds (or more probably, giving credits) to its advertisers.  But again, this is in an environment where the advertisers do not seek refunds or credits.  Google simply and uniformly withholds the funds pursuant to its liquidated damages provisions, as a matter of policy.  Indeed, the advertisers have no right to refunds or credits under their contracts with Google.  Rather, as alleged above, they have the mere right to seek credits under specified circumstances, and it is within Google's complete discretion as to whether to award them.  What is more, Google itself won a case with advertisers by pointing out that they received value from ads placed wherever Google chose to place them, including on blank pages. (*See* ¶ 48, *infra*, for supporting citations, which are incorporated here by reference.)  This is plainly a milieu in which Google faced no potential for damages upon breaches by the plaintiffs or class members, and certainly none entitling it to withhold 100% of program funds upon every breach of whatever magnitude or type, rendering its liquidated damages provisions patently unreasonable and unenforceable.

47.    Furthermore, the Law Revision Commission Comments to CAL. CIV. CODE § 1671 provides that in considering the reasonableness of a liquidated damages provision, the Court should consider, *inter alia*, "the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract." *Id.*  Again, there was no real range of harm where Google was not liable over to its advertisers.  The Comments also provide that

> [o]ther relevant considerations in the determination of whether the amount of liquidated damages is so high or so low as to be unreasonable include, but are not limited to, which matters as the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation by the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract.

Google fails under each of these considerations given its immense power relative to plaintiffs and other publishers; the fact that the plaintiffs and proposed class members were not represented by

1   lawyers at the time their AdSense contracts were made; the fact that the parties could not have

2   anticipated that proof of actual damages would be costly or inconvenient, since they anticipated

3   none to Google, and certainly none that would justify keeping 100% of earned funds in all

4   circumstances, no matter how much, especially where Google is already terminating the publisher

5   and as a matter of regular course, deducting specific, purportedly affected sums from what the

6   advertisers pay as a matter of regular course; the fact that Google can point to no difficulty in

7   proving causation and foreseeability, given that it suffered no compensable harm from plaintiffs'

8   supposed breaches; and the fact that the liquidated damages provisions are in form contracts.  For

9   these reasons, too, the provisions at issue are unreasonable, and, therefore, they are invalid and

10  unenforceable.

11  **B.     Google's Benefits from Withholding Terminated Publishers' Last Program Earnings**
    **        from Them**

12       48.     Whatever Google does with earnings withheld from terminated publishers, it

13  benefits greatly.  As to any of the publishers' share kept by Google, the financial benefit is

14  obvious; it is enriched by the money withheld.  But even if in all instances Google actually returns

15  the terminated publisher's withheld share and its own share to supposedly affected advertisers—a

16  paradigm which plaintiffs certainly lack sufficient knowledge to admit—Google still benefits.  The

17  practice would draw considerable and valuable goodwill from the benefiting AdWords advertiser,

18  which already has had its ads served, perhaps to great effect in terms of sales or other profitmaking.

19  Indeed, according to Google itself, even ads served on web pages with no content at all, or pages

20  containing adult content, can and do generate interest and sales for advertisers.  (*See generally*

21  Google's Opposition to Plaintiffs' Motion for Class Certification (Dkt. No. 272) filed in *In re*

22  *AdWords Litig.*, N.D. Cal. No. 08-cv-03369; *see also*, *e.g.*, *id.* at 5 ("In aggregate terms, ads

23  displayed on parked domains and error pages actually have rates of conversion that are on par with

24  or better than ads appearing on other types of pages in the Google Network."), 23 ("By

25  intentionally ignoring the value that advertisers received from using Google's services [which

26  resulted in ads being placed on sites with no content], plaintiffs' restitution model would yield

27  absurd and legally untenable results in which many advertisers would receive an undeserved

28

1  windfall.").  In fact, according to Google's contracts with its advertisers, it can serve ads wherever

2  it pleases, absent affirmative opt-outs.  (*See*, *e.g.*, *id.* at 1 and n.1 (citing to declaration (Dkt. No.

3  274) which cites, at ¶¶ 36-38, to AdWords terms and conditions).)  The advertiser has no recourse

4  except to request account credits, which Google might or might not issue because its contracts

5  reserve to it complete discretion as to whether to grant such requests.  (*E.g.*,

6  https://adwords.google.com/select/tsandcsfinder, ¶ 7 (last accessed Apr. 30, 2015).)  Thus, when

7  advertisers sued Google for ad placements they considered useless, Google defeated class

8  certification by arguing and submitting evidence that ads placed on sites with no content, or ads

9  placed on error pages, generated value for the advertiser.  (*See generally In re AdWords Litig.* at

10  Dkt. Nos. 272 and 274.)  So in the situations complained of herein, AdWords advertisers see their

11  ad budgets enhanced with unexpected funds—which they likely will spend with Google, which has

12  just given them free, valuable advertising (indeed, the advertisers would have to spend the money

13  with Google if "returning" funds to the advertisers means that the advertisers' accounts are merely

14  credited, per Google's AdWords policy, *see* n.8, *supra*).

15        49.     For these reasons, Google loses nothing, and likely gains much, whenever it

16  terminates publishers and returns the publishers' withheld share of program funds, as well as its

17  own share, to advertisers.  Google gets the money back—and likely much more—from advertisers

18  that are pleased with their very good fortune.

19  **C.    Plaintiffs' and Proposed Class Members' Bitter Experiences with Google's AdSense
        Program**

20        **1.     Plaintiff FRC**

21        50.     Google has wrongfully withheld earnings due plaintiff FRC under its AdSense

22  program.

23        51.     FRC owns the Repost content syndication service and the website Repost.us.  In or

24  about July 2012, plaintiff became an AdSense publisher for pages served on various websites under

25  its Repost.us brand.[10]  This sort of publication is expressly permitted by Google.

26

27  _____

28  [10] FRC became an AdSense publisher following Google's approval of its AdSense program
    application.  (*See* https://support.google.com/adsense/answer/10162?hl=en (referring to application
    process and stating that "[o]nce our systems detect that you've placed the ad code on a live page,

1   (https://support.google.com/adsense/answer/1346295 ("Ads on the same page or site as another

2   publisher.  If a website is in compliance with our program policies and the company or owner of

3   the site has given you permission to display ads on their site, you may place our ad code along with

4   the other publisher's ad code on the same page.  You will, however, need to contact your web

5   hosting company or the owner of the website to obtain permission to display ads on their web-

6   site. . . .") (last accessed Sept. 6, 2014).)  Websites on which AdSense ads were to be placed by

7   FRC complied with Google's AdSense program policies, to the best of FRC's knowledge;

8   accordingly, FRC alleges the same.  Any time a new site started taking content with AdSense ads,

9   FRC would check it out for compliance with AdSense program policies.  Also, FRC monitored

10  participating sites for compliance with AdSense policies.  Additionally, FRC obtained the requisite

11  permission from the "company or owner of the site[s]" before proceeding with AdSense ad

12  placement.[11]  Then, in good faith, FRC expended significant time and money in effecting

13  publication of thousands of ads, from various advertisers, under the AdSense program.

14          52.     Furthermore, and more specifically, FRC complied with all terms set forth in

15  Google's AdSense terms and conditions, *see* Exs. A-C hereto, including each of the linked

16  AdSense Program Policies and the Google Branding Guidelines.  Also, FRC knows that program

17  we automatically continue the review process and check that your site complies with our policies.
    When we've completed the second review, we send you an email letting you know the status of
18  your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to
    FRC's account following Google's approval of FRC's application.

19      [11] Indeed, as explained in paragraph 58, *infra*, Google said nothing about FRC's ad placement
20  in its termination notice—it merely identified supposed "invalid activity in [FRC's] AdSense
    account."  But to be clear, with respect to websites on which AdSense ads were served: FRC did
21  not encourage accidental clicks.  FRC did not display ads in such a way that they might have been
    mistaken for other website content.  FRC did not place ads under misleading headers or titles.  FRC
22  did not use language to encourage users to click on ads.  FRC did not bring unnecessary or
    unnatural attention to its ads.  FRC did not place ads on pages or sites where dynamic content was
23  the primary focus.  FRC did not place links, play buttons, download buttons, games, drop-down
    boxes, or applications near ads.  FRC did not place ads on non-content-based pages.  FRC did not
24  offer users compensation for clicking ads.  FRC did not disguise ads on its webpages.  FRC did not
    attempt to associate specific images with individual ads appearing on their sites.  FRC did not
25  display its content below the fold.  FRC did not display ads in software applications.  FRC did not
    display ads in email messages.  FRC did not display ads from any other publishers.  FRC did not
26  display more than the maximum of three standard ad units, three link units, and two search boxes
    on one webpage.  FRC did not display ads on password-protected pages.  FRC websites did not
27  have more than three pop-ups.  And FRC did not display ads in pop-up windows.  FRC does not
    hereby admit that the foregoing statements of performance are based on binding or material
28  contractual terms.

1    ads were served successfully because its representatives saw them in many instances and, further,

2    because of Google's periodic reports of successful publication of these ads and its AdSense

3    program payments to FRC.

4        53.    All went well until February 2014, when estimated earnings for ads by the FRC, as

5    reported by Google, began to increase at a previously unseen rate.  This increase was depicted in

6    the online dashboard that Google made available to FRC before it terminated FRC's account.  That

7    dashboard also showed a difference between a higher earnings number and a lower payable

8    number, suggesting to FRC that Google's automated systems were seizing on some sort of issue,

9    real, or merely a function of something benign having caught the attention of the algorithm.

10       54.    FRC then reported the increase to Google, asking for help to ascertain why the

11   increase was happening and also seeking aid to correct it if there actually was a problem.

12   Additionally, FRC attempted to identify the reason for the spike on its own.  FRC was not

13   responsible for this spike in earnings in the sense that it did nothing to cause invalid activity,

14   including invalid clicks, if in fact there were any.  To this day, FRC is not personally aware of any

15   invalid activity of any kind actually associated with its account.  FRC simply, in good faith, took

16   note of: (a) Google's own data, as available on the online dashboard available to FRC before FRC

17   was terminated, between earnings (or some such term, which was the higher number) and finalized

18   earnings (or some such term, which was the lower number); and (b) spikes in clicks, as to which it

19   asked Google to help to determine if the increases were actually problematic in any way.  To the

20   best of FRC's personal knowledge, it complied with all of Google's contractual terms, policies, and

21   guidelines.

22       55.    Alternatively, in the event that invalid activity, including but not limited to invalid

23   clicks, actually occurred on websites where FRC served AdSense ads, such activity was not caused

24   by FRC or anyone affiliated with or known to FRC; therefore, any such invalid activity was not

25   within the reasonable control of FRC.  For this reason, FRC's performance with respect to any such

26   invalid activity, or its prevention, should be excused, including by way of the *force majeure* clause

27   at paragraph 14 of the AdSense terms and conditions.  (*See* Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither party

28   will be liable for inadequate performance to the extent caused by a condition (for example, natural

1    disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet

2    disturbance) that was beyond the party's reasonable control.").)

3         56.    Shortly after the FRC reached out to Google, it received a note asking it to set up an

4    appointment to speak with a representative from the AdSense team.  FRC did as requested,

5    scheduling a call for March 6, 2014.

6         57.    At the end of February 2014, Google had reported that FRC's estimated earnings for

7    February 2014 were over $40,000.  To FRC, it seemed unlikely, based on its history with the

8    program and Google's reports, that the number was correct; it seemed too high.  But certainly FRC

9    was due, if not all the estimated earnings, some substantial portion of those estimated earnings,

10   amounting to several thousands of dollars—perhaps in the $8,000 to $11,000 range, per FRC's

11   recollection of Google's own performance report for February 2014 that was available to FRC

12   online before Google terminated FRC and locked it out of its account—for AdSense ads that FRC

13   had dutifully served in February 2014 before Google disabled its account.  It bears underscoring

14   that while Google has attempted to mislead by speaking of FRC's reference in plaintiffs' first

15   amended complaint to an $8,000 to $11,000 range as an admission by FRC that 75% or more of its

16   clicks were invalid, *see* Google MTD (Dkt. No. 38) at 7,[12] such is not the case.  Rather, FRC was

17   referring in good faith to what it recollected seeing on Google's dashboard before Google

18   terminated its account.

19        58.    Then on March 4, 2014—two days before the March 6, 2014 call with the AdSense

20   representative was to occur—FRC received word from the AdSense program that Google had

21   disabled its account.  Google offered no explanation, other than a reference to its supposed

22   detection of "invalid activity in [FRC's] AdSense account."  (Declaration of Jim Gray in Support

23   of Google's Motion To Dismiss First Amended Class Action Complaint (Dkt. No. 39) ("Gray

24

25        [12] According to Google, it "disabled FRC's AdSense account in March 2014, following a
     dramatic spike in earnings, at least 75-80% of which even FRC itself attributes to invalid activity.
26   (FAC, ¶¶ 29-31 (admitting that of $40,000 earned, between $8,000 and $11,000 was valid).)."  But
     there was no such admission in plaintiffs' first amended complaint.  (Dkt. No. 27, ¶¶ 29-31.)  As is
27   plain from FRC's allegations, it simply was referring to *Google's* numbers.  And FRC could never
     determine the accuracy of Google's numbers due to Google's policy of not providing information
28   when it disables accounts for supposed "invalid activity."  (*See* ¶ 58, *infra*.)

