# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| FREE RANGE CONTENT, INC., ET AL., | Case No. 14-cv-02329-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION** |
| GOOGLE INC., | [Re: ECF 171] |
| Defendant. | |

This is a putative class action lawsuit against Defendant Google Inc. ("Google") arising out of Google's AdSense advertising program. AdSense is a platform by which Google arranges for operators (or, "publishers") of websites and other web properties (such as games) to display advertisements in exchange for a share of the revenue that Google generates in selling those ads. Plaintiffs Free Range Content, Inc. ("FRC"), Coconut Island Software, Inc. ("CIS"), Taylor Chose, and Matthew Simpson (collectively, "Plaintiffs") are former publishers in the AdSense program whose accounts were terminated by Google. Plaintiffs contend that when Google disabled their accounts, Google withheld all of their unpaid "earnings" without regard to the scope of the purported breaches Google invoked to terminate the publishers' accounts.

Presently before the Court is Plaintiff's Motion for Class Certification. Mot., ECF 171. Plaintiffs seek to certify three classes: (1) a Rule 23(b)(2) class seeking declaratory relief for violations of Cal. Civ. Code § 1671(b) and Cal. Bus. & Prof. Code §§17200 *et seq.* ("UCL"); (2) a Rule 23(b)(3) terms-and-conditions class seeking damages or restitution for violations of Cal. Civ. Code § 1671(b) and the UCL, as well as for breach of contract; and (3) a Rule 23(b)(3) terms-of-service class seeking damages or restitution for violations of Cal. Civ. Code § 1671(b) and the UCL, breach of contract, and breach of the implied covenant of good faith and fair dealing. Mot. i. Plaintiffs also request that the Court appoint FRC, CIS, Chose, and Simpson as class

representatives for the Rule 23(b)(2) class; CIS as class representative for the Rule 23(b)(3) terms-and-conditions class; and FRC as the representative for the Rule 23(b)(3) terms-of-service class. *Id.* at ii.  Plaintiffs ask the Court to appoint Hagens Berman Sobol Shapiro LLP class counsel.  *Id.*

The Court held a hearing on this motion on June 15, 2017.  For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for class certification.

# I.    BACKGROUND

## A.    Factual Background and Class Allegations

### i.    Google's AdSense Program

Google's AdSense program allows website operators (or, "publishers") to earn money by displaying third-party advertisements on their websites or other web properties (such as games).  The publishers receive a share of the revenue that Google generates in selling those ads to advertisers, who pay for each click on or view of the ad.  Loebel-Fried Decl. ¶ 9, ECF 188

#### a.    AdSense Terms and Conditions and Terms of Service

The AdSense terms of use and documents they incorporate govern the relationship between Google and each publisher.  Third Am. Compl. ("TAC") ¶ 27, ECF 92.  The terms took two forms during the relevant period: a 10-page "Terms and Conditions" ("T&C") from the start of the class period until April 22, 2013, and a 5-page "Terms of "Service" ("TOS") from April 23, 2013, onward (collectively, the "Terms").  Exs. 1 ("T&C") & 3 ("TOS") to Liu Decl., ECF 179-1, 179-3.

Both Terms require publishers to adhere to Google's hyperlinked "Program Policies," which set forth a variety of requirements and prohibitions regarding, among other things, the content of a publisher's website, placement of ads on the website, and methods of generating advertising traffic, and bind publishers continuing to use AdSense to future changes to the terms.  TOS ¶¶ 1, 4; T&C ¶¶ 1, 17; *see, e.g.*, Exs. 6–16 to Liu Decl., ECF 179-6–179-16.  Notably, Google is concerned with "invalid activity," which the Terms state:

> . . . includes, but is not limited to, (i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by

United States District Court
Northern District of California

payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above.

TOS ¶ 5; T&C ¶ 5 (defining prohibited uses), ¶ 11 ("clicks co-mingled with a significant number of invalid clicks . . . or as a result of any breach of this Agreement by You for any applicable pay period" are not payable"); Loebel-Fried Decl. ¶ 2 (defining "invalid activity," "invalid traffic," and/or "spam" as clicks, impressions, or other chargeable advertiser activity that does not originate from a genuine user). Google will only pay a publisher for valid activity or clicks, which is "determined by Google in its sole discretion." TOS ¶ 5; T&C ¶ 11 ("You shall receive a payment related to the number of valid clicks on Ads . . ., in each case as determined by Google[.]").

### b. Google's Monitoring for Inauthentic Ad Traffic and Policy Violations

To ensure that Google only charges advertisers for valid clicks, impressions, or other chargeable advertiser activity, Google monitors ad traffic and policy compliance using automated and manual processes. Loebel-Fried Decl. ¶ 2; *see generally* Ex. 13 to Berman Decl., ECF 161-11. Invalid activity impacting AdSense typically falls into one of three general categories: (1) computer programs or "bots" that click or view ads and pretend to be human, (2) real people who are not clicking on the ad out of genuine interest, such as publishers clicking or viewing their own ads or soliciting people to do so, or (3) publishers using webpage layouts that cause users with no genuine interest in the advertised content to inadvertently click on ads or mistake adds for site content. Loebel-Fried Decl. ¶ 11; Tuzhilin Decl. ¶ 14, ECF 196. On the policy side, Google requires a certain level of quality, and therefore prohibits the displaying of Google ads on websites devoted to displaying scraped or duplicative content and ads, often referred to as "MFA" or "Made for AdSense" websites, and websites associated with graphic violence, pornography, or copyright violations, among other websites Google believes are not "high-quality websites." Liu Decl. ¶ 8. Essentially, there are two types of invalid activity: one that pertains to the quality of the ad traffic and the other stemming from violations of Google's policies.

Google's ad traffic quality monitoring entails, among other things: (1) developing and refining █████████████████████████████████████████████

3

United States District Court
Northern District of California

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ███████████████████████████████████ Loebel-Fried Decl. ¶¶ 5–

4  7, 16–27.  On the other hand, to detect policy violations, Google ████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████—and relies

8  on reports from advertisers or publishers regarding non-compliant webpages, which the Publisher

9  Quality team then investigates.  Liu Decl. ¶¶ 11–15.  ████████████████████

10  ████████████████████████████████████ *Id.*

### c.  Payment and Termination of AdSense Publishers

Publishers set up accounts with Google and are paid the "earned balance"—meaning the amount that Google calculates is owed on valid activity—on a monthly basis, generally 30 days after the month in which the balance is earned.  T&C ¶ 11; TOS ¶ 5.  Over the course of any month in which a publisher displays Google-supplied ads, the "AdSense Front End" (or, "dashboard") will generally show the revenue associated with ad traffic not determined to be invalid by ████████████████ Loebel-Fried Decl. ¶ 42.  The amount reflected on the dashboard may be subject to adjustment based on ████████████████████████████████ ███████████████████ *Id.* ¶ 43.  Around the 21st of the next month, if the account meets the "payment threshold," Google will pay the publisher for clicks or impressions not determined to be inauthentic or otherwise not payable from the prior month.  *Id.* ¶ 46; TOS ¶ 5; T&C ¶ 11 (specifying that the "payment threshold" under the T&C is "$10").

When Google determines that a publisher's level of spam or policy violation(s) is unacceptable, it may warn, suspend, or terminate the publisher.  Loebel-Fried Decl. ¶ 36; Liu Decl. ¶ 18(e) (setting out a non-exclusive list of conditions under which Google may terminate a publisher's account).  The Terms allow both the publisher and Google to terminate the relationship for any reason.  T&C ¶ 6, TOS ¶ 10.  In pertinent part, the Terms state:

If you terminate the Agreement and your earned balance equals or

4

exceeds the applicable threshold we will pay you your earned balance within approximately 90 days after the end of the calendar month in which the Agreement is terminated.  Any earned balance below the applicable threshold will remain unpaid.  Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason.  If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account.

TOS ¶¶ 10, 5; T&C ¶ 11 ("Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You, or in the event that an advertiser whose Ads are displayed in connection with Your Property(ies) defaults on payment for such Ads to Google.").