Decl."), Dkt. No. 39-7 at 2.)  Notably, "invalid activity," as defined by Google, is a nebulous concept and refers in Google's AdSense contract to invalid clicks but also to events other than invalid clicks.  (*See* Exs. A and C, ¶ 5 (referring, *inter alia*, to "[a]ds served to end users whose browsers have Java Script disabled").)  Yet as Google wrote in its termination notice, underscoring the lack of meaningful information that it had provided regarding the supposed reason for termination of FRC's account: "We're limited in the amount of information we can provide about your specific violation.  We understand this can be frustrating for you, but we've taken these precautionary measures because intentional violators can use this information to circumvent our detection systems."  (Dkt. No. 39-7 at 2.)  So what exactly was Google referring to by "invalid activity"?  It did not say.  (*Id.*)  Further, as is its practice, Google, upon disablement of FRC's account, also locked out FRC from access to its AdSense publisher account information and details.

59.    FRC was shocked to hear of its account termination, given that it had itself alerted Google to a potential problem with its account and sought in good faith to identify and correct whatever problem there actually might be.  It promptly filed in writing the appeal referenced in the termination notice, even though it was greatly hobbled by the fact that Google was withholding critical information from it, including the most basic information about what sort of "invalid activity" Google had supposedly detected; where the "invalid activity" had supposedly occurred (again, bearing in mind that Google defines "invalid activity" as including events other than problematic clicks, *see* Exs. A and C, ¶ 5); and where it supposedly came from.  Google mandates that appellants use a form to appeal,[13] and that form allows only a short explanation (limited, upon information and belief, to a mere 1,000 characters) of the bases for the appeal—or for whatever bases the terminated publisher can muster, given his or her severe information deficit.  By way of

---

[13] https://support.google.com/adsense/answer/2576043?hl=en
https://support.google.com/adsense/answer/57153?hl=en&ref_topic=1342777 (to appeal the disabling of a publisher's account, the publisher is advised on a help page (that is not linked to the program terms and conditions) to "please contact [Google] *only* through [its] appeal form) (emphasis in original) (last accessed Feb. 19, 2015).

1   this appeal, FRC sought not only reinstatement of its account, but also the earnings owed it and

2   withheld by Google.

3          60.     Also, FRC's telephone conference with the Google AdSense representative took

4   place as planned on March 6, 2014.  During this call, the AdSense representative sounded

5   sympathetic but made it plain that he had no control over the matter.  The representative also

6   indicated that FRC would be paid its earnings for the last payment period only if Google granted its

7   appeal.  Shortly thereafter, FRC received a terse letter from Google, dated March 7, 2014, rejecting

8   its appeal.  Given the short turnaround time, FRC doubts, with good reason, that its appeal received

9   any sort of real attention.  In fact, given the paucity of information that FRC could address in its

10  appeal, thanks to Google's admitted refusal to provide meaningful details with its disablement

11  notice, Dkt. No. 39-7 at 2, coupled with the restrictive appeal form that Google required FRC to

12  use, Google's appeal process was an exercise in bad faith and unreasonableness; it was mere

13  pretense to confirming the decision already made.

14         61.     Thus, having disabled FRC's AdSense account, Google refused to pay FRC *any* of

15  the sums it owed FRC for having served many thousands of AdSense ads on Repost.com-branded

16  webpages during the last pay period.  Google made no attempt to limit what it withheld, whether

17  based on an assessment of the ad serves supposedly affected, or the time-scope of whatever

18  problem it supposedly had identified with FRC's AdSense account, or the supposed severity of the

19  purported problem, or on any other factor—Google simply withheld *all* of FRC's earnings for the

20  last payment period, as it admits it always does, ¶ 25, *supra*, with no discretion or good faith

21  applied, contrary to FRC's contractual expectations.

22         62.     Like all of the plaintiffs, FRC was a much, much smaller entity than the behemoth

23  Google.  FRC was afforded no opportunity, and was unable, to negotiate any of the AdSense terms

24  of service or policies with Google.

25         **2.     Plaintiff Coconut Island Software, Inc.**

26         63.     Google has wrongfully withheld money due plaintiff Coconut Island Software, Inc.

27  ("CIS") under its AdSense program.

28

THIRD AMENDED CLASS ACTION COMPLAINT - 27
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

64.     CIS was an AdSense publisher continuously from March 2005[14] through November 2012, when Google disabled its publisher account.  As is its practice, upon disablement of CIS's account, Google locked out CIS from access to its AdSense publisher account information and details.

65.     Like all of the plaintiffs, CIS is a much, much smaller entity than Google.  CIS was afforded no opportunity, and was unable, to negotiate any of the AdSense terms of service or policies with Google.

66.     During the time period when CIS's publisher account was active, CIS successfully served many thousands of ads for various advertisers under the AdSense program.  CIS served these ads on its websites, including www.healthcarehiring.com and www.e-physician.info.  CIS knows that program ads were served successfully on its websites because its owner saw those published ads in many instances, and also because of Google's periodic reports of successful publication of these ads and its receipt of AdSense program payments.  Indeed, for years, a substantial portion of the family income for CIS's owner came from Google AdSense payments.

67.     Also—and without admitting that the following statements of performance are based on binding or material contractual obligations—CIS websites bore extensive, unique, and original content.  Further, CIS did not place AdSense ads on sites with little to no original content, or on pages with no content.  Additionally, CIS assured a good user experience through clear navigation and organization; users were able to easily click through its webpages and find the information they are seeking.[15]  In sum, and without admitting that they were part of the AdSense

---

[14] CIS's owner recalls that CIS became an AdSense publisher following Google's approval of its AdSense program application.  (*See* https://support.google.com/adsense/answer/10162?hl=en (referring to application process and stating that "[o]nce our systems detect that you've placed the ad code on a live page, we automatically continue the review process and check that your site complies with our policies. When we've completed the second review, we send you an email letting you know the status of your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to CIS's account following Google's approval of CIS's application.

[15] What is more, CIS did not encourage accidental clicks. CIS did not display ads in such a way that they might have been mistaken for other website content.  CIS did not place ads under misleading headers or titles.  CIS did not use language to encourage users to click on ads.  CIS did not bring unnecessary or unnatural attention to its ads.  CIS did not place ads on pages or sites where dynamic content was the primary focus.  CIS did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.  CIS did not place ads on non-content-

1   contract or admitting their materiality if they are deemed to be, CIS complied with Google's

2   webmaster guidelines by offering significant value to end users by the provision of unique and

3   relevant content on its websites, and it did not place ads on sites with little to no original content.

4          68.      Furthermore, CIS complied with all terms set forth in Google's AdSense terms and

5   conditions, *see* Exs. A-C, including each of the linked AdSense Program Policies and the Google

6   Branding Guidelines.  CIS caused no invalid activity, including invalid clicks, on its websites, and

7   it is not aware of any.[16]  Also, CIS knows that program ads were served successfully because its

8   representatives saw them in many instances and, further, because of Google's periodic reports of

9   successful publication of these ads and its AdSense program payments to CIS.

10         69.      Though Google deems participation in its AdSense program to be free, participation

11  was not free to CIS.  Rather, over the years, CIS paid or spent thousands of dollars on website

12  programming, software, hosting fees, connectivity fees, and equipment costs.  Also, its owner

13  worked hard, and often full-time, at developing the websites where the AdSense program ads were

14  run, and at generating content for those websites.  At all times he worked in good faith to comply

15  with Google's AdSense contract, Google's program policies, and Google's webmaster guidelines.

16         70.      Google stated (in part) in its November 16, 2012 termination notice that CIS's

17  publisher account was being disabled because Google's "specialists" purportedly had "found that it

18  was not in compliance with [Google's] policies," but Google merely offered vague references to

---

19  based pages.  CIS did not offer users compensation for clicking ads.  CIS did not disguise ads on its
20  webpages.  CIS did not attempt to associate specific images with individual ads appearing on their
    sites.  CIS did not display its content below the fold.  CIS did not display ads in software
21  applications.  CIS did not display ads in email messages.  CIS displayed ads only from Google's
    AdSense network.  CIS did not display ads from any other publishers.  CIS did not display more
22  than the maximum of three standard ad units, three link units, and two search boxes on one
    webpage.  CIS did not display ads on password-protected pages.  CIS websites did not have more
23  than three pop-ups.  And CIS did not display ads in pop-up windows.  CIS does not hereby admit
    that the foregoing statements of performance are based on binding or material contractual terms.

    [16] Alternatively, in the event that invalid activity, including but not limited to invalid clicks,
24  occurred on websites where CIS served AdSense ads, such activity was not caused by CIS or
    anyone affiliated with or known to CIS; therefore, any such invalid activity was not within the
25  reasonable control of CIS.  For this reason, CIS's performance with respect to any such invalid
    activity, or its prevention, should be excused, including by way of the *force majeure* clause at
26  paragraph 14 of the AdSense terms and conditions.  (Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither party will
    be liable for inadequate performance to the extent caused by a condition (for example, natural
27  disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet
    disturbance) that was beyond the party's reasonable control.").)
28

1    various "webmaster guidelines."  (Dkt. No. 39-9 at 2.)  And in the same notice, in an admission

2    that there was no actual violations of specific policies, Google stated that CIS's "sites violate the

3    *spirit* of [its] policies," such that it was disabling CIS's account.  (*Id.* (emphasis added).)  In fact,

4    CIS did not violate any AdSense policy intentionally, and it is unaware of any unintentional policy

5    violations.  To illustrate Google's bad faith and capriciousness in terminating CIS's publisher

6    account, attached as Exhibit G are copies of screenshots of websites similar to CIS's which appear

7    to be displaying AdSense advertisements to this day.

8        71.    When Google disabled CIS's publisher account, CIS, based on CIS's previous

9    review of Google's earnings tool, was owed approximately $2,400.  That same day, November 16,

10   2012, according to Google's records provided with its motion to dismiss plaintiffs' first amended

11   complaint, Dkt. No. 39-10 at 2, CIS appealed.[17]  Because of Google's failure to provide CIS with

12   meaningful information as to why its account had been terminated, its owner could only speculate

13   on what to address.  So he stated in part in CIS's appeal: "Please help me.  I have no idea why this

14   happened.  I have been an adsense publisher for 7 years and have many websites, all of them

15   displaying real content that has taken years of work to develop.  I have been to adsense-in-your-

16   city and discussed sites with policy staff. . . ."  (*Id.*)  But it was to no avail.  A mere three days

17   later, Google denied CIS's appeal, with no help or explanation whatsoever; all Google said to its

18   longtime publisher was that its account "was found to violate [its] program policies," so it was

19   disabled.  (*Id.*)  Given the short turnaround time and the lack of information in Google's notice,

20   CIS doubts, with good reason, that its appeal received any sort of real attention.  In fact, given the

21   paucity of information that CIS could address in its appeal, thanks to Google's failure to provide

22   meaningful details with its disablement notice, coupled with the restrictive appeal form that Google

23   required CIS to use, Google's appeal process was an exercise in bad faith and unreasonableness; it

24   was mere pretense to confirming the decision already made.

25       72.    Thus, having disabled CIS's AdSense account, Google refused to pay CIS *any* of

26   the sums it owed CIS for having served ads on its webpages since the time it was last paid—a

27   _____
         [17] CIS used the same form, with the same limitations, that FRC used.  (*See* ¶ 59 and n.13,
28   *supra*.)

period of well over a month, *i.e.*, all of October 2012 and half of the month of November 2012. Google made no attempt to limit what it withheld, whether based on an assessment of the ad serves supposedly affected, or the time-scope of whatever problem it supposedly had identified with CIS's AdSense account, or the supposed severity of the purported problem, or on any other factor— Google simply withheld *all* of CIS's earnings for the last payment period, as it admits it always does, ¶ 25, *supra*, with no discretion or good faith applied, contrary to CIS's contractual expectations.

### 3.   Plaintiff Taylor Chose

73.     Google has wrongfully withheld money due plaintiff Chose under its AdSense program.

74.     Ms. Chose became an AdSense publisher in or about September 2013.[18]  Near or about the end of November 2013, Google disabled Ms. Chose's publisher account.  As is its practice, upon disablement of her account, Google locked out Ms. Chose from access to her AdSense publisher account information and details.

75.     Like all of the plaintiffs, Ms. Chose is no match for Google's power—she is simply an individual web publisher who sought in good faith to use Google's AdSense product.  Ms. Chose was afforded no opportunity, and was unable, to negotiate any of the AdSense terms of service or policies with Google.