In accordance with these provisions, after terminating a publisher for breach or invalid activity, Google may withhold the amounts accrued in the publisher's account during the previous payment cycle or the estimated amounts that have accumulated in the publisher's account for the current month.  Loebel-Fried Decl. ¶ 47; Liu Decl. ¶¶ 19–22.  ██████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████   *See, e.g.*, Loebel-Fried Decl. ¶¶ 43–45; 48–52; Liu Decl. ¶¶ 21–22.  Plaintiffs dispute this characterization of the amounts displayed on publishers' dashboards.  Instead, they contend that the amounts are accrued "earnings" in which the publishers have a property right.  Mot. 4; Reply 1, ECF 218.

Any publisher may appeal Google's termination decision.  Liu Decl. ¶ 23.  The Publisher Quality team's reviews of appeals are done manually.  *Id.*

### ii. The Four Named Plaintiffs and Their Use of the AdSense Program

#### a. Free Range Content

FRC, founded by John Pettit, started to run Google ads in July 2012.  TAC ¶ 51.  FRC provided content, such as articles, that its customers ("content consumers") could embed onto their

United States District Court
Northern District of California

own websites through its Repost article syndication service.  Ex. 3 to Wong Decl. ("Pettitt Dep.") 72:10–77:22, ECF 197-3.  FRC displayed this content and a Google ad on the content consumer's webpage, "almost always" along with ads placed by the content consumer and, occasionally, other non-ad content from the content consumer.  *Id.* at 81:8–20.  FRC's service embedded the article and the Google ad on the content consumer's webpage, in a separate window called an "iframe," that is "isolated" from the rest of the content on a consumer's page and website.  *Id.* at 45:18–22, 46:9–25.

When FRC saw that Google had identified "large" levels of invalid traffic on its AdSense accounts beginning in December 2013, FRC contacted Google several times and reported seeing levels of revenue per ad that it called "crazy," "ridiculous," and "CLEARLY OFF."  Exs. 6, 8–9 to Wong Decl., ECF 197-6, 197-8, 197-9; Exs. 18–19 to Berman Decl., ECF 161-14, 161-15.  Subsequently, Google ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ Exs. 10 & 11 to Wong Decl., ECF 197-10, 197-11.  A second Google employee confirmed and terminated FRC on March 4, 2014.  *Id.*  FRC appealed, and another Google employee found that it had a "[f]aulty business model" that used "cross domain framing," and that the spam level was "very high" in violation of Google's policies.  *Id.*; Ex. 14 to Liu Decl. ("Ad Placement Policies") 8, ECF 195-14.  Google's records show that Google "deducted" $14,277.19 from FRC in connection with its termination.  Ex. 17 to Berman Decl., ECF 161-13.

### b.  Coconut Island Software

CIS joined AdSense in or about March 2005.  TAC ¶ 64.  CIS operated several websites that collected job listings and information about physicians and other healthcare providers that were primarily available from public sources, though CIS did have at least some unique content.  Ex. 12 to Wong Decl. ("Clark Dep.")[1] 88:5–90:1, 113:17–24 (defining unique content as "content that [he] authored, in the sense that [he] figured out what was going to go into that category on

---

[1] Michael Clark is the president of CIS.  Clark Decl. ¶ 1, ECF 164.

United States District Court
Northern District of California

1   that page, and [then] displayed it in a way that the users [could] find"), ECF 197-12.  During the

2   class period, CIS had created up to 60 million webpages based on certain templates that included a

3   significant number of the links redirected to other job-listing websites, *i.e.*, not to the actual job

4   postings.  *Id.* at 112:6–113:16.

5        After Google's ████████████████████████████

6   ████████████████, the Publisher Quality team manually reviewed CIS's websites and ultimately

7   terminated CIS on November 16, 2012 for one or more policy violations.  Ex. 17 to Berman Decl.;

8   Ex. 27 to Wong Decl., ECF 197-27.  Upon examination, Google determined that CIS's websites

9   were MFA, meaning the websites were designed primarily to generate ad revenue rather than to

10   provide real content, and/or contained a large number of links to "thin affiliates," websites that

11   linked to other job listing sites, in violation of the Webmaster Quality Guidelines.  Liu Decl. ¶ 30

12   (explaining that "MFA" stands for "Made for AdSense," meaning Google believes the website is

13   "devoted to displaying scraped content and ads with little or no additional content"); *id.* ¶¶ 33–34;

14   Ex. 27 to Wong Decl.  CIS appealed its termination but, after review by another Google employee,

15   its appeal was denied.  Ex. 32 to Wong Decl., ECF 197-32; Liu Decl. ¶ 23.  Google's records

16   show that Google "deducted" $2,181.01 from CIS in connection with its termination.  Ex. 17 to

17   Berman Decl.

18        **c.   Taylor Chose**

19        Taylor Chose signed up for AdSense in September 2013, and operated a website that

20   consisted of a series of lists or "articles" based on "popular trends," and featured images

21   accompanied by a few line of text.  Ex. 17 to Wong Decl. ("Chose Dep.") 33:5–8, 43:5–44:20,

22   ECF 197-17; Liu Decl. ¶ 29.  Chose did not create any of the images herself; rather, she found

23   them online and did not know the copyright status of said images.  Chose Dep. 132:23–135:24;

24   Liu Decl. ¶ 28.  On November 27, 2013, two separate Publisher Quality reviewers determined that

25   Chose had violated Google policies.  Ex. 22 to Wong Decl., ECF 197-22.  Specifically, they found

26   that Chose's website was "high risk" with "[l]ow quality MFA gallery pages."  *Id.*  Additionally,

27   Google determined that the template Chose used to design the layout of her site included

28   prohibited ad placement.  Liu Decl. ¶ 27.  For this reason, Google terminated Chose's AdSense

account.  *Id.* ¶ 26.  Google's records show that it "deducted" $16,921.77 from Chose's account in connection with her termination.  Ex. 17 to Berman Decl.  Chose did not appeal her termination.  TAC ¶ 82.

### d.  Matthew Simpson

Mathew Simpson signed up for AdSense in August 2011, and began utilizing his account in earnest in approximately February 2012.  Ans. ¶ 86, ECF 120.  Simpson operated several websites.  TAC ¶ 88.  On June 17, 2013, Google ███████████████████████████████████ ███████████████████████████████.  Loebel-Fried Decl. ¶ 68; Ex. 17 to Berman Decl.; Ex. 22 to Berman Decl. ("Loebel-Fried Dep.") 78:23–79:3, ECF 161-18.  Google contends that termination was based on its finding that ████████████████████████████████████ ██████████████████████████████████████████.  Loebel-Fried Decl. ¶¶ 64–67.  Google's records showed that it "deducted" $77.82 from Simpson in connection with his termination.  Ex. 17 to Berman Decl.  Simpson did not appeal his termination.  Ex. 23 to Wong Decl. ("Simpson Dep.") 104:13–14, ECF 197-23.

### B.    Proposed Class Definitions

Plaintiffs seek to certify three classes (the "Declaratory Relief Class," the "Terms-and-Conditions Class," and the "Terms-of Service Class"):

### i.    Declaratory Relief Class:

All former or current Google AdSense publishers: (1) whose AdSense accounts were subject to Google's terms and conditions or terms of service for the U.S., Canada, American Samoa, Puerto Rico, United States Minor Outlying Islands, the U.S. Virgin Islands, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Cayman Islands, Dominica, Falkland Islands, Grenada, Guyana, Haiti, Jamaica, Montserrat, Netherland Antilles, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Trinidad and Tobago, or the Turks and Caicos Islands (the locations at issue); (2) whose AdSense account Google disabled or terminated for any breach of contract, including policy violations or invalid activity, on any date between and including May 20, 2010, and the date of judgment in this matter; and (3) whose last AdSense program earnings or unpaid amounts Google withheld in their entirety, and permanently, in connection with such disablement or termination.

### ii.    Terms-and-Conditions Class:

All former or current Google AdSense publishers: (1) whose

United States District Court
Northern District of California

AdSense accounts were subject to Google's terms and conditions for the locations at issue; (2) whose AdSense account Google disabled or terminated for any breach of contract, including policy violations or invalid activity, on any date between and including May 20, 2010, and April 22, 2013; and (3) whose last AdSense program earnings or unpaid amounts Google withheld in their entirety, and permanently, in connection with such disablement or termination.