76.     During the time period when Ms. Chose's publisher account was active, Ms. Chose successfully served ads for various advertisers under the AdSense program.  She served these ads on her website www.teens-read.com.  Ms. Chose knows that program ads were served successfully on her website because she saw those published ads in several instances.  Also, prior to being locked out of her account details, Ms. Chose saw Google's periodic reports of successful

---

[18] Ms. Chose became an AdSense publisher following Google's approval of her AdSense program application.  (*See* https://support.google.com/adsense/answer/10162?hl=en (referring to application process and stating that "[o]nce our systems detect that you've placed the ad code on a live page, we automatically continue the review process and check that your site complies with our policies. When we've completed the second review, we send you an email letting you know the status of your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to her account following Google's approval of her application.

1    publication of ads on her website.  Additionally, Ms. Chose's receipt of AdSense program

2    payments prior to her account disablement demonstrated that she had performed successfully under

3    the AdSense program.  Furthermore, Ms. Chose complied with all terms set forth in Google's

4    AdSense terms and conditions, *see* Exs. A-C, including each of the linked AdSense Program

5    Policies and the Google Branding Guidelines.  She caused no invalid activity on her website,

6    including invalid clicks, and she is not aware of any.[19]

7            77.     Also—and without admitting that the following statements of performance are

8    based on binding or material contractual obligations—Ms. Chose's website bore unique and

9    original content.  Further, she did not place AdSense ads on sites with little to no original content,

10   or on pages with no content.  Additionally, Ms. Chose assured a good user experience through

11   clear navigation and organization; users were able to easily click through her website in order to

12   find the content they were seeking.[20]  In sum, and without admitting that they were part of the

13   AdSense contract or admitting their materiality if they are deemed to be, Ms. Chose complied with

14   Google's webmaster guidelines by offering significant value to end users by the provision of

15        [19] Alternatively, in the event that invalid activity, including but not limited to invalid clicks,
     occurred on websites where Ms. Chose served AdSense ads, such activity was not caused by Ms.
16   Chose or anyone affiliated with or known to her; therefore, any such invalid activity was not within
     the reasonable control of Ms. Chose.  For this reason, Ms. Chose's performance with respect to any
17   such invalid activity, or its prevention, should be excused, including by way of the *force majeure*
     clause at paragraph 14 of the AdSense terms and conditions.  (Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither
18   party will be liable for inadequate performance to the extent caused by a condition (for example,
     natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet
19   disturbance) that was beyond the party's reasonable control.").)

20        [20] What is more, Ms. Chose did not encourage accidental clicks. Ms. Chose did not display ads
     in such a way that they might have been mistaken for other website content.  Ms. Chose did not
21   place ads under misleading headers or titles.  Ms. Chose did not use language to encourage users to
     click on ads.  Ms. Chose did not bring unnecessary or unnatural attention to its ads.  Ms. Chose did
22   not place ads on pages or sites where dynamic content was the primary focus.  Ms. Chose did not
     place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.
23   Ms. Chose did not place ads on non-content-based pages.  Ms. Chose did not offer users
     compensation for clicking ads.  Ms. Chose did not disguise ads on its webpages.  Ms. Chose did
24   not attempt to associate specific images with individual ads appearing on their sites.  Ms. Chose did
     not display its content below the fold.  Ms. Chose did not display ads in software applications.  Ms.
25   Chose did not display ads in email messages.  Ms. Chose displayed ads only from Google's
     AdSense network.  Ms. Chose did not display ads from any other publishers.  Ms. Chose did not
26   display more than the maximum of three standard ad units, three link units, and two search boxes
     on one webpage.  Ms. Chose did not display ads on password-protected pages.  Ms. Chose websites
27   did not have more than three pop-ups.  And Ms. Chose did not display ads in pop-up windows.
     Ms. Chose does not hereby admit that the foregoing statements of performance are based on
28   binding or material contractual terms.

THIRD AMENDED CLASS ACTION COMPLAINT - 32
Case No. 5:14-cv-02329-BLF
010450-11 718002 V1

1   unique and relevant content on its websites, and it did not place ads on sites with little to no

2   original content.

3          78.     Furthermore, though Google deems participation in its AdSense program to be free,

4   participation was not free to Ms. Chose.  Rather, Ms. Chose paid monthly hosting fees, in addition

5   to the cost of purchasing her domain name.  Also, she expended time in generating content for her

6   website, and content is what drives viewers to websites in the AdSense network, which benefits

7   both advertisers and Google.

8          79.     Google stated in its November 27, 2013 termination notice that it is "important for

9   sites displaying AdSense ads to offer significant value to the user by providing unique and relevant

10   content, and not to place ads on auto-generated pages or pages with little to no content."  (Dkt. No.

11   39-11 at 2.)  Aside from providing four very general examples of what it might mean, Google

12   provided no further explanation for why it disabled her account.  (*See id.*)  Google's notice made

13   no sense to Ms. Chose because she created her own content, and because she had violated none of

14   the four principles cited by Google.  In fact, Ms. Chose did not violate any AdSense policy

15   intentionally, and she is unaware of any unintentional policy violations.  To illustrate Google's bad

16   faith and capriciousness in terminating Ms. Chose's publisher account, attached as Exhibit H are

17   copies of screenshots of a website which displayed AdSense advertisements the same way in which

18   Ms. Chose published them.

19          80.     When Google disabled Ms. Chose's publisher account, she was owed approximately

20   $25,000, based on her best estimate.  But the exact number is difficult to confirm because, as stated

21   above, Google locks out publishers from their account details upon disabling their accounts.

22          81.     Having disabled Ms. Chose's AdSense account, Google refused to pay her *any* of

23   the sums it owed her for having served ads on her website during the last pay period.  Google made

24   no attempt to limit what it withheld, whether based on an assessment of the ad serves supposedly

25   affected, or the time-scope of whatever problem it supposedly had identified with Ms. Chose's

26   AdSense account, or the supposed severity of the purported problem, or on any other factor—

27   Google simply withheld *all* of Ms. Chose's last program earnings, as it admits it always does, ¶ 25,

28   *supra*, with no discretion or good faith applied, contrary to Ms. Chose's contractual expectations.

1  82.  Ms. Chose did not appeal the termination of her account. The AdSense terms and

2 conditions did not tell her that an appeal was possible, nor did her termination notice. (Dkt. No.

3 39-11 at 2.) In fact, it told her that no action was required. (*Id.*) She also did not dispute the

4 withholding of her earned program funds, including pursuant to paragraph 5 of the terms and

5 conditions. (Ex. A, ¶ 5; Ex. C, ¶ 5.) But she certainly did not mean to waive or forfeit her right to

6 maintain this action in court. Rather, in her view, the language at issue in paragraph 5 did not

7 pertain to the withholding of her program payments upon termination; it referred to the notification

8 of Google within "30 days of any such payment," and there was *no* payment to her upon

9 termination. Furthermore, it appeared in a paragraph with the heading "Payments," rather than in

10 the paragraph entitled "Termination." (*Cf.* Ex. A, ¶ 10; Ex. C, ¶ 10.) Also, given that Google had

11 locked out Ms. Chose from her account upon termination, she had no access to her publisher

12 identification number, and it was her understanding that she needed that number to communicate

13 with Google about her account. Additionally, paragraph 5 of the terms and conditions, and the

14 terms and conditions altogether, provided no address at which to notify Google in writing of any

15 dispute. (*See* Exs. A and C, ¶ 5.) Also, in its termination notice, Google gave her no meaningful

16 information on which to base a dispute regarding the withholding of her funds. (Dkt. No. 39-11 at

17 2.)

18  83.  Indeed, in a help article entitled "Deductions from earnings FAQs," Google states

19 that when it makes deductions from earnings "for invalid click activity or for activity that was not

20 in compliance with Google policy," it "adjust[s] [the publisher's] earnings and reimburse[s] the

21 advertisers who paid for these clicks." (https://support.google.com/adsense/answer/2808531?hl=en

22 (last accessed February 17, 2015).) This is what Google told Ms. Chose it was doing upon

23 termination of her account. (Dkt. No. 39-11 at 2 ("As your account has been permanently disabled,

24 we will withhold payment of your account balance. . . . The earnings on your account will be

25 returned to the affected advertisers.").) And in the "Deductions from earnings FAQs," Google

26 explicitly states in answer to the question, "I'd like to appeal the deduction. Can I do so?"—

27 "*Unfortunately you can't appeal the deduction.*"

28 (https://support.google.com/adsense/answer/2808531?hl=en (emphasis added).) Coupled with the

1   reasons set forth in the previous paragraph of the instant complaint, this statement on the part of

2   Google further illustrates that in the situation alleged, Ms. Chose was not required to notify Google

3   within 30 days that she disputed the earnings kept from her and returned to advertisers (per Google

4   in its disablement notice to her).

5          84.     Under the circumstances described herein, the fact that Ms. Chose did not dispute

6   the withholding of her final program earnings within 30 days should not work as a waiver or

7   forfeiture, nor should it impede her ability to maintain this suit.  *See* CAL. CIV. CODE § 1442

8   ("CONDITIONS INVOLVING FORFEITURE, HOW CONSTRUED. A condition involving a

9   forfeiture must be strictly interpreted against the party for whose benefit it is created.").

10          **4.     Plaintiff Matthew Simpson**

11          85.     Google has wrongfully withheld money due plaintiff Simpson under its AdSense

12   program.

13          86.     Mr. Simpson was an AdSense publisher from approximately February 2012[21]

14   through approximately mid-June 2013, when Google disabled his publisher account.  As is its

15   practice, upon disablement of Mr. Simpson's account, Google locked out Mr. Simpson from access

16   to his AdSense publisher account information and details.

17          87.     Like all of the plaintiffs, Mr. Simpson is no match for Google's power—he is

18   simply an individual web publisher who sought in good faith to use Google's AdSense product.

19   Mr. Simpson was afforded no opportunity, and was unable, to negotiate any of the AdSense terms

20   of service or policies with Google.

21          88.     During the time period when Mr. Simpson's publisher account was active, Mr.

22   Simpson successfully served thousands of ads for various advertisers under the AdSense program.

23   He served these ads mainly on his websites www.konacoffeebeans.org,

24   ――――――――――――――
       [21] Mr. Simpson became an AdSense publisher following Google's approval of his AdSense
25   program application, on or shortly after August 15, 2011.  (*See*
       https://support.google.com/adsense/answer/10162?hl=en (referring to application process and
26   stating that "[o]nce our systems detect that you've placed the ad code on a live page, we
       automatically continue the review process and check that your site complies with our policies.
27   When we've completed the second review, we send you an email letting you know the status of
       your application.") (last accessed Mar. 2, 2015).)  Nothing changed materially with respect to Mr.
28   Simpson's account following Google's approval of his application.

www.classicalmusicheadphones.com, and www.case-cafe.com.  Mr. Simpson knows that program ads were served successfully on his websites because he saw those published ads in many instances, and also because of Google's periodic reports of successful publication of these ads and his receipt of AdSense program payments.  Furthermore, Mr. Simpson complied with all terms set forth in Google's AdSense terms and conditions, *see* Exs. A-C, including each of the linked AdSense Program Policies and the Google Branding Guidelines.

89.     Also—and without admitting that the following statements of performance are based on binding or material contractual obligations—Mr. Simpson's websites bore unique and original content.  Further, he did not place AdSense ads on sites with little to no original content, or on pages with no content.  Additionally, Mr. Simpson assured a good user experience through clear navigation and organization; users were able to easily click through his websites in order to find the content they were seeking.[22]  In sum, and without admitting that they were part of the AdSense contract or admitting their materiality if they are deemed to be, Mr. Simpson complied with Google's webmaster guidelines by offering significant value to end users by the provision of unique and relevant content on its websites, and he did not place ads on sites with little to no original content.

90.     Furthermore, though Google deems participation in its AdSense program to be free, participation was not free to Mr. Simpson.  Rather, Mr. Simpson paid website hosting fees and the

---

[22] What is more, Mr. Simpson did not encourage accidental clicks. Mr. Simpson did not display ads in such a way that they might have been mistaken for other website content. Mr. Simpson did not place ads under misleading headers or titles. Mr. Simpson did not use language to encourage users to click on ads.  Mr. Simpson did not bring unnecessary or unnatural attention to its ads.  Mr. Simpson did not place ads on pages or sites where dynamic content was the primary focus.  Mr. Simpson did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.  Mr. Simpson did not place ads on non-content-based pages.  Mr. Simpson did not offer users compensation for clicking ads.  Mr. Simpson did not disguise ads on its webpages.  Mr. Simpson did not attempt to associate specific images with individual ads appearing on their sites.  Mr. Simpson did not display its content below the fold.  Mr. Simpson did not display ads in software applications.  Mr. Simpson did not display ads in email messages.  Mr. Simpson displayed ads only from Google's AdSense network.  Mr. Simpson did not display ads from any other publishers.  Mr. Simpson did not display more than the maximum of three standard ad units, three link units, and two search boxes on one webpage.  Mr. Simpson did not display ads on password-protected pages.  Mr. Simpson websites did not have more than three pop-ups.  And Mr. Simpson did not display ads in pop-up windows.  Mr. Simpson does not hereby admit that the foregoing statements of performance are based on binding or material contractual terms.