### iii.    Terms-of-Service Class:

All former or current Google AdSense publishers: (1) whose AdSense accounts were subject to Google's terms of service for the locations at issue; (2) whose AdSense account Google disabled or terminated for any breach of contract, including policy violations or invalid activity, on any date between and including April 23, 2013, and the date of judgment in this matter; (3) whose last AdSense program earnings or unpaid amounts Google withheld in their entirety, and permanently, in connection with such disablement or termination; and (4) who submitted a written notice of dispute to Google within 30 days of notice from Google of withholding from their AdSense publishers' accounts.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions.  "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  The burden is on the party seeking certification to show, by a preponderance of the evidence, that the prerequisites have been met. *See Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011).

Certification under Rule 23 is a two-step process.  The party seeking certification must first satisfy the four threshold requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy.  Specifically, Rule 23(a) requires a showing that

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The party seeking certification must then establish that one of the three grounds for certification applies.  *See* Fed. R. Civ. P. 23(b).  Plaintiffs invoke Rule 23(b)(3) and

United States District Court
Northern District of California

1    Rule 23(b)(2).

2         Rule 23(b)(3) provides that a class action may be maintained where

3              the court finds that the questions of law or fact common to class
              members predominate over any questions affecting only individual
4              members, and that a class action is superior to other available
              methods for fairly and efficiently adjudicating the controversy.  The
5              matters pertinent to these findings include:

6              (A) the class members' interests in individually controlling the
              prosecution or defense of separate actions;
7
8              (B) the extent and nature of any litigation concerning the
              controversy already begun by or against class members;

9              (C) the desirability or undesirability of concentrating the litigation of
              the claims in the particular forum; and
10
              (D) the likely difficulties in managing a class action.
11

12   Fed. R. Civ. P. 23(b)(3).  A (b)(3) class is appropriate "whenever the actual interests of the parties

13   can be served best by settling their differences in a single action."  *Hanlon v. Chrysler Corp.*, 150

14   F.3d 1011, 1022 (9th Cir. 1998) (internal quotation marks omitted).  "When common questions

15   present a significant aspect of the case and they can be resolved for all members of the class in a

16   single adjudication, there is clear justification for handling the dispute on a representative rather

17   than on an individual basis."  *Id.* (citation and internal quotation marks omitted).

18        A class action may proceed under Rule 23(b)(2) where "the party opposing the class has

19   acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

20   corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

21   23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory

22   remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful

23   only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 350 (citation and

24   internal quotation marks omitted).  Rule 23(b)(2) "does not authorize class certification when each

25   individual class member would be entitled to a different injunction or declaratory judgment

26   against the defendant."  *Id.* (emphasis omitted).  Nor "does [it] authorize class certification when

27   each class member would be entitled to an individualized award of monetary damages."  *Id.*

28        In considering a motion for class certification, the substantive allegations of the complaint

United States District Court
Northern District of California

are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through a class action."  *Hanni v. Am. Airlines, Inc.*, No. 08–cv–00732, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010); *see also Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 447 (N.D. Cal. 2012) ("[Courts] need not blindly rely on conclusory allegations which parrot Rule 23 requirements." (citation and internal quotation marks omitted)). Accordingly, "the court may consider supplemental evidentiary submissions of the parties." *Hanni*, 2010 WL 289297, at *8 (citations omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975).

   "A court's class-certification analysis . . . may entail some overlap with the merits of the plaintiff's underlying claim."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1194 (2013) (citation and internal quotation marks omitted).  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Id.* at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195.

## III.   DISCUSSION

   The parties have engaged in extensive discovery in this case and have submitted a great deal of evidence in support of their respective positions.  The Court has reviewed all of this evidence in detail.  For the reasons discussed below, the Court is persuaded that it is not appropriate to certify the proposed class under Rule 23(b)(2).  Additionally, the Court concludes that while Plaintiffs have satisfied all of the requirements of Rule 23(a), the individualized issues that would need to be addressed if Plaintiffs' claims under Cal. Civ. Code § 1671(b) and the UCL, and for breach of contract went forward on a class basis are insurmountable.  However, Plaintiffs have satisfied their burden with respect to their claim for breach of the implied covenant of good faith and fair dealing.

### A.   Plaintiffs Have Met the Rule 23(a) Requirements

   A named plaintiff bears the burden of demonstrating that the class meets the following four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

United States District Court
Northern District of California

1  defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

2  representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P.

3  23(a); *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended*

4  *on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (citing *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d

5  1304, 1309 (9th Cir. 1977).  Google contends that plaintiff has not demonstrated commonality or

6  typicality.  The Court discusses all of the Rule 23(a) requirements below.

7         **i.   Numerosity & Ascertainability**

8        Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of

9  all the class members is impracticable."  Impracticability is not impossibility, and instead refers

10  only to the "difficulty or inconvenience of joining all members of the class."  *Harris v. Palm*

11  *Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (citation and internal quotation

12  marks omitted).  While there is no set number cut-off, the number of individuals who will satisfy

13  the requirements for membership in the proposed classes in this case easily satisfies the

14  numerosity requirement.  *See Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994) (noting that

15  courts have certified classes as small as 14 and have often certified classes with 50 to 60

16  members).  Plaintiffs contend that Google terminated and withheld "earnings" from tens of

17  thousands of publishers during the proposed class period, and thus, joinder of all affected

18  individuals would be impracticable.  Mot. 12–13.  Google does not dispute that the numerosity

19  requirement is satisfied.  The Court thus concludes the numerosity requirement is satisfied.

20        Related to numerosity is ascertainability.  A class is ascertainable if it is defined by

21  objective criteria and "sufficiently definite so that it is administratively feasible to determine

22  whether a particular person is a class member."  *Wolph v. Acer Am. Corp.*, No. C 09–01314, 2012

23  WL 993531, at *1 (N.D. Cal. Mar. 23, 2012).  Ascertainability "is needed for properly enforcing

24  the preclusive effect of final judgment," that is, "who gets the benefit of any relief and who gets

25  the burden of any loss."  *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D Cal.

26  2011).  Ascertainability is plainly satisfied here, as Google knows or is able to identify the class

27  members.  Mot. 10; Ex. 42 to Berman Decl., at 30, ECF 161-33 (interrogatory answer stating,

28  "Google has terminated approximately ████ publishers who were subject to the AdSense

1    TOS").

2             ii.    **Commonality**

3        The commonality requirement of Rule 23(a)(2) is met where "the class members' claims

4    'depend upon a common contention' such that 'determination of its truth or falsity will resolve an

5    issue that is central to the validity of each [claim] with one stroke.'" *Mazza*, 666 F.3d at 588

6    (internal citation omitted) (quoting *Dukes*, 564 U.S. at 350). Thus, plaintiffs seeking to certify a

7    class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to

8    common questions of law or fact that are 'apt to drive the resolution of the litigation.'" *Id.*

9    (quoting *Dukes*, 564 U.S. at 350). "[C]ommonality only requires a single significant question of

10   law or fact." *Id.* at 589 (citing *Dukes*, 564 U.S. at 358). "The commonality preconditions of Rule

11   23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d

12   at 1019. "The existence of shared legal issues with divergent factual predicates is sufficient, as is

13   a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

14       Google argues that Plaintiffs do not satisfy Rule 23(a)'s commonality requirement because

15   they have failed to identify common questions of law and fact. Opp'n 12. Specifically, Google

16   contends that determining whether any class member was assessed any liquidated damages or can

17   claim that Google breached any payment obligation will mandate extensive individual inquiry to

18   determine whether the publisher had payable clicks or impressions when it was terminated. *Id.* at

19   12–13. Further, Google asserts that common evidence cannot resolve this issue, and thus,

20   commonality is not satisfied. *Id.* at 13.

21       The Court finds Google's argument unpersuasive, and concludes that Plaintiffs have

22   satisfied the commonality requirement. In particular, Plaintiffs have asserted four core claims that

23   arise from the termination provisions in the TOS and the T&C: whether the liquidated damages

24   provisions are unreasonable as to all class members and are therefore unenforceable, whether the

25   provisions violate the UCL, whether Google breached the contract, and/or whether Google

26   breached the implied covenant of good faith by "deducting" the purported "earnings" at

27   termination. *See* Mot. 13; Reply 3. Plaintiffs present common evidence that shows that all of the

28   class members were subject to the purported liquidated damages provisions, and therefore, its

United States District Court
Northern District of California

legality will raise common questions of law that will likely drive the resolution of the litigation. As such, the Court finds that these claims satisfy the low threshold of Rule 23(a)(2).