1   cost of domain registrations, which cost some $150 per year.  Also, he expended time in generating

2   content for his websites, and content is what drives viewers to websites in the AdSense network,

3   which benefits both advertisers and Google.  Further, because Mr. Simpson's websites offered his

4   headphone and coffee reviews, he spent approximately $700 on headphones and coffee while he

5   was a publisher, so that he could review those items.  And he also spent 5-6 hours per day on

6   various occasions giving advice on coffee and headphones in relevant forums, and these efforts

7   served to drive traffic to his AdSense ad-bearing websites.

8        91.     Google stated in its June 2013 termination notice that Mr. Simpson's publisher

9   account was being disabled supposedly because of a detection of "invalid activity on his site," Dkt.

10  No. 39-12 at 2, but Google offered no explanation as to what invalid activity it purportedly had

11  detected.  Notably, "invalid activity," as defined by Google, is a nebulous concept and refers in

12  Google's AdSense contract to invalid clicks but also to events other than invalid clicks.  (*See* Exs.

13  A and C, ¶ 5 (referring, *inter alia*, to "[a]ds served to end users whose browsers have Java Script

14  disabled").)  Yet as Google wrote in its termination notice, underscoring the lack of meaningful

15  information that it had provided regarding the supposed reason for termination of FRC's account:

16  "We're limited in the amount of information we can provide about your specific violation.  We

17  understand this can be frustrating for you, but we've taken these precautionary measures because

18  intentional violators can use this information to circumvent our detection systems."  (Dkt. No. 39-7

19  at 2.)  So what exactly was Google referring to by "invalid activity"?  It did not say.  (*Id.*)  In fact,

20  Mr. Simpson did not conduct any invalid activity on his websites intentionally, nor did he condone

21  any; further, he is unaware of any unintentional invalid activity on his websites that bore AdSense

22  ads.  Mr. Simpson did nothing to cause invalid activity, including invalid clicks, if in fact there

23  were any.  To this day, Mr. Simpson is not aware of any invalid activity of any kind actually

24  associated with its account.  To the best of Mr. Simpson's personal knowledge, he complied with

25  all of Google's contractual terms, policies, and guidelines.

26       92.     Alternatively, in the event that invalid activity, including but not limited to invalid

27  clicks, occurred on websites where Mr. Simpson served AdSense ads, such activity was not caused

28  by Mr. Simpson or anyone affiliated with or known to Mr. Simpson; therefore, any such invalid

1  activity was not within the reasonable control of Mr. Simpson.  For this reason, Mr. Simpson's

2  performance with respect to any such invalid activity, or its prevention, should be excused,

3  including by way of the *force majeure* clause at paragraph 14 of the AdSense terms and conditions.

4  (Ex. A, ¶ 14; Ex. C, ¶ 14 ("Neither party will be liable for inadequate performance to the extent

5  caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition,

6  governmental action, and Internet disturbance) that was beyond the party's reasonable control.").)

7          93.     When Google disabled Mr. Simpson's publisher account, he was owed

8  approximately $147.

9          94.     Having disabled Mr. Simpson's AdSense account, Google refused to pay him *any* of

10  the sums it owed him for having served ads on his websites during the last pay period.  Google

11  made no attempt to limit what it withheld, whether based on an assessment of the ad serves

12  supposedly affected, or the time-scope of whatever problem it supposedly had identified with Mr.

13  Simpson's AdSense account, or the supposed severity of the purported problem, or on any other

14  factor—Google simply withheld *all* of Mr. Simpson's earnings for the last payment period, as it

15  admits it always does, ¶ 25, *supra*, with no discretion or good faith applied, contrary to Mr.

16  Simpson's contractual expectations.

17          95.     Mr. Simpson did not dispute the withholding of his earned program funds, including

18  pursuant to paragraph 5 of the terms and conditions.  (Ex. A, ¶ 5; Ex. C, ¶ 5.)  But he certainly did

19  not mean to waive or forfeit his right to maintain this action in court.  Rather, in his view, the

20  language at issue in paragraph 5 did not pertain to the withholding of his program payments upon

21  termination; it referred to the notification of Google within "30 days of any such payment," and

22  there was *no* payment to him upon termination.  Furthermore, it appeared in a paragraph with the

23  heading "Payments," rather than in the paragraph entitled "Termination."  (*Cf.* Ex. A, ¶ 10; Ex. C,

24  ¶ 10.)  Also, given that Google had locked out Mr. Simpson from his account upon termination, he

25  had no access to his publisher identification number, and it was his understanding that he needed

26  that number to communicate with Google about his account.  Additionally, paragraph 5 of the

27  terms and conditions, and the terms and conditions altogether, provided no address at which to

28  notify Google in writing of any dispute.  (*See generally* Exs. A and C.)  Also, in its termination

1    notice, Google gave him no meaningful information on which to base a dispute regarding the

2    withholding of his funds.  (Dkt. No. 39-11 at 2.)

3          96.      Indeed, in a help article entitled "Deductions from earnings FAQs," Google states

4    that when it makes deductions from earnings "for invalid click activity or for activity that was not

5    in compliance with Google policy," it "adjust[s] [the publisher's] earnings and reimburse[s] the

6    advertisers who paid for these clicks."  (https://support.google.com/adsense/answer/2808531?hl=en

7    (last accessed February 17, 2015).)  This is what Google told Mr. Simpson it was doing upon

8    termination of his account.  (Dkt. No. 39-11 at 2 ("As your account has been permanently disabled,

9    we will withhold payment of your account balance. . . .  The earnings on your account will be

10    returned to the affected advertisers.").)  And in the "Deductions from earnings FAQs," Google

11    explicitly states in answer to the question, "I'd like to appeal the deduction.  Can I do so?"—

12    "*Unfortunately you can't appeal the deduction*."

13    (https://support.google.com/adsense/answer/2808531?hl=en (emphasis added).)  Coupled with the

14    reasons set forth in the previous paragraph of the instant complaint, this statement on the part of

15    Google further illustrates that in the situation alleged, Mr. Simpson was not required to notify

16    Google within 30 days that he disputed the earnings kept from him and returned to advertisers (per

17    Google in its disablement notice to him).

18          97.      Under the circumstances described herein, the fact that Mr. Simpson did not dispute

19    the withholding of his final program earnings within 30 days should not work as a waiver or

20    forfeiture, nor should it impede his ability to maintain this suit.  *See* CAL. CIV. CODE § 1442

21    ("CONDITIONS INVOLVING FORFEITURE, HOW CONSTRUED. A condition involving a

22    forfeiture must be strictly interpreted against the party for whose benefit it is created.").

23          98.      Google uses localized terms of service for its AdSense publishers.  The Canadian

24    terms of service, like the U.S. terms of service, provide that California law applies to "[a]ll claims

25    arising out of or relating to th[e] Agreement or the Services" and that such claims "will be litigated

26    exclusively in the federal or state courts of Santa Clara County, California, USA . . . ."

27    (https://www.google.com/adsense/localized-terms (Canadian terms, ¶ 14) (last accessed Sept. 6,

28    2014).)

**5.      Other Publishers, Similar Experiences**

99.      Google's wrongful refusal to pay publishers terminated from the AdSense program *any* of the sums owed to them for serving ads since the last program payment has spawned a plethora of bitter complaints detailed at various places on the web.  For example, as noted in the introduction, one self-described AdSense publisher stated the following: "It's common knowledge among SEOs that AdSense tends to be disabled a few days before the supposed payout.  I haven't lost any big sum—only $2000 but I know one person that lost $40,000.  It was all legitimate traffic coming straight from Google themselves, no click fraud no bought traffic etc.  PS: I was using AdSense from 2008 to 2013—over 5 years so it's not like only new users got banned." (https://news.ycombinator.com/item?id=7672910 (last accessed May 7, 2014.)  Another reported in part as follows:

> Oh joy, I just got this dreaded email this morning. I've spent since December creating 85 niche sites and generated around $400 so far, none of which I'm going to receive now because my account is disabled.
>
> I'm just starting to go through my sites and try to figure out WHY and here are a couple of things I have noticed so far.
>
> On my latest batch of 11 sites I forgot to disable adsense on the privacy policy and contact page (i only activated adsense on these sites 24 hours ago so they are my prime suspects)
>
> On some of my earliest sites I only made the contact page available via the privacy policy page, so I'll need to improve the navigation on those sites.
>
> Apart from that, I honestly can't see why my entire account was killed. I was receiving normal amounts of clicks based on the traffic I was getting so I don't think I had invalid click activity. . . .

(http://empireflippers.com/adsense-account-disabled/ (last accessed May 8, 2014).)  Numerous similar reports abound.

100.      Google's behavior also has engendered other lawsuits.  In *Ogtanyan v. Google Inc.*, Superior Court of the State of California, County of Santa Clara, No. 114-CV-259301 (filed

THIRD AMENDED CLASS ACTION COMPLAINT - 40
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

1   January 17, 2014), which has survived a demurrer,[23] plaintiff entered into the AdSense agreement

2   with Google and served ads on a website "from September to November 2013." (*See* Ex. D (copy

3   of complaint), ¶ 1.)  In November 2013, according to the complaint, Google owed almost $1

4   million to the publisher, but it terminated the account, "citing a vague violation of Google's

5   policies," and withheld the entire sum. (*Id.*, ¶ 2.)  The publisher appealed, but Google "summarily

6   rejected" that appeal. (*Id.*)  In his complaint, the publisher provides examples of other popular

7   websites participating in the AdSense program which displayed ads in manners similar to the way

8   he displayed ads—yet those websites still appear to be in good standing with Google. (*Id.*, ¶¶ 21-

9   24.)

10      101.    In *Super Cray Inc. v. Google Inc.*, N.D. Cal., No. 5:15-cv-00109 (filed January 8,

11   2015) (copy attached as Ex. E), plaintiff entered into the AdSense agreement with Google and

12   "began displaying targeted advertisements to [] viewers [of its website] . . . in early September

13   2014." (*See* Ex. E, ¶ 25.)  By October 21, 2014, according to the complaint, Google owed

14   $535,000 to the publisher, but it terminated the account, even after it had repeatedly assured the

15   publisher of good performance (*id.*, ¶¶ 30-37), advising that its website "Layout Encourage[d]

16   Accidental Clicks." (*Id.*, ¶ 42.)  Google then withheld the total amount owed to the plaintiff:

17   "$535,000." (*Id.*)  This sum consists of earnings for well over a month, given that the plaintiff

18   began serving ads "in early September 2014." (*Id.*, ¶ 25.)

19      102.    And in *AdSupply, Inc. v. Google Inc.*, Superior Court of the State of California,

20   County of Los Angeles, No. BC547094 (filed May 30, 2014),[24] the publisher, which alleges itself

21   to be a "highly-reputable marketing and advertising firm and network," Ex. F, ¶ 8, tells a similar

22   story.  The publisher served ads during February 2014, such that it had earned $140,741.02,

23   according to Google. (*Id.*, ¶ 19.)  But Google disabled the publisher's account and paid it nothing,

24   despite its having served "thousand[s] of AdSense advertisements as documented and reflected on

25   Google's very own AdSense program in real time." (*Id.*, ¶ 33.)

26   ───────────────

   [23] *See* Dkt. No. 63 herein (attaching copy of the Court's order on Google's motion for a demurrer).

27   [24] *See* Ex. F (copy of complaint).  On information and belief, the matter has been transferred to

28   the Superior Court of California for the County of Santa Clara.

1

**D.      Reports from an Anonymous, Self-Described Former Employee of Google Regarding Google's Alleged Practice of Wrongfully Withholding Payment from AdSense Publishers**

2

3      103.    On April 29, 2014, an anonymous, self-described "former Google employee" took

4   to the web to "leak information to the public of what [he or she] witnessed and took part in while

5   being an employee." (http://pastebin.com/qh6Tta3h (last accessed May 7, 2014).)  The individual

6   wrote that "[his or her] position was to deal with AdSense accounts, more specifically the accounts

7   of publishers (not advertisers)." (*Id*.)  The individual indicates that he or she is keeping his or her

8   identity a secret for now, and he or she did not reveal the subject information sooner, because of

9   "[h]aving signed many documents such as NDA's and non-competes," and out of fear of "many

10  repercussions . . . , especially in the form of legal retribution from Google." (*Id*.)

11      104.    The individual goes on to describe an alleged first-quarter 2009 Google AdSense

12  division meeting in which "division higher ups" participated. (*Id*.)  In this "very long meeting,"

13  according to this individual, there was discussion to the effect that "Google had suffered some very

14  serious losses in the financial department several months earlier." (*Id*.)  The upshot was that

15  Google was going to "'carry out extreme quality control on AdSense publishers.'" (*Id*.)  This was

16  said to mean that "AdSense itself hands out too many checks each month to publishers, and that the

17  checks were too large and that needed to end right away." (*Id*.)  Other "smaller meetings"

18  reportedly followed, and "the word was," according to this individual, that "they [Google] were

19  planning to cut off a large portion of publisher's payments." (*Id*.)