### iii.    Typicality

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. 2007) (citing *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotation marks and citation omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hunt*, 241 F.R.D. at 510 (citations omitted).

In the instant case, Plaintiffs' claims and those of the proposed class members arise out of Google's terminating or disabling each class member's AdSense account and the fact that Google withheld the amount displayed on their dashboards upon termination. Mot. 14. Plaintiffs allege, and Google does not dispute, that each class member was or is an AdSense publisher that was a party to a form contract with Google (either the TOS or the T&C). Nevertheless, Google contends that Plaintiffs are not typical of the putative classes. The Court addresses each of Google's arguments in turn.

### a.   Analyzing Compensable Clicks (All Classes)

With respect to all three classes, Google contends that the named plaintiffs are not typical because they cannot show they had valid ad activity and/or that their webpages complied with Google's policies during the period for which Google withheld payment, and therefore had no payable ad activity. Opp'n 13–14. Google asserts that with no payable ad activity, all of

14

1   Plaintiffs' claims fail, and, that Plaintiffs are unable to provide any evidence showing that for the

2   payments they claim are owed, they had only valid clicks on policy-compliant webpages.  *Id.*  In

3   support of this argument, Google offers evidence regarding its potential defenses with respect to

4   each named plaintiff.  These purported defenses fall into three categories: (1) websites that failed

5   to comply with Google policy regarding website construction, Opp'n 15–16 (arguing that CIS's

6   webpages used formulaic layouts, contained a significant amount of scraped or duplicative

7   content, and provided links to "thin affiliate" sites in violation of Google policy); (2) websites

8   with a significant number of invalid clicks, *see id.* at 16 (offering evidence suggesting that Chose

9   violated multiple Google policies by featuring images pulled from the web, which she admits

10  might be copyrighted); *id.* at 16–17 (stating that the vast majority of Simpson's clicks ███████

11  ███████████████████████████████ suggesting invalid ad traffic); (3) or websites with some

12  combination of both, *id.* at 14–15 (claiming that FRC's use of iframes violated Google policy and

13  also that "a high degree of FRC's traffic was fake").

14          Plaintiffs, however, counter that Google's argument is flawed.  Specifically, Plaintiffs

15  contend that because Google did not engage in an individualized inquiry to determine whether the

16  publishers had payable clicks or impressions when it terminated the publishers' accounts, it does

17  not have the right to do so at this point because the clause upon which Google relies did not

18  survive termination.  Reply 4–5, 11–12.

19          As a preliminary matter, the Court declines to resolve the merits question of whether

20  Google can, in the context of this litigation, engage in an individualized analysis of whether the

21  publishers had payable clicks or impressions when it terminated the publishers' accounts as part of

22  the typicality assessment, because the underlying issue goes to the interpretation of the Terms.

23  Nevertheless, upon review of the alleged defenses, the Court concludes that Google's purported

24  defenses against the named plaintiffs are not unique in such a way that they would create a

25  distraction that would become a "major focus of the litigation."  Indeed, Google argues that all of

26  the named plaintiffs are subject to the purported defense.  *See* Opp'n 13–17.  As such, the Court

27  can only conclude that Google is likely to raise the same purported defense as against at least a

28  vast number of the putative class members, if not all of them.  Accordingly, the Court finds that

the named plaintiffs satisfy the permissive typicality requirement.  *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 534–35 (N.D. Cal. 2012) (finding typicality satisfied where Costco's purported defense "represent[ed] a key defense typical of claims [Costco would] raise against the class as a whole"); *cf. Backus v. ConAgra Foods, Inc.*, No. C 16-00454, 2016 WL 7406505, at *3–4 (N.D. Cal. Dec. 22, 2016) (finding typicality not satisfied where named plaintiff continued to buy the products at issue despite knowing the full extent of the dangers associated with trans fats and had previously sued based on that knowledge and could therefore not have relied on the allegedly misleading label at issue in the case).

### b. Substantial Performance (Rule 23(b)(3) Classes—Breach of Contract and Implied Covenant Claims)

Google also argues that even if Plaintiffs could show they had some compensable activity, Google would establish that each of them failed to substantially perform, which would defeat their breach of contract and implied covenant claims.  Opp'n 17.  Plaintiffs, however, argue that they performed under the contract by allowing ads to be served via their web properties, and thus, generated "earnings."  Reply 7.  And, Plaintiffs contend that even if they did breach the agreement, none did so intentionally.  *Id.* (citing Pettit Decl. ¶ 6; Clark Decl. ¶ 6).[2]

While Plaintiffs in the two Rule 23(b)(3) classes must prove substantial performance or an excuse for nonperformance to succeed on their breach of contract and implied covenant claims, *see Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011); *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010), Plaintiffs have demonstrated how they could make such a showing sufficient to permit a jury to consider the matter as a class.  This is because a reasonable jury could conclude that Plaintiffs substantially performed merely by publishing ads on their websites notwithstanding any compliance issues.  *See Murray's Iron Works, Inc. v. Boyce*, 158 Cal. App. 4th 1279, 1291 (2008) ("'What constitutes substantial performance is a question of fact, but it is essential that there be no [willful] departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so

---

[2] The Court considers only CIS and FRC because they are the proposed named plaintiffs for the Rule 23(b)(3) classes.

that the promisee may get practically what the contract calls for.'" (citing and quoting 1 Witkin, Summary of Cal. Law, Contracts § 818 (10th ed. 2005)).  And, as with questions regarding the presence of compensable clicks, Google is likely to raise the same purported defense as against at least a vast number of the putative class members, if not all of them, and is not a distraction caused by defenses unique to the named plaintiffs.  Finally, a reasonable jury could also or alternatively find that Google waived its right to challenge non-compliance with its policies by zeroing out the accounts at issue.  Therefore, Google's argument on this point fails.

### c.   No Bad Faith Withholding (TOS Class—Implied Covenant Claim)

With respect to the TOS class, Google argues that FRC is atypical because Google did not withhold any of FRC's purported "earnings" in bad faith.  Opp'n 17.  Google emphasizes that three Google employees agreed that FRC's websites violated Google policies, and thus, Plaintiffs cannot rely on bad faith.  *Id.*  Plaintiffs disagree with the focus of Google's inquiry, and instead suggest that the withholding was done in bad faith because there was no honest determination as to what specific sums ought to be withheld.  Reply 8.  Plaintiffs do not contend that the termination was done in bad faith.  *Id.*  Because this issue is so intertwined with the determination of whether Plaintiffs substantially performed under the agreements and whether Google waived its right to challenged non-compliance with its policies, the Court finds this argument does not show that FRC is an atypical class representative.

### d.   Former Publishers (Rule 23(b)(2) Class)

Finally, Google asserts that because none of the named plaintiffs is a current AdSense publisher and therefore they have nothing to gain from the Court declaring the challenged provisions unenforceable, the named plaintiffs do not have standing to seek declaratory relief. While the Court agrees, the Court does not agree that this speaks to typicality, and therefore discusses this issue below with respect to the Rule 23(b)(2) requirements.

Thus, based on the foregoing analysis, the Court is satisfied that Plaintiffs have met their burden of demonstrating that their claims are typical of the absent class members.

### iv.   Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the

United States District Court
Northern District of California

interests of the class."  "Determining whether the representative parties adequately represent a class involves two inquiries: (1) whether the named plaintiff and his or her counsel have any conflicts of interest with other class members and (2) whether the named plaintiff and his or her counsel will act vigorously on behalf of the class."  *Calvert v. Red Robin Int'l, Inc.*, No. C 11–03026, 2012 WL 1668980, at *2 (N.D. Cal. May 11, 2012) (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).  These inquiries are guided by the principle that "a class representative sues, not for himself alone, but as representative of a class comprising all who are similarly situated.  The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity."  *Calvert*, 2012 WL 1668980, at *2 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949)).