20      105.    Purportedly, "the first big batch of bans happened in March of 2009.  The main

21  reason, the publishers made too much money.  But something quite devious happened." (*Id*.)

22  According to this individual, "[w]e were told to begin banning accounts that were close to their

23  payout period (which is why account bans never occur immediately after a payout).  The purpose

24  was to get that money owed to publishers back to Google AdSense, while already having served up

25  the ads to the public." (*Id*.)

26      106.    According to this individual, "[f]rom 2009 to 2012 there were many more big

27  batches of bans.  The biggest of all banning sessions occurred in April 2012.  The AdSense

28  division had enormous pressure from the company to make up for financial losses, and for

1    Google's lack of reaching certain internal financial goals for the quarter prior." (*Id.*)  Purportedly,

2    Google AdSense employees "were threatened with job losses if we didn't enforce the company's

3    wishes." (*Id.*)

4         107.    After "[s]everal publishers [reportedly] launched legal actions which were settled,"

5    Google, according to this individual, "came up with a new policy." (*Id.*)  This policy purportedly

6    was "officially called AdSense Quality Control Color codes (commonly called AQ3C by

7    employees)." (*Id.*)  According to this individual, "[t]hose publisher's [sic] that could do the most

8    damage by having their account banned were placed in a VIP group that was to be left alone.  The

9    rest of the publishers would be placed into other groupings accordingly." (*Id.*)  He or she also

10   states that "[t]he new AQ3C also implemented 'quality control' quotas for the account auditors, so

11   if you didn't meet the 'quality control' target (aka account bans) you would be called in for a

12   performance review." (*Id.*)

13        108.    The author of the post goes on to describe four groups, segregated by color,

14   requiring various levels of attention from AdSense employees.  These purportedly ranged from

15   urgent (red) to VIP (green), the latter of which he or she describes as the "'untouchables.'" (*Id.*)

16   AdSense publishers in these four groups purportedly were subject to differing degrees of scrutiny,

17   with publishers placed in the three non-green groups being subject to "ban[]s" for various

18   "reason[s]." (*Id.*)  All bans were to "occur as close to a payout period as possible with the most

19   amount of money accrued," according to the anonymous poster.  (*Id.*)

20        109.    The individual goes on to write of a purported scheme whereby Google also used

21   skewed "Google Analytics" data to bilk publishers out of some or all of the money owed them.

22   (*See id.*)

23        110.    Google has denied these allegations made by the anonymous poster.  (*E.g.*,

24   http://www.zdnet.com/adsense-leak-controversy-heats-up-as-google-denies-favoritism-theft-

25   allegations-7000028913/ (last accessed May 7, 2014).)

26        111.    An individual purporting to be the same anonymous poster has replied to Google's

27   denial. (http://pastebin.com/DXTu8Mcm (last accessed May 20, 2014).)  This individual purports

28   to take back nothing from the previous post and claims to "have communications, … files, … lists,

1  … [and] names." (*Id.*)  The individual indicates that he or she will release "it [his or her

2  information and material] to the legal representatives of the class action lawsuit against Google in

3  regards to AdSense," if such an action is brought.  (*Id.*)

4         112.     True and correct copies of the original April 29, 2014 post, and the second

5  referenced post, dated April 30, 2014, are attached as Exhibits I and J, respectively.

6         113.     As of the date of this second amended complaint, plaintiffs cannot confirm the

7  veracity of the allegations made by the individual or individuals in these two posts.  If true, the

8  posts could help to illuminate why Google took such harsh and unfair action against the plaintiffs,

9  notwithstanding their good faith efforts to comply with Google's policies.  They also could help to

10  explain why so many publishers have complained of similar actions on the part of Google.  But in

11  any event, if the information in the referenced two posts does not prove to be true either in whole

12  or part, Google nonetheless has behaved unlawfully in refusing to pay publishers, including the

13  plaintiffs, sums earned by them for serving AdSense ads in the period prior to Google's disabling

14  of those publishers' accounts.

15                      **V.     CLASS ALLEGATIONS**

16         114.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(1), (2), and (3).

17         115.     Plaintiffs bring this action on behalf of themselves and the following class, for

18  damages, declaratory, and injunctive relief:

19       All Google AdSense publishers whose AdSense accounts were/are subject to
     Google's localized terms and conditions for the U.S., American Samoa, Anguilla,

20       Antigua and Barbuda, Aruba, Australia, Bahamas, Barbados, Belize, Bermuda,
     Bulgaria, Canada, Cayman Islands, Czech Republic, Dominica, Egypt, Falkland

21       Islands, Grenada, Guyana, Haiti, Jamaica, Japan, Jordan, Libya, Montenegro,
     Montserrat, Morocco, Netherland Antilles, New Zealand, Puerto Rico, Qatar, Saint

22       Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Saudi Arabia,
     Serbia, Serbia and Montenegro, Singapore, Trinidad and Tobago, Turkey, Turks and

23       Caicos Islands, United Arab Emirates, United States Minor Outlying Islands, Virgin
     Islands, Western Sahara, and Yemen whose AdSense account was disabled or

24       terminated, and whose last AdSense program payment (or payments) was (or were)
     withheld in its (or their) entirety, and permanently, by Google.

25

26  Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries;

27  defendant's current or former employees, officers, directors, agents, and representatives; and the

28  district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

family members.  Plaintiffs will seek to amend this proposed class as necessary, or to add a class or classes as necessary, in order to obtain all the relief sought by way of this complaint.

116.    As for the publishers included in the proposed class definition in the preceding paragraph whose AdSense accounts were/are subject to non-U.S. terms and conditions, the contract terms at issue are the same, or substantially the same, as those applicable, or purportedly applicable, to U.S. publisher accounts.

117.    **Numerosity:**  The exact number of the members of the proposed class is unknown and is not available to the plaintiffs at this time, but, upon information and belief, the class will consist of many tens or even hundreds of thousands of members, such that individual joinder in this case is impracticable.

118.    **Commonality:**  Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed class.  These include, but are not limited to:

a.    Whether Google withholds 100% of earned but unpaid funds from publishers whose accounts it disables or terminates, purportedly under terms of its AdSense contracts with those publishers;

b.    Whether terms of Google's AdSense contracts purportedly giving Google the right to withhold earned funds from publishers participating in its AdSense program are unconscionable and unenforceable;

c.    Whether the terms of Google's AdSense contracts purportedly giving Google the right to withhold earned funds from publishers participating in its AdSense program are actually liquidated damages terms that are unreasonable and that constitute penalties in violation of California law on liquidated damages, such that they are unenforceable;

d.    Whether Google has breached its contracts with publishers for no reason, as a pretense for withholding earned program funds from them;

e.    Whether Google has breached its AdSense contracts with publishers by refusing to pay them monies earned for serving ads, or for other performance;

f.    Whether Google has breached the implied covenant of good faith and fair dealing in administering its AdSense contracts in and following termination actions with its

THIRD AMENDED CLASS ACTION COMPLAINT - 45
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

1    AdSense publishers as alleged herein, including by way of applying no discretion to its decisions,

2    and by uniformly and systematically withholding all program earnings due them when their

3    accounts are terminated;

4              g.       Whether plaintiffs and members of the proposed class are entitled to

5    declaratory relief with respect to the illegality of the terms of Google's AdSense contracts insofar

6    as they purport to allow Google to withhold monies earned from AdSense program publishers, and

7    as to the illegality of its conduct as alleged herein, and injunctive relief in order to compel Google

8    to apply good faith, reasonable discretion, and/or objective reasonableness to any truly justifiable

9    withholdings, if any, and also to halt Google's unlawful practices as alleged in this complaint, and

10   whether plaintiffs and the proposed class are entitled to their attorneys' fees, costs, and expenses

11   for securing such relief;

12             h.       Whether plaintiffs and members of the proposed class are entitled to

13   accountings as requested;

14             i.       Whether plaintiffs and members of the proposed class are entitled to any

15   damages or restitution, including payments of AdSense program payments wrongfully withheld

16   from them by Google, and to their attorneys' fees, costs, and expenses related to any recovery of

17   such monetary relief; and

18             j.       Whether plaintiffs and members of the proposed class are entitled to any

19   damages or restitution incidental to the declaratory or injunctive relief they seek, and to their

20   attorneys' fees, costs, and expenses related to any recovery of such monetary relief.

21        119.   **Typicality:**  Plaintiffs' claims are typical of the claims of the members of the

22   proposed class.  The factual and legal bases of Google's liability are the same and resulted in injury

23   to plaintiffs and all of the other members of the proposed class.

24        120.   **Adequate representation:**  Plaintiffs will represent and protect the interests of the

25   proposed class both fairly and adequately.  Plaintiffs have retained counsel competent and

26   experienced in complex class-action litigation.  Plaintiffs have no interests that are antagonistic to

27   those of the proposed class, and its interests do not conflict with the interests of the proposed class

28   members it seeks to represent.

THIRD AMENDED CLASS ACTION COMPLAINT - 46
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

121.   **Prevention of inconsistent or varying adjudications:**  If prosecution of myriad individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results.  This would have the effect of establishing incompatible standards of conduct for the defendant.  Certification of plaintiffs' proposed class would prevent these undesirable outcomes.

122.   **Injunctive and declaratory relief:**  By way of its conduct described in this complaint, the defendant has acted on grounds that apply generally to the proposed class. Furthermore, the defendant purports to apply common contractual terms in effecting the actions complained of with respect to members of the proposed class.  Accordingly, the injunctive and declaratory relief requested are appropriate respecting the class as a whole.

123.   **Predominance and superiority:**  This proposed class action is appropriate for certification.  Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable.  Even if members of the proposed class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter.  Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.  Further, uniformity of decisions will be ensured.

## VI.   CLAIMS FOR RELIEF

## APPLICATION OF CALIFORNIA LAW

124.   Plaintiffs' state-law claims in this matter, and those of the proposed class, are governed by California law per the terms of Google's AdSense contracts.  (Ex. A, ¶ 14; Ex. B, ¶ 17; Ex. C, ¶ 14 and the corresponding paragraphs of the localized terms applicable to the accounts of other members of the proposed class, which localized terms are available at https://www.google.com/adsense/localized-terms?null=SO (last accessed March 4, 2015).) Additionally, as alleged above, all of Google's objectionable and unlawful acts and omissions, as

1  complained of herein, and Google's harms done to plaintiffs and the proposed class, were done in

2  California.

### FIRST CAUSE OF ACTION

### VIOLATION OF CAL. CIV. CODE § 1671(b)

5       125.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

6  set forth herein.

7       126.    For the reasons expressed in this complaint, including in paragraphs 35-47, *supra*,

8  which specifically are incorporated herein, Google's AdSense agreements contain liquidated

9  damages provisions that purport to give it the right to withhold a fixed, certain sum of 100% of a

10  publisher's unpaid amounts, or earned, but unpaid, revenue, upon termination of his, her, or its

11  account.  (*See* Ex. A, ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid

12  activity, we may withhold unpaid amounts or charge back your account."); Ex. B, ¶ 11 ("Google

13  reserves the right to withhold payment or charge back Your account due to any of the foregoing or

14  any breach of this Agreement by You, pending Google's reasonable investigation of any of the

15  foregoing or any breach of this Agreement by You . . . ."); Ex. C, ¶ 10 ("If we terminate the

16  Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or

17  charge back your account."); *see also* Ex. A, ¶ 5; Ex. C, ¶ 5 ("Payments to [publishers] may be

18  withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any

19  amounts arising from invalid activity . . . .").[25])  But not all liquidated damages provisions are

20  enforceable.

21       127.    California law provides that "a provision in a contract liquidating the damages for

22  the breach of the contract is valid *unless the party seeking to invalidate the provision establishes*

23  *that the provision was unreasonable under the circumstances existing at the time the contract was*

24  *made*."  CAL. CIV. CODE § 1671(b) (emphasis added).  Here, for the reasons expressed in this

25  complaint, including in paragraphs 45-47, *supra*, the provisions at issue were "unreasonable under

26

27      [25] Google may also purport to invoke paragraph 5 of its AdSense terms and conditions in order
to withhold 100% of unpaid program earnings from publishers upon termination of their action,

28  such that it, too, would be viewed as a liquidated damages provision.

the circumstances existing at the time the contract was made."  *See* CAL. CIV. CODE § 1671(b).

Accordingly, the provisions are invalid and unenforceable.

128.    Given the unreasonableness, invalidity, and unenforceability of these liquidated

damages provisions, plaintiffs and the proposed class are entitled to the monetary, restitutionary,

declaratory, injunctive, and other relief requested herein, including but not limited to the payment

to them of all funds wrongfully withheld from them by Google pursuant to these provisions.

**SECOND CAUSE OF ACTION**

**BREACH OF CONTRACT**

129.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

set forth herein.

130.    Plaintiffs and members of the proposed class entered into contracts with Google

regarding their participation in Google's AdSense program.  (*See* Exs. A, B, and C.)  Save for

certain terms alleged to be invalid and unenforceable, these contracts are valid.

**A.    Google has breached the parties' contracts, entitling plaintiffs to damages for their performance thereunder.**

131.    The AdSense contracts at issue contain terms promising that Google will pay

publishers for, *inter alia*, serving ads on their websites sold by Google to various advertisers.