Plaintiffs contend that the interests of the proposed classes and of the proposed class representatives are the same, and that the proposed class representatives understand their obligations to the class and are ready, willing, and able to act as effective advocates for members of the proposed classes.  Mot. 15; *see also* Pettitt Decl. ¶¶ 2–4, 6–8, ECF 152; Clark Decl. ¶¶ 2–4, 6–8; Chose Decl. ¶¶ 2–4, 6–8, ECF 165; Simpson Decl. ¶¶ 2–4, 6–8, ECF 166.  Plaintiffs also state that there is nothing unusual about any of their claims that creates a fundamental conflict with any absent class member.  Mot. 15.  Finally, Plaintiffs argue that they have retained highly capable counsel who have successfully prosecuted consumer and commercial class actions throughout the United States.  *Id.*; *see also* Ex. 54 to Berman Decl., ECF 161-41.  Defendants do not object to the adequacy of the class representatives.  Accordingly, the Court finds that the adequacy requirement is satisfied.

**B.    Plaintiffs Have Not Met the Rule 23(b)(2) Requirements**

Under Rule 23(b)(2), class certification is appropriate "'only where the primary relief sought is declaratory or injunctive.'"  *Friend v. Hertz Corp.*, No. C–07–5222, 2011 WL 750741, at *4 (N.D. Cal. Feb. 24, 2011), *aff'd*, 564 Fed. Appx. 309 (9th Cir. 2014) (quoting *Zinser*, 253 F.3d at 1195).  On the other hand, a class that seeks both monetary and injunctive relief "may be certified pursuant to Rule 23(b)(2) where [the monetary] relief is 'merely incidental to [the] primary claim for injunctive relief.'"  *Zinser*, 253 F.3d at 1195 (quoting *Probe*, 780 F.2d at 780).

18

1   "Where a plaintiff seeks to certify a class under Rule 23(b)(2), such plaintiff must have standing to

2   seek the declaratory and/or injunctive relief sought on behalf of the class."  *Friend*, 2011 WL

3   750741, at *4 (citing *Bates v. United Parcel Serv.*, 511 F.3d 974, 983–85 (9th Cir. 2007) ("In a

4   class action, standing is satisfied if at least one named plaintiff meets the [standing]

5   requirements.")).

6           As all of the named plaintiffs are former AdSense account holders, they do not have

7   standing to seek injunctive relief because they have not shown that they suffer any likelihood of

8   future harm from Google nor can injunctive relief redress their purported injuries.  *Dukes*, 564

9   U.S. at 364 (referencing with approval the court of appeals' conclusion "that those plaintiffs no

10  longer employed by Wal-Mart lack standing to seek injunctive or declaratory relief against its

11  employment practices").  In addition, the absence of any current AdSense account holders among

12  named plaintiffs reflects that any interest the named plaintiffs may have in obtaining injunctive

13  relief is incidental to their request for money damages.  *See Senne v. Kansas City Royals Baseball*

14  *Corp.*, 315 F.R.D. 523, 584 (N.D. Cal. 2016).  Plaintiffs' argument that Google does provide re-

15  entry into the AdSense program on a case-by-case basis is unavailing because the suggestion that

16  the Google would allow re-entry for any of the named class representatives in this case is

17  speculative at best.  *See* Reply 8 (citing Ex. 9 to Suppl. Berman Decl. 3, ECF 213-9 ("Every once

18  in a while, the Spam team will reinstate a partner that was terminated for invalid clicks . . . .")).

19  Accordingly, Plaintiffs have not met the requirements to proceed as a class under Rule 23(b)(2).

20      **C.     Plaintiffs Have Met the Rule 23(b)(3) Requirements as to One Claim for One
               Proposed Class**

21          "[T]he presence of commonality alone [under 23(a)(2)] is not sufficient to fulfill Rule

22  23(b)(3)."  *Hanlon,* 150 F.3d at 1022.  Rather, "[t]o qualify for certification under [Rule 23(b)(3)],

23  a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: common questions

24  must 'predominate over any questions affecting only individual members,' and class resolution

25  must be 'superior to other available methods for the fair and efficient adjudication of the

26  controversy.'"  *Id.* (citing and quoting Fed. R. Civ. P. 23(b)(3)).  In the instant case, Plaintiffs seek

27  to certify two Rule 23(b)(3) classes for damages or restitution.

28

United States District Court
Northern District of California

### i. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citation omitted). The predominance test of Rule 23(b)(3) is "far more demanding" than the commonality test under Rule 23(a)(2). *Id.* at 624. Though common issues need not be "dispositive of the litigation," *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001), they must "present a significant aspect of the case [that] can be resolved for all members of the class in a single adjudication" so as to justify "handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022. Courts must thus separate the issues subject to "generalized proof" from those subject to "individualized proof" to determine whether plaintiffs have satisfied the predominance requirement. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02–1486, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006) ("Predominance requires that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members.") (internal quotation omitted). Whether the predominance requirement is satisfied in a particular case "turns on close scrutiny of 'the relationship between the common and individual issues.'" *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (quoting *Hanlon*, 150 F.3d at 1022).

To apply the predominance standard to the TOS and T&C classes, the Court begins by describing the underlying merits inquiry before turning to the question of how best to conduct such an inquiry. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1191 (2013) ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" (alterations omitted)). Given the similarities between the Rule 23(b)(3) classes, the Court addresses them together, but will separately assess the predominance of common questions claim by claim. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) ("[W]e must analyze each of the plaintiff's claims separately. . . . Each potential class must be analyzed on its own merits, with

consideration given to the elements of the claim at stake." (citation omitted)).

### 1. Cal. Civ. Code § 1671(b) (T&C and TOS classes)

Plaintiffs seek certification of both TOS and T&C classes to prove liability and damages/restitution for violations of California's liquidated damages statute, Cal. Civ. Code § 1671. With the exception of two types of contracts not applicable to this case, "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b). Essential to Plaintiffs' claim under section 1671 is that their own breach of contract led to the assessment of such fees. *Leong v. Square Enix of Am. Holdings, Inc.*, No. CV 09–4484, 2010 WL 1641364, at *6 (C.D. Cal. Apr. 20, 2010) (". . . a claim under § 1671 and for 'illegal penalties' requires a showing that the contractual penalty (1) assesses liquidated damages (2) for breach of the contract."). And, to succeed on their claim, Plaintiffs must show that Google *actually* withheld money owed to them. *Id.*; *Roling v. E*Trade Secs., LLC*, 756 F. Supp. 2d 1179, 1191 (N.D. Cal. 2010) ("Essential to plaintiff's claim under Section 1671 is that their own breach led to the assessment of [liquidated damages]."); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-4000, 2013 WL 57861, at *7 (N.D. Cal. Jan. 3, 2013) (plaintiffs must show that they paid a penalty).

Plaintiffs contend that the following question is common as to the entire class and does not require individualized inquiries: whether the contractual provisions at issue, which are the same for all class members, are unreasonable under the circumstances existing at the time the contract was made. Mot. 17. Plaintiffs state that if the answer is yes, the provisions are unenforceable. *Id.*

Google argues, however, that predominance is lacking because the proposed class impermissibly includes a large number of publishers that were not affected by the Challenged Terms, *i.e.*, that were assessed no penalty. Opp'n 18–19. In support of this argument, Google contends that for Plaintiffs to show that Google actually withheld money under the purported liquidated damages provisions, individualized inquiries and evidence will be required. *Id.* 19. Google further asserts that this inquiry will reveal that the class definitions are overbroad as the classes contain a large number of persons not exposed to or harmed by the challenged conduct,

1   which also precludes a finding of predominance.  *Id.* at 18.  Google provides evidence regarding

2   the named plaintiffs' webpages to demonstrate why predominance is lacking.  The Court discusses

3   only CIS and FRC, as they are the proposed representatives for the Rule 23(b)(3) classes.

4          As to CIS, the proposed representative for the T&C class, Google's evidence shows that it

5   terminated CIS for policy violations.  Ex. 17 to Berman Decl.; Ex. 27 to Wong Decl.  According

6   to Google's reviewers, CIS webpages used formulaic layouts, contained a significant amount of

7   scraped or duplicative content, and provided links to "thin affiliate" sites that themselves were a

8   collection of links.  Clark Dep. 48:13–49:18, 112:6–113:16, 124:4–125:21, 141:1–142:7; Exs. 13–

9   15 to Wong Decl., ECF 197-13–197-15 (three screenshots of CIS pages); Liu Decl. ¶¶ 32–34.