(Ex. A, ¶ 5; Ex. B, ¶ 11; Ex. C, ¶ 5.)

132.    As alleged herein, plaintiffs and publisher-members of the proposed class have

performed under the AdSense contract by, *inter alia*, adhering to all of Google's contract terms and

applicable policies, and by displaying the subject ads on their websites and other properties.  (*See*

¶¶ 51-52, 66-68, 76-77, 88-89, *supra*.)

133.    Notwithstanding plaintiffs' performance, or excuse for performance, Google,

purportedly relying on other terms of the contracts, terminated plaintiffs' accounts and offered no

meaningful reason for doing so, thereby breaching the parties' contract which permits termination

of publishers' accounts only for some reason.  (*See* Ex. A, ¶ 10 ("Google may at any time terminate

the Agreement . . . for any *reason*.") (emphasis added); Ex. B, ¶ 11 (containing "for any reason"

proviso); Ex. C, ¶ 10 (same as Ex. A); *see also* ¶¶ 58-59, 70, 79, 91, *supra*).)  Plaintiffs, having

1    performed in all material or significant respects under their contracts with Google, or being

2    excused therefrom, gave Google no reason to terminate their contracts.  This is illustrated, in part,

3    by Google allowing other publishers to continue serving AdSense ads on sites similar to those on

4    which plaintiffs CIS and Chose served AdSense ads.  (*See* ¶¶ 70, 79, *supra*.)

5        134.    Google also has breached the parties' contract by uniformly and systematically

6    withholding *all* funds due to publishers at the time of termination, with no granularity whatsoever,

7    and without the application of the discretion promised in the contract.  (*See* Ex. A, ¶ 5 ("Payments

8    to you *may* be withheld to reflect or adjusted to exclude any amounts refunded or credited to

9    advertisers and any amounts arising from invalid activity, as determined by Google in its sole

10   *discretion*.") (emphasis added), ¶ 10 ("If we terminate the Agreement due to your breach or due to

11   invalid activity, we *may* [not *will*] withhold unpaid amounts or charge back your account.")

12   (emphasis added); Ex. C, ¶¶ 5, 10 (same); *see also* ¶¶ 61, 72, 81, 94, *supra*.)  Regardless of

13   whether, for example, 1% of the ads or 60% of the ads served in the subject time period may, in

14   Google's view, have been associated with what Google deems invalid activity or policy violations,

15   Google, as an admitted matter of extra-contractual policy, systematically withholds 100% of the

16   money at issue from all terminated publishers.  (*See* ¶¶ 25, 32, *supra*.)  Google takes this action

17   notwithstanding its acknowledged ability to determine which ads may, in its view, have been

18   associated with what it deems invalid activity, and which ads were not.  Moreover, Google takes

19   this action even if a publisher himself or herself was not the cause of, and had nothing to do with,

20   the supposed violation of Google policy leading to disablement of his or her account.  Whatever

21   the circumstances, Google systematically withholds all program funds earned by publishers upon

22   their termination.

23       135.    As alleged above, plaintiffs have performed their duties under the contracts at issue

24   by doing all, or substantially all, of the significant or material things the contracts required them to

25   do, or they were excused from having to do those things.  This has given rise to Google's duty to

26   perform by paying plaintiffs all the earnings due them.

27       136.    Furthermore, where conditions precedent to Google's performance (*i.e.*, paying

28   AdSense publishers their earnings) were concerned, Google's conduct in the above regard,

1   including the systematic withholding of 100% of program earnings upon termination of plaintiffs'

2   publishers' accounts, was arbitrary, capricious, and unreasonable in that a uniform and complete

3   withholding was effected, whatever the circumstances.  In light of Google's admitted ability to

4   segregate what it deemed invalid activity or breaching activity from non-problematic activity, and

5   in light of the widely varying and often large amounts of ad serves and earned money at stake, and

6   other factors alleged herein, Google's behavior was not reasonable by any objective standard.

7   137.   Alternatively, where conditions precedent to Google's performance (*i.e.*, paying

8   AdSense publishers their earnings) were concerned, Google's conduct in the above regard,

9   including the systematic withholding of 100% of program earnings upon termination of plaintiffs'

10   publishers' accounts, was done in bad faith.  Neither the decision to withhold 100% of plaintiffs'

11   unpaid program earnings, nor the act of withholding those funds, were done in good faith.  Instead,

12   they were simply examples of Google's systematic and uniform policies and practice to withhold

13   the publishers' last earnings completely.

14   138.   Plaintiffs and members of the class have been damaged by Google's breaches of

15   contract.  Google owes the plaintiffs and proposed class members their program earnings to the full

16   extent allowed by the parties' contracts, together with prejudgment interest.

17   **B.      The contracts contain unconscionable terms that are unenforceable.**

18   139.   Further, the contractual terms purporting to permit Google to withhold payment of

19   funds owed to publishers whose accounts it disables, *see* Ex. A, ¶¶ 5, 10; Ex. B, ¶ 11; and Ex. C,

20   ¶¶ 5, 10, which Google reads and applies as permitting it to withhold such funds in their entirety,

21   are unconscionable.  Accordingly, they are unenforceable.  *See* Cal. Civ. Code § 1670.5(a).

22   140.   These oppressive terms appear in contracts of adhesion that were foisted upon small

23   entities and individuals, which had no bargaining power, by a giant and powerful corporation,

24   Google, that drafted them and presented them as a take-it-or-leave-it proposition.  (*See* Ex. A, ¶¶ 5,

25   10; Ex. B, ¶ 11; Ex. C, ¶¶ 5, 10; *see also* ¶¶ 62, 65, 75, 87, *supra*.)  There was no negotiation, and

26   there was an absence of meaningful choice.  Therefore, the identified terms are procedurally

27   unconscionable.

28

1    141.    Also, the terms at issue are so one-sided as to shock the conscience; they are harsh

2    and oppressive in that they purport, according to Google, to allow Google to withhold all program

3    funds corresponding to ads placed on the publishers' properties, however limited in scope or time

4    the supposed offense or policy violation might have been,[26] and even when the publisher had

5    nothing to do with whatever Google deems to be cause for termination of his or her account.  (*See*

6    Ex. A, ¶¶ 5, 10; Ex. B, ¶ 11; Ex. C, ¶¶ 5, 10; *see also* ¶ 33, *supra*.)  Google applies these terms to

7    withhold hundreds, thousands, tens of thousands, hundreds of thousands, and even a million dollars

8    or more from terminated publishers for earnings periods well in excess of a month, no matter what

9    the circumstances.  (*See* ¶¶ 57, 71-72, 80-81, 93-94, 100-02, *supra*.)  Therefore, the identified

10   terms are substantively unconscionable.  Thus, being both procedurally and substantively

11   unconscionable, these terms are unenforceable.  *See id*.

12   **C.    The parties' contracts contain invalid and unenforceable liquidated damages provisions.**

13

14   142.    Additionally, these terms constitute unreasonable, invalid, and unenforceable

15   provisions for liquidated damages, for the reasons set forth herein, including specifically in ¶¶ 35-

16   47, *supra*.  CAL. CIV. CODE § 1671(b).  When Google disables a publisher's account, such as those

17   of the plaintiffs, it withholds all funds associated with the publisher account.  These are its

18   liquidated damages for purported violations of its terms of service.  But under California law

19   governing liquidated damages provisions, the terms in question constitute penalties in that the sums

20   Google can purportedly withhold from publishers, *i.e.*, *all* sums at issue, bear no reasonable

21   relationship to any actual damages or injury that Google might have suffered from the supposed

22   breach of the AdSense contracts by publishers.  Indeed, Google's purported contractual right to

23   withhold all such funds bears no reasonable relationship to the range of actual damages that the

24   parties could have anticipated would flow from a breach of Google's AdSense terms of service or

25   ―――――――――――――

26   [26] Though Google claims that an argument to the effect that these terms, in its own view, allow
     it to withhold 100% of funds even if one out of 1,000 clicks are supposedly invalid or problematic
     in some way, Google in fact withholds 100% of unpaid program earnings across the board from
27   terminated publishers, and gives them virtually no reason as to why.  A reasonable inference flows
     that Google in fact withholds 100% of funds under these terms even when it can identify few clicks
28   or ad serves as problematic.

policies.  Setting liquidated damages at 100% of the total sum at issue does not represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that might be sustained, for in fact, there was no such endeavor at all.  No matter how limited the supposed offense, Google can (and does) refuse to pay all the funds owed, notwithstanding all the performance on the part of the publisher in the payment period prior to Google's disabling of its account.  California law does not permit Google so to do, including under the law of severable, paired performances, part performance, or restitution, for the law abhors forfeiture.  In short, Google's liquidated damages provisions were unreasonable under the circumstances existing at the time the contract was made, rendering them invalid and unenforceable.  *See id.*  And California law does not otherwise permit Google to withhold all unpaid amounts from publishers when it terminates them for purported breach of contract.

**D.    When the unenforceable provisions are stricken from the contract, plaintiffs are left with recoverable damages for their performance under the contracts.**

143.    With these payment-withholding terms stricken from the contracts as unenforceable, Google's liability to plaintiffs and the proposed class for breach of contract is stark.  As alleged above, plaintiffs have performed their duties under the contracts by doing all, or substantially all, of the significant or material things the contracts required them to do, or they were excused from having to do those things.  This has given rise to Google's duty to perform by paying them all the earnings due them.

144.    Plaintiffs and members of the proposed class have been damaged by Google's breach of contract in the amount of sums payable to them but withheld when their AdSense accounts were disabled, together with pre-judgment interest.

**E.    Accounting**

145.    As additional relief or as part of their remedy, plaintiffs and the proposed class are entitled to an accounting of all AdSense program sums earned, payable, or otherwise associated with their publisher accounts at the time they were disabled, including without limitation as to all sums associated with the publishers' service of AdSense-related ads on their websites or other properties, or other performance under any AdSense program, and any subset of such sums that

1   Google purports to be associated with the claimed violation of AdSense terms of service or

2   policies.

3       146.    Such an accounting will enable a determination of the amount of damages owed to

4   each plaintiff and member of the proposed class, especially in these circumstances where Google

5   locks out publishers from their accounts upon termination; where the plaintiffs and proposed class

6   members have relationships with Google based on Google's collection and administration of funds

7   owed to them; and where Google is the party that knows what supposed violations or invalid

8   activities it had in mind when it terminated publishers' accounts, and to what extent these

9   violations or activities correspond to ads served and other performance on the part of the plaintiffs

10  and members of the putative class.

11                          **THIRD CAUSE OF ACTION**

12  **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

13      147.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

14  set forth herein.

15      148.    Plaintiffs and members of the proposed class entered into contracts with Google

16  regarding their participation in Google's AdSense program.  (*See* Exs. A, B, and C.)  Save for

17  certain terms alleged to be invalid and unenforceable, these contracts are valid.

18      149.    As alleged above, plaintiffs have performed their duties under the contracts by

19  doing all, or substantially all, of the significant or material things the contracts required them to do,

20  or they were excused from having to do those things.  This has given rise to Google's duty to

21  perform by paying them all the earnings due them

22      150.    There exists in every contract, including Google's AdSense agreements with the

23  plaintiffs and members of the proposed class, an implied covenant of good faith and fair dealing.

24  Google has breached this covenant by unfairly interfering with plaintiffs' right to receive the

25  benefits of the contracts at issue.

26      151.    First, Google terminated plaintiffs' accounts and offered no meaningful reasons for

27  doing so, thereby breaching the parties' contract which permits termination of publishers' accounts

28  only for some reason.  (*See* Ex. A, ¶ 10 ("Google may at any time terminate the Agreement . . . *for*

THIRD AMENDED CLASS ACTION COMPLAINT - 54
Case No. 5:14-cv-02329-BLF
010450-11 718002 V1

1   *any reason*.") (emphasis added); Ex. B, ¶ 11 (promising investigation); Ex. C, ¶ 10 (same).)

2   Further, Google purported to terminate plaintiff FRC's AdSense account for supposed "invalid

3   activity," even though FRC endeavored at all times to comply with Google's policies and itself

4   brought potential issues to Google's attention so that it could resolve them to Google's satisfaction.

5   (*See* ¶¶ 51-52, 54, *supra*.)  Then, as a matter of extra-contractual policy, Google denied FRC

6   meaningful information regarding Google's claim of "invalid activity" on FRC's account and

7   refused FRC's sincere and reasonable request for details.  (*See* ¶¶ 58-60, *supra*.)  Because of this

8   behavior, FRC could make no meaningful appeal.  (*See also* ¶ 59, *supra*.)  Nonetheless, FRC

9   attempted to appeal, advising Google that it was "unaware of violating any policy" and reminding

10  Google that it had sought help from Google in ascertaining if there was any problem with the high

11  click rates it was seeing.  (Dkt. No. 39-8 at 2.)  FRC also complained that its appeal form, which

12  only allows 1,000 characters for explanation, was woefully inadequate.  (*Id.*)  But Google simply

13  brushed off FRC's request, without any good-faith review.  (*See* ¶ 60, *supra*.)