10  Google has submitted evidence in support of its argument that this conduct violates its policies.

11  *See* Ex. 10 to Liu Decl. ("Webmaster Guidelines") 5–6, ECF 195-10 ("Don't create multiple pages

12  . . . or domains with substantially duplicate content"; "Provide unique and relevant content that

13  gives users a reason to visit your site first."); Ex. 6 to Liu Decl. ("AdSense Program Policies") 5,

14  ECF 195-6 (Ads should not be "[p]laced on pages published specifically for the purpose of

15  showing ads.").  In light of these policy violations, Google contends that CIS had no compensable

16  clicks at the time Google terminated its account, and thus cannot show that it was affected by the

17  purported liquidated damages provision in the T&C.

18         As to FRC, the proposed representative for the TOS class, Google's evidence shows that it

19  terminated FRC for invalid clicks.  Ex. 17 to Berman Decl.  Nevertheless, Google contends that

20  contemporaneous evidence at the time it terminated FRC demonstrates that it could have also

21  terminated FRC for policy violations, and thus, none of FRC's clicks were payable.  First,

22  Google's evidence shows that FRC placed all of its ads within iframes, Pettit Dep. 45:18–22,

23  46:9–25, in violation of long-standing Google policy prohibiting placing Google ads on "someone

24  else's website within a frame or window."  Ex. 16 to Liu Decl., ECF 195-16; Ex. 29 to Wong

25  Decl., ECF 197-29.  Second, although Google argues that the aforementioned policy violation is

26  sufficient to warrant a finding that FRC had no compensable clicks such that any withholding was

27  not linked to the purported liquidated damages clause, Google asserts that all of FRC's ad activity

28  was "co-mingled" with a significant amount of spam clicks and was therefore not payable

1    pursuant to paragraph 5 of the TOS.  Loebel-Fried Decl. ¶¶ 56–60; TOS ¶ 5 (clicks or impressions

2    co-mingled with a significant amount of invalid activity are invalid).  Like CIS, Google contends

3    that FRC had no compensable clicks at the time Google terminated its account, and thus cannot

4    show that it was affected by the allegedly unlawful provision.

5         In reply, Plaintiffs contend that such an individualized inquiry is not required because the

6    case is about the lawfulness of Google's withholding of "earnings" reported in the publishers'

7    account, and because their theory is that Google withheld all of the putative class members'

8    "earnings" unlawfully.  Reply 9.  Plaintiffs also reassert their position that Google has waived its

9    right to conduct a "granular adjustment" to the "earnings" displayed on their dashboard by failing

10   to conduct such an analysis prior to zeroing-out their accounts.  *Id.*

11        Plaintiffs, however, miss the mark.  To succeed on their claims under section 1671(b),

12   Plaintiffs must show that the provisions in question assessed a penalty.  *Ubaldi v. SLM Corp.*

13   (*Ubaldi II*), No. 11-cv-1320, 2014 WL 12639953, at *8 (N.D. Cal. Dec. 19, 2014) ("Defendants

14   correctly note that the damages class [under section 1671] can only contain members who actually

15   paid late charges[.]").  *Leong*, 2010 WL 1641364, at *6; *Roling*, 756 F. Supp. 2d at 1191.  Thus,

16   although Plaintiffs argue that Google waived its right to conduct a post hoc granular assessment of

17   the validity of clicks, any alleged waiver on Google's part is irrelevant—Plaintiffs must show that

18   they paid a penalty as a part of their case in chief.  Thus, the question of whether Plaintiffs paid a

19   penalty is not amenable to common proof for all absent class members.

20        In all of the cases involving an alleged liquidated damages provision that this Court

21   identified, there was no dispute on this issue as the "penalty" came straight from the plaintiff's

22   pocket.  *See, e.g.*, *Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252, 1257 (N.D. Cal. 2015) (Zipcar

23   imposed late fees of $50 per each hour (or portion of an hour) that the customer kept the car

24   beyond the end of a reservation, up to a maximum of $150); *Ubaldi v. SLM Corp.*, (*Ubaldi I*), No.

25   11-cv-1320, 2014 WL 1266783, at *1 (N.D. Cal. Mar. 24, 2014) ("Plaintiffs paid late charges on

26   their loans based on a clause in the promissory notes providing for a late charge of the greater of

27   5% of the late installment payment or $5.00.").  In this case, there can only be a penalty where

28   valid click activity was unpaid.  Unlike the cases cited, the Terms did not add any additional

23

charges at termination.

Although Plaintiffs repeatedly emphasize that any revenue existing in their accounts at the time of termination was an "earning," and thus any withholding constituted a penalty, this interpretation has no support in the language of the Terms.  Neither the TOS nor the T&C includes the terms "earnings" or "withheld amounts."  Instead, the Terms define only the right to payment. The T&C include the following language:

> You shall receive a payment related to the number of valid clicks on Ads, the number of valid impressions of Ads . . ., and/or other events performed in connection with the display of Ads on Your Property(ies), in each case as determined by Google for its participants in the Program.

T&C ¶ 11.  The TOS include the following language:

> [Y]ou will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google.

TOS ¶ 5.  Although the Court agrees that use of the term "earnings" would connote a right to the amounts displayed, that is merely attorney argument, and the Court has considered only the contractual provisions regarding payment as delineated above.  In light of the Terms, Plaintiffs arguments regarding predominance fail.

Indeed, in contrast to the liquidated damages classes in *Ubaldi* and *Bayol*, which included only those who actually paid a penalty, Google's evidence suggests that the TOS and T&C classes very likely include plaintiffs who could not have paid a penalty as they had no actual earnings. For example, publishers whose web properties did not comply with Google policies had no right to payment as defined by the contract, and thus had no property right in the amounts displayed on their dashboards.

Case law plainly establishes that "the existence of large numbers of class members who were never exposed to the challenged conduct to begin with" is a "flaw that may defeat predominance."  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136–37 (9th Cir. 2016) (emphasis omitted); *see also Mazza*, 666 F.3d at 596; *Berger*, 741 F.3d at 1068–69.  Google relies on *Berger v. Home Depot USA, Inc.*, *Mazza v. American Honda Motor Corporation*, and *Moore v.*

*Apple Inc.*, 309 F.R.D. 532 (N.D. Cal. 2015), to support its assertion that predominance is not satisfied here for that very reason. *See* Opp'n 18–20. In *Berger*, the Ninth Circuit held that class certification failed because the plaintiffs could not show "that all of the members of his proposed class were exposed to Home Depot's alleged deceptive practices." 741 F.3d at 1069. The Ninth Circuit explained that "[e]ach of the five contracts used by Home Depot require[ed] an independent legal analysis to determine whether the language and design of that contract did or did not suffice to alert customers that the damage waiver was an optional purchase, and thereby did or did not expose that group of customers to a potentially misleading or deceptive statement." *Id.* at 1069.

Similarly, in *Mazza*, the Ninth Circuit held that a class could not be certified because the plaintiffs could not show that "all class members were exposed to Honda's misleading statements." 666 F.3d at 589, 594. There, plaintiffs alleged that Honda had made deceptive and misleading claims about a particular brake system. *Id.* at 585–88. The Court concluded that given the specifics of Honda's advertising campaign and the fact that Honda's advertising materials did not deny that limitations to the system existed and that class members were exposed to disparate information, it was "unreasonable to assume" that all class members were exposed to Honda's misleading statements, and that without such exposure, consumers were not likely to be deceived. *Id.* at 596. Ultimately, the Court concluded, "the relevant class must be defined in such a way to include only members who were exposed to advertising that is alleged to be materially misleading." *Id.*

Applying the Ninth Circuit's analysis in *Mazza*, the court in *Moore* found that the proposed class was overbroad because it included individuals who could not have been injured by Apple's wrongful conduct as a matter of law. 309 F.R.D. at 543.