14        152.    Similarly, Google terminated the other three plaintiffs' accounts for no good or

15  discernible reasons.  (*See* ¶¶ 70, 79, 91, *supra.*)  Indeed, websites run by other publishers and

16  similar to plaintiff CIS's and plaintiff Chose's continue to display AdSense ads.  (*See* ¶¶ 70, 79,

17  *supra*.)  Further, as with FRC, Google withheld meaningful information from the other plaintiffs as

18  a matter of its extra-contractual policy.  (*See* ¶¶ 70-71, 79, 91, *supra*.)  Google likewise brushed

19  off, and offered no good-faith, meaningful review of its long-time publisher CIS's appeal, which in

20  any event publishers cannot meaningfully articulate on the minimalist form Google demands they

21  use, and it ignored CIS's request for more information.  (*See* ¶ 71, *supra*.)

22        153.    Second, Google violated the covenant by withholding *all* sums payable to the

23  plaintiffs for ads already served on their websites during the period preceding termination of their

24  accounts, purporting to return these funds to advertisers.  (*See* ¶¶ 25, 32, *supra*.)  Google made no

25  effort whatsoever to limit the funds it refused to pay to the plaintiffs in any way—even though the

26  contract promises the use of discretion and said only that funds *might* be withheld (not that they

27  *would* be withheld).  (*See* Ex. A, ¶ 5 ("Payments to you *may* be withheld to reflect or adjusted to

28  exclude any amounts refunded or credited to advertisers and any amounts arising from invalid

1   activity, as determined by Google in its sole *discretion*.") (emphasis added), ¶ 10 ("If we terminate

2   the Agreement due to your breach or due to invalid activity, we *may* [not *will*] withhold unpaid

3   amounts or charge back your account.") (emphasis added); Ex. B, ¶ 11 (promising investigation);

4   Ex. C, ¶¶ 5, 10 (same as Ex. A).)  For example, Google did not limit the funds it withheld to ads

5   appearing on specific webpages, nor did it limit its action to a specific time period when activity

6   that purportedly violated its policies had occurred.  Instead, as a matter of its extra-contractual

7   policy, Google systematically withheld 100% of plaintiffs' program earnings for the periods

8   preceding their termination of their accounts.  (*See* ¶¶ 25, 32, *supra*.)  Upon information and belief,

9   other members of the proposed class, have suffered similar fates and violations of the covenant.

10          154.    Where discretion, or absolute discretion, is given under the contract to Google, Ex.

11  A, ¶¶ 5, 10; Ex. B, ¶ 11; Ex. C, ¶¶ 5, 10, Google claims that it did merely what the contract said it

12  could do under its grant of that discretion; therefore, according to Google, the implied covenant of

13  good faith and fair dealing cannot apply because it would be at odds with the contract's express

14  grant of discretionary power or absolute discretion.  Here, however, the covenant of good faith and

15  fair dealing must be implied with respect to Google's discretion, or absolute discretion, because

16  otherwise, if the provisions at issue were read literally, then an unenforceable, illusionary

17  agreement would result given that publishers receive no money or other consideration from Google

18  beyond what would be an illusory promise of payment.

19          155.    Plaintiffs and members of the proposed class have been damaged by Google's

20  breach of the implied covenant of good faith and fair dealing in the amount of sums owed to them

21  but not paid when their AdSense accounts were disabled, together with pre-judgment interest.

22          156.    As additional relief or as part of their remedy under this alternative claim, plaintiffs

23  and the proposed class are entitled to an accounting of all AdSense program sums earned, payable,

24  or otherwise associated with their publisher accounts at the time they were disabled, including

25  without limitation as to all sums associated with the publishers' service of AdSense-related ads on

26  their websites or other properties, or other performance under any AdSense program, and any

27  subset of such sums that Google purports to be associated with the claimed violation of AdSense

28  terms of service or policies.

157.    Such an accounting will enable a determination of the amount of damages owed to each plaintiff and member of the proposed class, especially in these circumstances where Google locks out publishers from their accounts upon termination; where the plaintiffs and proposed class members have relationships with Google based on Google's collection and administration of funds owed to them; and where Google is the party that knows what supposed violations or invalid activities it had in mind when it terminated publishers' accounts, and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs and members of the putative class.

## FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

158.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

159.    Plaintiffs plead this cause of action in the alternative to their causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.  Plaintiffs have alleged that certain terms of the contract addressing the withholding of program earnings from terminated publishers are invalid and unenforceable.  Plaintiffs plead this claim to the extent necessary to provide them a means of recovering program earnings due them if the terms at issue are held to be unenforceable.  For purposes of this cause of action, plaintiffs deny the enforceability of the terms at issue, and, as needed to enable the recovery of the earnings due them for serving AdSense program ads, the unenforceability of their entire AdSense contracts with Google.

160.    To the detriment of plaintiffs and the proposed class, Google has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.  More specifically, Google has been unjustly benefited by retaining monies due and payable to publishers, including the plaintiffs and members of the proposed class, for serving on their websites advertisements sold by Google to various advertisers.  (*See* ¶¶ 48-49, *supra*.)

161.    As between the plaintiffs and the proposed class on one hand, and Google on the other, it would be unjust for Google to retain the benefits attained by its wrongful actions.  Moreover, even if Google remitted some or all of the withheld funds to its advertisers, it did so by

1    its wrongful choice, to the publishers' detriment, after first wrongfully choosing to withhold all of

2    the sums payable to publishers when it terminated their accounts.  Thus, Google remains liable to

3    plaintiffs and members of the proposed class for these funds.  Accordingly, under this alternative

4    cause of action, should plaintiffs ultimately rely upon it, plaintiffs and members of the proposed

5    class seek full restitution of the referenced sums which Google withheld from them and by which

6    Google was unjustly enriched, together with pre-judgment interest, or the value of the benefit by

7    which Google was unjustly enriched, based on the wrongful conduct alleged herein.

8        162.   As additional relief or as part of their remedy under this alternative claim, plaintiffs

9    and the proposed class are entitled to an accounting of all AdSense program sums earned, payable,

10   or otherwise associated with their publisher accounts at the time they were disabled, including

11   without limitation as to all sums associated with the publishers' service of AdSense-related ads on

12   their websites or other properties, or other performance under any AdSense program, and any

13   subset of such sums that Google purports to be associated with the claimed violation of AdSense

14   terms of service or policies.

15       163.   Such an accounting will enable a determination of the amount of damages owed to

16   each plaintiff and member of the proposed class, especially in these circumstances where Google

17   locks out publishers from their accounts upon termination; where the plaintiffs and proposed class

18   members have relationships with Google based on Google's collection and administration of funds

19   owed to them; and where Google is the party that knows what supposed violations or invalid

20   activities it had in mind when it terminated publishers' accounts, and to what extent these

21   violations or activities correspond to ads served and other performance on the part of the plaintiffs

22   and members of the putative class.

23                          **FIFTH CAUSE OF ACTION**

24                   **VIOLATION OF THE UNFAIR COMPETITION LAW**
                     (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)
25

26       164.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

27   set forth herein.

28

THIRD AMENDED CLASS ACTION COMPLAINT - 58
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1

165.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

166.     California's Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice.  CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

167.     Google has engaged in, and, upon information and belief, continues to engage in, fraudulent, unlawful, and unfair business acts and practices prohibited by California's UCL.  These acts and practices, which were undertaken in California, include the inducing of AdSense publishers to serve ads on their websites for Google advertisers on the promise of payment to the publishers of a share of the money paid to Google by the advertisers for that service (¶ 23, *supra*); causing publishers to serve those ads on their websites (*e.g.*, ¶¶ 1-2, *supra*); disabling publisher accounts before monies earned for serving those ads are due to be paid (*e.g.*, ¶¶ 3, 5, *supra*); maintaining an extra-contractual policy providing that all final program earnings would be withheld systematically and uniformly from publishers whose accounts were disabled, without the use of any discretion whatsoever, notwithstanding promises to the contrary in Google's contracts (¶¶ 25, 32, *supra*); and then systematically and uniformly withholding not some, but *all*, of the funds due to the publishers for serving ads or otherwise performing during the final payment periods, without any attempt to limit, let alone rationally limit, the sum withheld, and without the application of discretion or good faith (*e.g.*, ¶ 5, *supra*).  These acts and practices broadly and detrimentally affect consumers of Google's AdSense products; in addition, the plaintiffs and fellow publishers are small and unsophisticated entities, or individuals, ¶ 28, *supra*, who have fallen prey to the conduct of a much larger and sophisticated entity as set forth herein.

168.     Google's conduct has harmed plaintiffs and members of the proposed class, as well as the broader public interest as alleged herein.  Google advertises its AdSense program widely, and thousands and thousands of small publishers, including individuals, have become customers of the service, or product, it offers.  Despite publishers' actions, including those of the plaintiffs, to comply with Google's policies and to act in good faith in response to any notices from Google of policy infringements, Google refuses to pay publishers, including the plaintiffs, what is owed them

1    for serving ads during the period prior to disabling the publishers' accounts.  As a matter of a

2    policy and practice outside the parties' contracts, Google simply withholds all the monies due to

3    terminated publishers, however limited in scope or time a purported policy violation or purported

4    contract breach (including purported breaches which, if they actually occurred, were not material

5    breaches), or a publisher's supposed offense, may be.

6    **A.      Violation of "Fraudulent" Prong of UCL**

7          169.    First, Google's behavior violates the "fraudulent business act or practice" prong of

8    the UCL.  Nowhere do Google's AdSense contracts with publishers advise the plaintiffs, or class

9    members, of its policy that upon termination of the publisher's account, it *will* withhold 100% of

10   the publishers' unpaid program earnings for the period, however long, prior to termination.

11         170.    Google's AdSense contracts with publishers, *see* Exs. A-C, including those in place

12   in the months before each plaintiffs' account termination, and by extension, in the months before

13   the account terminations of class members, do *not* provide or advise that, as a matter of policy or

14   course, upon termination of a publisher's account, Google will automatically withhold 100% of the

15   publishers' unpaid program earnings.  To the contrary, these contracts speak in terms of an

16   application of (a) *discretion* to decisions to withhold or adjust payments, Exs. A and C, ¶ 5; and (b)

17   advise only that Google *may*—not *will*—withhold unpaid accounts, Exs. A and C, ¶ 10; Ex. B, ¶ 11

18   ("Google reserves the right to withhold payment or charge back Your account due to any of the

19   foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of

20   any of the foregoing or any breach of this Agreement by You . . . .").[27]  Each plaintiff reviewed

21   these contracts prior to their becoming AdSense publishers, and periodically thereafter.

22

23         [27] The form of AdSense contract attached as Exhibit B to this complaint, which is dated
     February 25, 2008 (*see* its final page), appears, based on an examination of Internet Archives
24   (https://archive.org/index.php) files, to have been in effect at least through April 18, 2013.  This
     conclusion is based on an archives snapshot taken that date, but that version of the AdSense terms
25   may have been in effect a month or two longer.  By June 14, 2013, the form of agreement had
     switched over to that set forth in Exs. A and C hereto.  As Google sets forth in the Declaration of
26   Jim Gray filed in support of its motion to dismiss plaintiffs' first amended complaint, Dkt. No. 39,
     "paragraphs 1, 4, 5, and 10 of Ex. C to the first amended complaint,"—which also is attached
27   hereto as Ex. C—"are substantially the same (though the formatting and wording was different) in
     the November 2012 version of the TOS."  (Gray Decl., ¶ 3.)  Thus, in the months preceding each
28   plaintiff's account termination, a version of Google's contract was in place that, like Ex. A hereto,

171.    Thus, Google intentionally omitted in its representations to plaintiffs made in contracts applicable to their service of AdSense ads in the one-to-two month period before termination of their accounts, *see* Exs. A-C and ¶ 72, *supra*, that upon termination, Google would always withhold 100% of their program funds as a systematic and uniform function of its extra-contractual policy, and as a systematic and uniform practice, unknown to plaintiffs.  Had this information been disclosed to the plaintiffs, they would have behaved differently; they would not have expended time, energy, and money in their websites serving AdSense program ads if they had known that Google would always withhold 100% of their unpaid program earnings if it terminated their accounts.

172.    But since at least November 16, 2012 (and likely since much earlier), when plaintiff CIS was terminated and Google advised it that it would be withholding 100% of its program funds, Dkt. No. 39-9 at 2, with no indication that it had considered withholding any lesser percentage of funds, Google has had an extra-contractual policy by which it withholds 100% of the program funds due terminated publishers as a systematic and uniform matter of course.  (*See* ¶¶ 25, 32, 70-71, *supra*.)  Each of the remaining three plaintiffs entered into their AdSense contracts or served ads under contracts reiterated *after* Google revealed this policy to CIS for the first time, ¶¶ 51, 74, 86, *supra*, by withholding 100% of CIS's last program earnings upon termination of its accounts, and Google did not reveal this policy to them at the time of entry into their AdSense agreements.  Google itself knew of this extra-contractual policy at least as of the time it entered into AdSense agreements with plaintiffs FRC, Chose, and Simpson, and further investigation and discovery will reveal if it also knew of this extra-contractual policy before it entered into an AdSense agreement with plaintiff CIS.  By entering into AdSense contracts with at least three of the plaintiffs—and with thousands upon thousands of AdSense publishers whose contracts were dated at least as early as November 16, 2012—while omitting to advise them in those contracts of critical information as to its extra-contractual 100%-withholding policy, Google has violated the "fraudulent" prong of the UCL.