Here, like in *Berger*, *Mazza*, and *Moore*, not all class members can allege that they have suffered an injury because of the purported liquidated damages clause in light of the contractual language; *i.e.*, they could not have paid a penalty. *See* Loebel-Fried Decl. ¶¶ 74–93; Ex. 12 to Loebel-Fried Decl., ECF 194-12. As the court recognized in *Ubaldi II*, "the damages class [under section 1671] can only contain members who actually paid late charges[.]" 2014 WL 12639953,

at *8.  Because the damages classes contain members who did not actually pay the penalty, the TOS and T&C classes are overbroad and inappropriate for classwide resolution as to this claim. Although the Court suspects that it would be possible for Plaintiffs to narrow the classes to include only those class members who did indeed have earnings, it is not appropriate for the Court to do so *sua sponte*.  The Court also notes that the above discussion supports Google's argument that classwide adjudication of the merits of Plaintiffs' section 1671(b) claims would require the production and presentation of individualized evidence to determine whether each class member actually paid a penalty.

For the foregoing reasons, the Court concludes that Plaintiffs cannot satisfy the predominance requirement for their claims under 1671(b) with respect to either the T&C or the TOS class.

### 2.   California's Unfair Competition Law (T&C and TOS classes)

The UCL prohibits "unlawful, unfair or fraudulent business act [s] or practice[s]" and "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  To state a claim under the UCL, a plaintiff must plead that: (1) defendant engaged in one of the practices prohibited by the statute; and (2) plaintiff suffered actual injury in fact as a result of defendant's actions.  *Laster v. T–Mobile U.S., Inc.,* 407 F.Supp.2d 1181, 1194 (S.D. Cal. 2005).  Plaintiffs allege that Google violated the UCL by its violations of section 1671(b).  Mot. 21.  Because this claim relies on the allegation that withholding the funds from Plaintiffs was unlawful under section 1671, *see id.*, and because the Court has found that the determination of whether the fee is a liquidated damage depends upon individualized evidence, the Court concludes that Plaintiffs UCL claim cannot satisfy the predominance requirement.

### 3.   Breach of Contract (T&C and TOS classes)

Plaintiffs propose two questions that they claim are common as to the entire class: (1) "if the purported liquidated damages clauses are unenforceable, whether Google breached a contractual duty to pay publishers for ad placements not filtered as invalid activity nor violative of policy, where Google claims a prior material breach on the part of the plaintiffs"; and (2) whether Google waived any right it may have had to make even granular withholdings from publishers'

"earnings" by instead choosing to withhold all unpaid "earnings." Mot. 19–20.  Google argues that Plaintiffs cannot show, using common evidence, that Google breached a payment obligation because they must first show they were owed a payment.  Opp'n 14.  Google asserts that the determination of whether each Plaintiff was owed a payment requires individualized evidence, and thus, the predominance requirement is not satisfied.  In reply, Plaintiffs argue that the issue is not whether class members were entitled to a payment, but rather, it is about the lawfulness of Google's withholding of "earnings actually accrued and reported in publishers' accounts."  Reply 9.

The Court need not assess the parties' arguments, however, because the breach of contract claims are premised on the Court determining whether the purported liquidated damages clause  is unenforceable, Mot. 19, and the Court has already held that determination of whether the purported liquidated damages clause is unenforceable will not be made on a classwide basis.  In addition, the second proposed question regarding Google's waiver does not satisfy the predominance requirement—it is a subsidiary question whose answer would have no effect on Plaintiffs' claims.  *See Hanlon*, 150 F.3d at 1022 (common issues predominate only when they constitute such "a significant aspect of the case" that "there is a clear justification for handling the dispute on a representative rather than on an individual basis" (citation omitted)).

### 4. Breach of the Implied Covenant of Good Faith and Fair Dealing (TOS class only)

Under California law, "[e]very contract imposes on each party a duty of good faith and fair dealing in each performance and its enforcement."  *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012) (internal quotation marks omitted).  "The covenant 'is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'"  *Rosenfeld v. JP Morgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (quoting *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995)).  In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the

1    defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and

2    (5) the plaintiff was harmed by the defendant's conduct." *Id.*

3         Plaintiffs claim that Google breached the implied covenant of good faith and fair dealing

4    under the later-effective terms of service by violating its duty to make purely subjective

5    withholding determinations in good faith.  Mot. 20 (emphasis omitted).  Specifically, Plaintiffs

6    assert that Google violated the covenant across the class when it, as a matter of uniform policy,

7    effected wholesale withholdings rather than individualized, granular deductions.  *Id.*  Google

8    contends, however, that individualized inquiries and evidence will predominate over questions of

9    liability on this claim because Plaintiffs would have to prove that each proposed class member

10   substantially performed its contractual obligations.  Opp'n 21.[3]  In reply, Plaintiffs assert that

11   Google's argument is unavailing because the publishers performed by allowing ads to be served

12   via their web properties.  Reply 7; Pettitt Decl. ¶ 6; Hr'g Tr. 17:23–18:3, ECF 211.

13        On this issue, the Court agrees with Plaintiffs: an individualized inquiry is not required

14   because there is a common issue as to what performance means under the contract.  As previously

15   explained, a reasonably jury could find that publishing the ads, in and of itself, constituted

16   substantial performance notwithstanding any policy violations or invalid clicks.  This is because

17   substantial performance requires only that "there be no [willful] departure from the terms of the

18   contract, and that the defects be such as may be easily remedied or compensated, so that the

19   promisee may get practically what the contract calls for."  *Murray's Iron Works*, 158 Cal. App.

20   4th at 1291 (citation omitted).  In light of Pettitt's declaration that FRC (the proposed class

21   representative for the TOS class) "endeavored to comply with Google's contract and with

22   Google's policies, and did not knowingly or willfully violate them," Pettitt Decl. ¶ 6, and the fact

23   that a reasonable jury could conclude that any invalid clicks or policy violations constitutes a

24   defect that could be easily compensated, performance would not need to be determined on an

25   individualized basis.

26        If, indeed, a jury were to determine that Plaintiffs substantially performed simply by

27

28   ─────────────────
     [3] Google does not dispute Plaintiffs' assertion that a common contract is at issue.  *See* Mot. 20.

publishing the ads on their websites, Google's argument regarding the need for individualized evidence fails, and common inquiries and evidence predominate over Plaintiffs claim for breach of the implied covenant of good faith and fair dealing.

Unlike the Court's analysis of the liquidated damages claim, evidence on this issue focuses primarily on Google's conduct, not on the publisher's conduct, once a threshold showing of performance is shown.[4]  This is unlike Plaintiffs' liquidated damages claim where Plaintiffs' payment of a penalty is an element of the claim.  The claim for breach of the implied covenant does not depend on Plaintiffs paying a penalty.

### ii.    Superiority of Class Action

To satisfy Rule 23(b)(3), Plaintiffs also must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23 sets out lists the following factors that Courts should consider in making this determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Court considers this issue only as to the breach of the implied covenant claim brought pursuant to the TOS class, as that is the only class to satisfy all of the other prerequisites to certification.

Plaintiffs argue that class litigation is the superior means of litigating the claims asserted because it is neither feasible nor desirable to have all of the terminated publishers bring separate actions to challenge the fee policies at issue.  Mot. 23.  In particular, Plaintiffs cite the following factors they claim support the superiority of class litigation: (1) most of the withholdings are too

---

[4] Of course a jury may determine that merely hosting a website that attracts clicks is not substantial performance, in which case Plaintiffs will lose on the merits.  But that issue is not before the Court at this time.

United States District Court
Northern District of California

small to engender a desire to control litigation on an individual basis; (2) direct notice can be provided to class members via the contact information maintained by Google; (3) determination of critical issues will be made for class members in one inquiry; and (4) the sums recoverable by class members will be determined from Google's records. *Id.* at 24.  Plaintiffs also contend that the presence of residents of other countries and territories in the proposed class does not undermine its manageability because the contract provisions are all the same; the opposite contracting party is Google; the agreements are all in English except for the Haitian agreement, which is in French and does not differ substantially from its English counterparts; the contracts all share the same California choice-of-law and choice-of-venue provisions; and notice is easily achievable because Google maintains email addresses for all putative class members.  *Id.*

Google disagrees that a class action is the proper vehicle for this suit.  *See* Opp'n 26.  Google makes three arguments in support of its position.  First, Google contends that the need for individual inquiries related to each publisher's "right to recover" would result in the need for it to consider evidence relating to each of the publishers in the classes which would make this litigation unmanageable, or, alternatively, the Court would be depriving Google of its right to use this evidence to defend itself in contravention of the Supreme Court's statement that Plaintiffs cannot conduct a "Trial by Formula."  Opp'n 26 (citing *Dukes*, 564 U.S. at 367).[5]  Second, Google argues that superiority is not met because putative class members have an incentive to run their own litigation given the purported amounts in controversy.  *Id.* at 27–28.  Finally, Google challenges Plaintiffs' assertion that the presence of foreign class members does not undermine the class's manageability.  *Id.* at 28–29.