---

nowhere indicated that Google would always withhold 100% of a publishers' final program earnings at termination of its account.

**B.      Violation of "Unlawful" Prong of UCL**

173.      Second, Google withholds 100% of unpaid program funds from terminated publishers on the basis of contractual terms purportedly permitting such conduct, but which actually violate California law (a) making unlawful and unenforceable contractual terms that are unconscionable; and (b) rendering unlawful and unenforceable unreasonable and penalizing provisions for liquidated damages.  *See* CAL. CIV. CODE § 1670.5(a); CAL. CIV. CODE § 1671(b); *see also* ¶¶ 35-47, *supra*.  Additionally, by willfully and intentionally omitting critical information from plaintiffs in its program contracts regarding its policy of withholding 100% of unpaid program funds upon account termination, Google has violated CAL. CIV. CODE § 1709, which makes deceit unlawful.  *See also* CAL. CIV. CODE § 1710 ("A deceit, within the meaning of the last section, is either: . . . (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) A promise, made without any intention of performing it.").  Having violated these provisions of California law, Google has violated the "unlawful" prong of the UCL.

**C.      Violation of "Unfair" Prong of UCL**

174.      Third, Google's actions, including conduct based on unconscionable contract terms and deceit, are patently unfair.  As described above, Google systematically withholds all monies due to publishers for performance already rendered when Google terminates the publishers' accounts, no matter how limited in scope or time the supposed offense identified by Google that led to termination.  This practice is tied to Google's violation of the law as to liquidated damages provisions, CAL. CIV. CODE § 1671(b), rendering it patently unfair as a systematic penalty applied to all terminated publishers.  The harm that Google causes by wielding its unlawful liquidated damages provision like a sledgehammer is not balanced by any good it does, especially where it already has terminated the publisher and has the means to identify what it considers to be problematic ad serves and to adjust accounts accordingly, which it does on a regular basis.  It need not withhold 100% of all unpaid program earnings.  Where Google has no liability over to its

1    advertisers, there is no justification for the harm it causes to terminated publishers by penalizing

2    them for all earned but unpaid revenue.  It is unfair to kick these publishers when Google already

3    has shut off their participation in the program, upon which many depend for their livelihoods.

4          175.    Also, Google has engaged in deceit by not advising publishers in its contracts of this

5    policy and practice.  This, too, is unfair and unjustified under the attendant circumstances.

6          176.    Thus, Google's fraudulent, unlawful, and unfair business acts and practices as

7    described herein demonstrate and constitute unfair competition in violation of California's UCL.

8    *See* CAL. CIV. CODE § 17200 ("[U]nfair competition shall mean and include any unlawful, unfair

9    or fraudulent business act or practice . . . .").  These acts and practices also detrimentally affect the

10   public interest, in that they undermine the lawfulness and fairness of business practices in

11   California, and outside California under contracts mandating the application of California law,

12   among thousands and thousands of publishers, to whom Google broadly advertises and makes its

13   AdSense program, and contracts, available.  Thousands and thousands of individuals and small

14   businesses are thereby affected as they consumer Google's AdSense service or product.

15         177.    Under the UCL, plaintiffs and the proposed class are entitled to restitution of the

16   monies owed them for their performance under the AdSense program, but retained by Google

17   wrongfully, together with pre-judgment interest, and to an injunction barring Google from

18   withholding in the future all such funds owed to AdSense publishers whose accounts it disables.

19         177.    Additionally, pursuant to the broad injunctive and equitable powers given the Court

20   under the UCL, *see* CAL. CIV. CODE § 17203, plaintiffs and the proposed class are entitled to an

21   accounting of all AdSense program sums earned, payable, or associated with their publisher

22   accounts at the time they were disabled, including without limitation as to all sums associated with

23   the publishers' service of AdSense-related ads on their websites or other properties, or other

24   performance under any AdSense program, and any subset of such sums that Google purports to be

25   associated with the claimed violation of AdSense terms of service or policies.  Such an accounting

26   will enable a determination of the amount of restitution owed to each plaintiff and member of the

27   proposed class, especially in these circumstances where Google locks out publishers from their

28   accounts upon termination; where the plaintiffs and proposed class members have relationships

1   with Google based on Google's collection and administration of funds owed to them; and where

2   Google is the party that knows what supposed violations or invalid activities it had in mind when it

3   terminated publishers' accounts, and to what extent these violations or activities correspond to ads

4   served and other performance on the part of the plaintiffs and members of the putative class.

**SIXTH CAUSE OF ACTION**

**REQUEST FOR DECLARATORY RELIEF**
(CALIFORNIA DECLARATORY JUDGMENT ACT, CAL. CIV. PROC. CODE § 1060)

7   178.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

8   set forth herein.

9   179.   For the reasons set forth above in paragraphs 139-41, the contractual terms

10  purporting to permit Google to withhold payment of earned but unpaid program revenues owed to

11  publishers whose accounts it disables, *see* Ex. A, ¶¶ 10, 5; Ex. B, ¶ 11; and Ex. C, ¶¶ 10, 5, which

12  Google reads and applies as permitting it to withhold such unpaid amounts in their entirety, are

13  unconscionable.  Accordingly, they are unenforceable.  *See* CAL. CIV. CODE § 1670.5(a) ("If the

14  court as a matter of law finds the contract or any clause of the contract to have been

15  unconscionable at the time it was made the court may refuse to enforce the contract, or it may

16  enforce the remainder of the contract without the unconscionable clause, or it may so limit the

17  application of any unconscionable clause as to avoid any unconscionable result.").  Yet Google

18  purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is

19  an actual controversy between the plaintiffs and class members on the one hand, and Google on the

20  other.

21  180.   Also, for the reasons set forth above in paragraphs 35-47, Google's contractual

22  terms invoked by it to withhold from terminated publishers all "unpaid amounts," *i.e.*, earned but

23  unpaid program revenue, or earnings (Ex. A, ¶ 10; Ex. C, ¶ 10); or to withhold from terminated

24  publishers all "payments" (Ex. B, ¶ 6), constitute unreasonable, invalid, and, therefore,

25  unenforceable liquidated damages provisions.  Further, to the extent that Google relies upon

26  paragraph 5 (or any other provision) of its terms and conditions (Exs. A and C) as giving it the

27  right to withhold all earned but unpaid amounts from terminated publishers, that term, too,

28

constitutes an unreasonable, invalid, and, therefore, unenforceable liquidated damages provision. CAL. CIV. CODE § 1671(b) ("Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid *unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made*.") (emphasis added). Yet Google purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is an actual controversy between the plaintiffs and class members on the one hand, and Google on the other.

181.   Accordingly, per the foregoing, including for those reasons expressed in the paragraphs specifically referenced and thereby incorporated in this cause of action, plaintiffs and members of the proposed class, pursuant to CIV. PROC. CODE § 1060 and otherwise, are entitled to an order or orders declaring these terms: (a) unconscionable, and, therefore, unenforceable against them and all AdSense publishers pursuant to CAL. CIV. CODE § 1670.5(a); and (b) unreasonable liquidated damages provisions that are invalid pursuant to CAL. CIV. CODE § 1671(b), and, therefore, unenforceable as against them and all AdSense publishers.

## SEVENTH CAUSE OF ACTION

### REQUEST FOR DECLARATORY RELIEF
(FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a))

182.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

183.   For the reasons set forth above in paragraphs 139-41, the contractual terms purporting to permit Google to withhold payment of earned but unpaid program revenues owed to publishers whose accounts it disables, *see* Ex. A, ¶¶ 10, 5; Ex. B, ¶ 11; and Ex. C, ¶¶ 10, 5, which Google reads and applies as permitting it to withhold such unpaid amounts in their entirety, are unconscionable. Accordingly, they are unenforceable. *See* CAL. CIV. CODE § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."). Yet Google

purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is an actual controversy between the plaintiffs and class members on the one hand, and Google on the other.

184.    Also, for the reasons set forth above in paragraphs 35-47, Google's contractual terms invoked by it to withhold from terminated publishers all "unpaid amounts," *i.e.*, earned but unpaid program revenue, or earnings (Ex. A, ¶ 10; Ex. C, ¶ 10); or to withhold from terminated publishers all "payments" (Ex. B, ¶ 6), constitute unreasonable, invalid, and, therefore, unenforceable liquidated damages provisions.  Further, to the extent that Google relies upon paragraph 5 (or any other provision) of its terms and conditions (Exs. A and C) as giving it the right to withhold all earned but unpaid amounts from terminated publishers, that term, too, constitutes an unreasonable, invalid, and, therefore, unenforceable liquidated damages provision. CAL. CIV. CODE § 1671(b) ("Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid *unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made*.") (emphasis added).  Yet Google purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is an actual controversy between the plaintiffs and class members on the one hand, and Google on the other.

185.    Accordingly, per the foregoing, including for those reasons expressed in the paragraphs specifically referenced and thereby incorporated in this cause of action, plaintiffs and members of the proposed class, pursuant to 28 U.S.C. § 2201(A) and otherwise, are entitled to an order or orders declaring these terms: (a) unconscionable, and, therefore, unenforceable against them and all AdSense publishers pursuant to CAL. CIV. CODE § 1670.5(a); and (b) unreasonable liquidated damages provisions that are invalid pursuant to CAL. CIV. CODE § 1671(b), and, therefore, unenforceable as against them and all AdSense publishers.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the following relief:

A.    That the Court certify this case as a class action on the nationwide basis requested, and that it appoint plaintiffs as class representatives and their counsel to be class counsel;

1           B.      That the Court award plaintiffs and the proposed class all appropriate relief to the

2    greatest extent available, including an accounting or accountings; monetary relief to the greatest

3    extent available, whether by way of restitution or damages or a combination thereof, together with

4    pre-judgment interest at the highest rate permitted by law; injunctive relief as requested herein, and

5    to the greatest extent available, requiring, *inter alia*, that Google undertake to calculate and pay all

6    unpaid amounts, program earnings, or earned but unpaid revenue due the terminated publisher

7    plaintiffs and the proposed class of terminated publishers, and that it cease the practices with

8    respect to its AdSense program complained of herein; and declaratory relief, adjudging the

9    practices complained of unlawful, and the contractual terms, including the provisions identified

10   herein, upon which Google purports to rely in withholding all unpaid amounts, program earnings,

11   or earned but unpaid revenue due the terminated publisher plaintiffs and the proposed class of

12   terminated publishers, unconscionable and unenforceable, and also unreasonable, invalid, and

13   unenforceable liquidated damages provisions; as well as plaintiffs' and the proposed class's

14   attorneys' fees, costs, and expenses;

15          C.      That the Court grant plaintiffs and the proposed class such additional orders or

16   judgments as may be necessary to redress or prevent the unlawful practices complained of herein;

17   and

18          D.      That the Court award plaintiffs and the proposed class such other, favorable relief as

19   may be available and appropriate under federal or state law, or at equity.

20                                     **JURY TRIAL DEMANDED**

21          Plaintiffs demand a trial by jury on all issues so triable.

22   DATED: Sept. 15, 2015                HAGENS BERMAN SOBOL SHAPIRO LLP

23                                  By    */s/ Steve W. Berman*

                                  Steve W. Berman (*pro hac vice*)

24                                     Robert F. Lopez (*pro hac vice*)

25                              1918 Eighth Avenue, Suite 3300

                         Seattle, WA  98101

26                            Telephone:  (206) 623-7292

                         Facsimile:  (206) 623-0594

27                            steve@hbsslaw.com

                         robl@hbsslaw.com

28

1
2
3
4

Jeff D. Friedman
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

5

*Attorneys for Plaintiffs and the Proposed Class*

6

7

LEVETOWN & JENKINS, LLP

8

By _____*/s/ John Jenkins*_____
          John Jenkins (CA Bar No. 161959)

9

Levetown & Jenkins, LLP
4675 MacArthur Court, Suite 1470
Newport Beach, CA 92660
Telephone:  (866) 237-1014
Facsimile:  (866) 278-2973
john@levjen.com

10

11

12

Andrew Levetown
Levetown & Jenkins, LLP
One Metro Center
700 12th Street, N.W., Suite 700
Washington, DC  20005
Telephone:  (202) 379-4899
Facsimile:  (866) 278-2973
alevetown@levjen.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 15, 2015, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the email addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

Dated: September 15, 2015                              */s/ Steve W. Berman*
                                                                      Steve W. Berman

THIRD AMENDED CLASS ACTION COMPLAINT - 69
Case No. 5:14-cv-02329-BLF
010450-11  718002 V1