On the whole, the Court finds that the Rule 23(b)(3) factors support classwide treatment in the instant case as to the putative class members that reside in the United States, but not as to the foreign class members.  As Plaintiffs note, the alternatives to class certification are either hundreds of separate proceedings, which would certainly be time-consuming and inefficient, or an abandonment of claims by most class members since the amount of individual recovery is

---

[5] Because the Court has already addressed this issue with respect to predominance, the Court need not address it here.

1    relatively small—an outcome which is certainly not desirable.  *In re Apple In-App Purchase Litig.*,

2    No. 11-CV-01758, 2013 WL 1856713, at *4 (N.D. Cal. May 2, 2013); *see* Reply 13; Ex. 12 to

3    Loebel-Fried Decl., ECF 194-12 (showing that of roughly ██████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████.  Additionally, given the

6    common questions affecting the class as a whole at the liability stages of this matter and class

7    members' ability to opt out of the monetary relief class, class members have a diminished interest

8    in controlling the common portions of this action.  *Ellis*, 285 F.R.D. at 539–40.  Moreover, the

9    size of the (b)(3) class is manageable, and Google does not argue otherwise.

10          The Court does agree with Google, however, that the presence of foreign class members is

11   problematic.  "Although the issue has not been addressed by the Ninth Circuit, other federal

12   district courts have held that [c]ourts may properly consider res judicata concerns when evaluating

13   the Superiority Requirement with respect to a proposed class that includes foreign class

14   members."  *Gbarabe v. Chevron Corp.*, No. 14-CV-00173, 2017 WL 956628, at *36 (N.D. Cal.

15   Mar. 13, 2017) (citations and internal quotation marks omitted).  The trending approach of federal

16   courts nationwide appears to be evaluating the res judicata effects of class judgments with respect

17   to groups of foreign plaintiffs and then excluding from the class those whose home countries

18   would not honor a class judgment from the United States.  *See, e.g.*, *Wilcox v. Lloyds TSB Bank,*

19   *PLC*, Civ. No. 13-508, 2016 WL 8679353, at *9–14 (D. Haw. Jan. 8, 2016); *Anwar v. Fairfield*

20   *Greenwich Ltd.*, 289 F.R.D. 105, 114–21 (S.D.N.Y. 2013), *vacated on other grounds by St.*

21   *Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V.*, 570 Fed. Appx. 37 (2d Cir. 2014);

22   *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 301 (D. Del. 2003).  Such exclusions have

23   occurred notwithstanding these courts' recognition that class manageability is only one of multiple

24   factors to be considered under Rule 23(b)(3), and that res judicata risks as to foreign plaintiffs

25   should be evaluated "along a continuum."  *Anwar*, 289 F.R.D. at 115 (quoting *In re Vivendi*

26   *Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007)).  These courts have also clarified that it is

27   plaintiffs' burden to "demonstrat[e] that 'foreign court recognition is more likely than not'" as to a

28   U.S. class judgment.  *Id.* (citing and quoting *In re Alstrom SA Sec. Litig.*, 253 F.R.D. 266, 282

1     (S.D.N.Y. 2008)).  To that end, where plaintiffs have failed to adequately brief res judicata

2     concerns related to foreign class members, courts have found it appropriate to exclude those

3     members from the class altogether.  *See, e.g.*, *In re Daimler Chrysler*, 216 F.R.D. at 301

4     (excluding foreign plaintiffs where "Lead Plaintiffs have not adequately responded to Defendants'

5     concerns regarding the issues of class management and damages suffered by purchasers on foreign

6     exchanges"); *In re Vivendi Universal*, 242 F.R.D. at 105 (excluding class members from foreign

7     countries as to which plaintiffs' expert opinions fell "short of establishing a probability that [the]

8     court would grant preclusive effect to any judgment or settlement issuing from this action").

9           Here, Plaintiffs have not met their burden with respect to the foreign class members.  The

10    Court does not have the benefit of a developed record on country-by-country preclusion

11    considerations and declines to certify a class including foreign plaintiffs in whose home countries

12    Plaintiffs have not shown a probability of res judicata effects.  *See In re DaimlerChrysler*, 216

13    F.R.D. at 301 (excluding foreign class members due to plaintiffs' failure to provide evidence

14    overcoming res judicata concerns); *In re Vivendi Universal*, 242 F.R.D. at 105 (same).  Indeed the

15    only evidence provided to the Court is a declaration of Google's expert, who declares that the

16    Commonwealth of the Bahamas, Barbados, Jamaica, Saint Lucia, and the Republic of Trinidad

17    and Tobago, would be "highly unlikely" to give this Court's ruling a res judicata effect.  Corbett

18    Decl. ¶¶ 1, 16–17, ECF 180.

19          The Court, however, need not decline to certify *any* class; the Court can simply define the

20    class to exclude class members whose AdSense accounts were subject to Google's TOS for any

21    country other than the United States.  *See, e.g.*, *In re DaimlerChrysler*, 216 F.R.D. at 301 (finding

22    that "Lead Plaintiffs have not adequately responded to Defendants' concerns" regarding foreign

23    plaintiffs but concluding that "the appropriate way in which to address the concerns related to

24    foreign investors is not to deny class certification, but to certify a class comprising only domestic

25    investors").  In light of the foregoing, and the current trend in federal courts, the Court finds that

26    redefining the class in such a way is appropriate here.  Having considered all of the factors under

27    Rule 23(b)(3), the Court concludes that the class in this case should be limited to members whose

28    AdSense accounts were subject to Google's TOS for the United States, who appear to pose no

United States District Court
Northern District of California

32

cognizable res judicata concerns for Google.  All other plaintiffs will be excluded from the class for the reasons discussed above.

### D.   Appointment of Lead Counsel

Federal Rule of Civil Procedure 23(g)(2) states that: "When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4).  Rule 23(g)(1) requires the court to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23.  In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Rule 23(g)(4) states that the duty of class counsel is to fairly and adequately represent the interests of the class.

Plaintiffs have retained highly capable counsel with extensive experience in successfully prosecuting consumer class actions throughout the United States. Ex. 54 to Berman Decl. Accordingly, and without any opposition, the Court finds that Hagens Berman is adequate under Rule 23(g)(1) and (4).

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.   Plaintiffs' Motion for Class Certification is GRANTED IN PART and DENIED IN PART.  The action is certified for the Rule 23(b)(3) Terms-of-Service Class only as to the claim for breach of the implied covenant of good faith and fair dealing.  Moreover, the class will be limited to plaintiffs whose AdSense accounts were subject to Google's TOS for the United States. Plaintiffs' motion is otherwise DENIED.

2.   Pursuant to Rule 23(c)(1)(B),

a.   The class is defined as, "all former or current Google AdSense publishers: (1) whose AdSense accounts were subject to Google's terms of service for the

United States District Court
Northern District of California

United States; (2) whose AdSense account Google disabled or terminated for any breach of contract, including policy violations or invalid activity, on any date between and including April 23, 2013, and the date of judgment in this matter; (3) whose last AdSense program earnings or unpaid amounts Google withheld in their entirety, and permanently, in connection with such disablement or termination; and (4) who submitted a written notice of dispute to Google within 30 days of notice from Google of withholding from their AdSense publishers' accounts."

    b.  The class issue is whether Google breached the implied covenant of good faith and fair dealing under the later-effective terms of service by violating its duty to make purely subjective withholding determinations in good faith.

3.    The Court appoints Free Range Content, Inc. as the class representative.

4.    Pursuant to Rule 23(g), the Court appoints Hagens Berman Sobol Shapiro LLP as class counsel.

5.    The parties shall meet and confer no later than August 10, 2017, as to whether notice should be given to the class pursuant to Rule 23(c)(2)(B).

**IT IS SO ORDERED.**

Dated: July 13, 2017

_____
BETH LABSON FREEMAN
United States District Judge